UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

COMPASS-CHARLOTTE 1031, LLC,

                          Plaintiff,

    -against-

PRIME CAPITAL VENTURES, LLC
BERONE CAPITAL FUND, LP
BERONE CAPITAL PARTNERS LLC
BERONE CAPITAL LLC
BERONE CAPITAL EQUITY FUND I, LP
405 MOTORSPORTS LLC f/k/a Berone Capital Equity
Partners LLC

                          Defendants.

_____

Case No.:  1:24-cv-55 (MAD/DJS)

**VERIFIED COMPLAINT**

(DEMAND FOR JURY TRIAL)

      Plaintiff Compass-Charlotte 1031, LLC ("Compass-Charlotte"), through its attorneys, Hinckley, Allen & Snyder LLP, for its Complaint against Defendants Prime Capital Ventures, LLC ("Prime"), Berone Capital Fund, LP, Berone Capital Partners LLC, Berone Capital LLC, Berone Capital Equity Fund I, LP, and 405 Motorsports LLC f/k/a Berone Capital Equity Partners LLC (collectively "Berone Capital") alleges as follows:

**PRELIMINARY STATEMENT**

      1.    This case involves what appears to be a multi-state fraud scheme with victims holding claims for well over $50 million for return of deposits which were paid and then not returned.  That $50+ million of deposits has gone missing (including a nearly $16 million deposit of Plaintiff Compass-Charlotte).  The immediate appointment of a receiver is required to find the deposits and return those deposits to Plaintiff and other creditors.

      2.    Prime and Berone Capital are joint venture partners who together operate under the name "Prime Capital Ventures LLC."  They claim to provide third parties with loans in the form of lines of credit.  They promise that if a third party sends them 20% of the loan value in cash

upfront (which they refer to as an "interest credit account" or "ICA deposit"), then they will hold that amount to pay interest on the line of credit they promise to advance to the third party.

3.     However, Prime and Berone Capital have repeatedly taken such deposits, failed to advance lines of credit, and then failed to return the deposits when contractually required to do so. Prime has repeatedly and falsely told Compass-Charlotte (and numerous other victims) that the funds are going to be returned any moment or that the wire has already been sent (all with no return of funds).

4.     Indeed, Prime and Berone Capital have taken over $50 million of ICA deposits from unsuspecting victims (like plaintiff Compass-Charlotte) and now those funds are gone and their location is unknown, *even after a federal bankruptcy court issued multiple orders attempting to locate the funds and entered a sanctions order against Berone Capital for non-compliance*.[1]

5.     Prime Capital Ventures claims to have made and funded hundreds of millions of dollars in loans from its Albany, New York headquarters, but is not even registered with the New York Secretary of State to conduct business in New York.

6.     Prime's principal told the federal bankruptcy court that a Rochester accounting firm has all of Prime's books and records and "completely handle our accounting, one hundred percent." Yet that same accountant thereafter responded to the trustee appointed by the bankruptcy court that "I do not have the books and records for this company" and "I have no record of this company". Those books and records have not been located. Indeed, Prime was unable to even

---

[1] Compass-Charlotte and other Prime creditors filed an involuntary bankruptcy petition against Prime on December 19, 2023 (*In re Prime Capital Ventures, LLC*, 23-11302 (Bankr. N.D.N.Y.) ("Prime Bankruptcy Case"), which was dismissed upon motion of the petitioning creditors on January 9, 2024. Prime Bankruptcy Case, Doc. 87.

provide the bankruptcy trustee with the most basic of financial statements (like a balance sheet or income statement), although the trustee requested them numerous times.

7.      Prime's books and records are not the only thing that seems to have gone missing. No one can seem to find Berone Capital.

a.   Berone Capital defaulted on an order to show cause issued in the Prime Bankruptcy Case regarding Berone Capital's failure to respond to discovery demands.

b.  It appears to have no physical offices.  The addresses it does list are to a mailbox at a UPS store in Georgia and to a $99 / month "virtual office" in Miami, Florida.

c.  No one responds to its phone or to emails.

d.  Two of the Berone Capital entities, including the general partner of the fund which allegedly holds the $50+ million plus in deposits, voluntarily dissolved on November 29, 2023.

e.  And Berone Capital appears to have made false statements in its filings with the Securities and Exchange Commission ("SEC") (as discussed below).

8.      If Prime and Berone Capital are legitimate entities conducting legitimate businesses, they should be willing to immediately provide information to the Court and a third-party receiver appointed by the Court to confirm where the missing $50+ million in deposits is (including Compass-Charlotte's $16 million deposit) and that they are solvent and can repay the millions of dollars of deposits that are owed.

9.      ***This is not a case about liability***.  Prime has admitted multiple times that it owes the $16 million deposit back to Compass-Charlotte and has sent texts and emails that those funds are on the way and being wired.  Yet no funds have been returned and now Prime cannot say where Compass-Charlotte's deposit is.

10.     This lawsuit is filed for the recovery by Compass-Charlotte of its deposit.  It is also filed to determine whether Prime and Berone Capital ever ran a legitimate business at all, or, as is strongly suspected, they have simply operated a multi-million dollar fraud scheme across multiple states.

## PARTIES

11.     Compass-Charlotte is a limited liability company with a principal place of business in Greenville, North Carolina.

12.     The sole member of Compass-Charlotte is Compass Landing Apartment Homes, LLC, a limited liability company with a principal place of business in Newport, North Carolina.

13.     The sole member of Compass Landing Apartment Homes, LLC is Exempt Trust f/b/o Thomas F. Taft, Sr. under Article IV(D) of the Helen Fleming Taft Revocable Living Trust, dated 11/14/2000 ("Exempt Trust").

14.     The Trustee of Exempt Trust is Thomas F. Taft, Sr., a North Carolina resident.

15.     Upon information and belief, Prime is a Delaware limited liability corporation with a principal place of business at 66 Pearl Street, Albany, New York.

16.     It is unknown exactly who the members of Prime are.

17.     Prime alleged in its complaint in the matter *Prime Capital Ventures, LLC v. Reign Financial International, Inc.*, Case No. 23-cv-207 (N.D.N.Y.), that "Prime is a citizen of the State of New York because Prime's sole member, Kris Roglieri, is a resident of the State of New York." *See id.*, Dkt. No. 1 ¶ 2.

18.     However, the website for Prime Commercial Lending, a Prime affiliate, states that "Kris [Roglieri] owns and operates Prime Capital Ventures which is a dedicated fund under Prime

Commercial Lending to fund large commercial real estate, energy and infrastructure projects nationally and internationally."  (https://primecommerciallending.com/about-us/)

19.     In addition, Berone Capital is named as the "Managing Member" of the business to be conducted under the name of Prime, according to a joint venture agreement between Prime and Berone Capital.

20.     There are a number of Berone Capital entities and it is unclear whether one or all of them are the "Managing Member" for Prime.

21.     Upon information and belief each of the Berone Capital entities are managed and controlled by two individuals: Jeremiah Beguesse and Fabian Stone, who appear to be residents of either Georgia or Florida.

22.     Berone Capital LLC was formed as a Delaware limited liability company on June 24, 2021.

23.     Berone Capital Fund LP was formed as a Delaware limited partnership on July 12, 2021.

24.     Berone Capital Equity Partners, LLC was formed as a Florida limited liability company on November 14, 2021.  In March 2023, it changed its name to 405 Motorsports LLC, and then filed a voluntary dissolution on November 29, 2023.  A Florida Secretary of State printout showing that dissolution is attached as Exhibit 1.[2]

25.     Berone Capital Equity Fund I, LP was formed as a Delaware limited partnership on November 14, 2021.

---

[2] The Georgia Secretary of State lists a September 8, 2023 dissolution date for this Berone Capital entity. Exhibit 2.

26.     Berone Capital Partners LLC was formed as a Florida limited liability company on November 29, 2021.  It is listed on Florida Secretary of State as being voluntarily dissolved as of November 29, 2023.  A Florida Secretary of State printout showing that dissolution is attached as Exhibit 3.

27.     Berone Capital Holdings, LLC was formed as a Delaware limited liability company on December 17, 2021.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

29.     This Court has personal jurisdiction over Prime because it maintains its principal place of business in the State of New York, continues to operate commercial enterprises in New York, and its contacts with New York are sufficient such that exercising jurisdiction over it would not offend traditional notions of fair play and substantial justice.

30.     The Court has personal jurisdiction over the Berone Capital entities because they are the "Managing Member" of the joint venture with Prime which does business under the name Prime Capital Ventures, LLC, with the business operating out of New York.

31.     Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b) because this is a district in which a substantial part of the events or omissions giving rise to the claims occurred, and in which Defendants are subject to the Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

### A.  Kris Roglieri and His Family of Companies

32.     Kris Roglieri ("Roglieri") is a businessman / financier who lives in Queensbury, New York.

33.     Roglieri is associated with numerous entities which he created or leads, including the following (among others):

(a) Prime Commercial Lending (www.primecommerciallending.com);

(b) The Finance Marketing Group;

(c) Commercial Capital Training Group (www.commercialcapitaltrainging.com);

(d) National Alliance of Commercial Loan Brokers; and

(e) Deal Maker (a publication for the Commercial Loan Brokerage Industry).

Attached as Exhibit 4 is a webpage from the Commercial Capital Training Group website which describes these entities as "A family of companies" and describes their origin and connections, all centered around Roglieri.

34.     A printout of Roglieri's LinkedIn page is attached hereto as Exhibit 5.

35.     Per the New York Secretary of State, Prime Commercial Lending, LLC ("Prime Commercial") was formed as a New York limited liability company on July 26, 2006.  Per its website, its principal place of business is at 66 South Pearl Street, 10th Floor.

36.     From various online filings, it appears that Prime Commercial was a small-time lender making loans as small as $22,000 business lines of credit up to $2,000,000 commercial real estate loans.

37.     For    instance,    Prime    Commercial    maintains    a    Facebook    page (facebook.com/primecommerciallend).  According to a May 12, 2022 posting, Prime Commercial

offers "commercial financing from $100,000 to $2,000,000 on a wide range of commercial property types."



38.     In  another Facebook posting (March 1, 2022), Prime Commercial said "Check out these recently funded transactions by Prime Commercial Lending team this week" and listed the following:



**B.  Interest Rates and Formation of Prime**

39.     Between the global financial crisis in 2008 and March 2022, the Federal Reserve kept prime interest rates at extremely low levels, with the Prime Rate staying around 3.25% for most of that period.

40.     On December 14, 2021, Roglieri formed Prime Capital Ventures, LLC as a Delaware limited liability company.  *See* Exhibit 6 (printout from Delaware Secretary of State website).

41.     According to a federal court complaint filed by Prime as plaintiff in the United States District Court for the Northern District of New York, Prime has "its principal place of business in Albany County, New York" and it is a citizen of New York "because Prime's sole member, Kris Roglieri, is a resident of the State of New York." *Prime Capital Ventures, LLC v. Reign Financial International, Inc. et. al.* (23-cv-207, NDNY) (the "Reign Lawsuit"), Dkt. No. 4 (First Amended Complaint) at ¶¶ 1-2 (attached hereto as Exhibit 7).

42.     Upon information and belief, at all times, Roglieri was also the sole manager of Prime and acted as its Chief Executive Officer.

43.     Although Roglieri operated Prime from Albany, New York, he never registered Prime to do business there (as reflected by the lack of any registration with the NY Secretary of State).

44.     Further details about Prime and Prime Commercial are included in the "About Us" section of Prime Commercial's website, a copy of which is attached hereto as Exhibit 8.

**C.  Formation of Berone Capital entities.**

45.     Like Prime, the Berone Capital entities were also formed in 2021.

46.     According to its website (beronecapital.com), Berone Capital claims to be an asset management firm.  "Berone Capital was founded to become industry disrupters.  Our firm strategically uses an assortment of traditional and non-traditional investment vehicles to attract and deploy assets under management."

47.     Berone Capital was formed by two individuals: Jeremiah Beguesse and Fabian Stone.

a.  Jeremiah Beguesse

48.     Per his LinkedIn profile, Jeremiah Beguesse graduated from Nova Southeastern University with a Bachelor's Degree in 2014.  A copy of his LinkedIn profile page is attached as Exhibit 9.

49.     After graduating from college, Mr. Beguesse moved around between various investment firms.  Indeed, his Investment Advisor Public Disclosure (IAPD) filed with the SEC indicates that before he founded Berone Capital, he was at 6 different investment firms, with his tenure at each being one year or less.

50.     In November 2021, Mr. Beguesse (CRD#6121650) registered Berone Capital LLC (CRD #316412) with the SEC.  A copy of that Investment Adviser Firm Summary is attached as Exhibit 10.

51.     The report filed with the SEC lists Mr. Beguesse's current employer as Berone Capital LLC and his LinkedIn page states that he is the Chief Investment Officer of Berone Capital.

52.     A copy of Mr. Beguesse's IAPD Report from the SEC is attached as Exhibit 11.

b.  Fabian Stone

53.     Berone was also formed by Fabian Stone.  According to Mr. Stone's LinkedIn profile, he has no background or experience in the financial services or investment advisor industry but has a background in healthcare.  A copy of that LinkedIn profile is attached as Exhibit 12.

54.     The About Us section of the Berone Capital website states this about Fabian Stone (https://beronecapital.com/aboutberone/):

> As Founder & Chief Operating Officer at Berone Capital, Fabian Stone is responsible for the operations and strategic agenda of the company.  He brings more than 22 years of experience and an extensive & diverse network to Berone Capital.  His experience and leadership have been focused on developing and scaling business services and solutions, providing an outstanding client experience,

11

and driving profitable revenue growth.  Fabian also operationalizes the core values & vision of Berone Capital.

55.     The statement about Fabian Stone having "22 years of experience" appears to be false.

56.     According to a Form ADV Part 2A Disclosure Brochure filed by Berone Capital with the SEC (Exhibit 13), Fabian Stone's business background only goes back to 2010 (indeed he only graduated from college in 2009).  At the same time as supposedly being the "Manager and Chief Operations Officer" for Berone Capital, Fabian Stone lists a regular job at AthenaHealth as a Senior Strategic Partner Associate.

57.     In its June 9, 2023 Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers (the "Berone 2023 ADV"), Berone Capital LLC listed both Beguesse and Stone as the control persons for Berone Capital LLC.  A copy of the Berone 2023 ADV is attached as Exhibit 14.

58.     The Berone 2023 ADV includes the following:

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| BEGUESSE, JEREMIAH | I | MANAGER & CHIEF COMPLIANCE OFFICER | 06/2021 | D | Y | N | 6121650 |
| Stone, Fabian | I | MANAGER | 06/2021 | D | Y | N | 7443107 |

To the extent the reference to 7443107 related to Fabian Stone was intended to reference a CRD No., it is false as Mr. Stone was never a registered broker or investment advisor.

59.     The Berone 2023 ADV also stated that Berone Capital was only managing around $4,000,000 and all of that money was being managed for individuals.  The Berone 2023 ADV states that Berone was not managing funds for any corporate entities.  This statement in the Berone 2023 ADV appears to also be false as discussed more fully below.

### c.  No physical offices or locations

60.     The Berone Capital website alleges that Berone Capital has offices in Atlanta, Georgia and Miami, Florida, but provides no physical addresses.

61.     Upon information and belief, none of the Berone Capital entities have ever had any actual physical business location or office.

62.     The address listed for Berone Capital LLC in the Berone 2023 ADV is 3595 Canton Road, Suite 312-223, Marietta, Georgia 30066.  That address is a private mailbox at a UPS Store. (Exhibit 15) (the "UPS Store Address").

63.     The principal place of business for Berone Capital Partners LLC as listed with the Florida Secretary of State is 848 Brickell Avenue Penthouse 5-D61, Miami, FL 33131 (the "Virtual Office Address").  That address is for a company that provides $99 / month "virtual offices" (essentially a receptionist to answer the phone and a mailbox).  (Exhibit 16).

64.     In a Form ADV Part 2b Brochure Supplement filed with the SEC in June 2023 (Exhibit 17), Beguesse listed an address for Berone Capital LLC at 530 Delphinium Way, Acworth, GA 30102 (the "Stone Family Address").  However, Cobb County Georgia Tax Collector records indicate that address is a private residence owned by Bryon and Lishia Stone.

65.     Accordingly, every indication is that Berone Capital's claim to have offices in Atlanta and Miami is false and designed to make it appear to be a legitimate business.

### d.  The "Fund"

66.     On October 21, 2021, Fabian Stone as the Manager of Berone Capital Fund, LP (hereafter the "Berone Capital Fund") filed with the SEC a "Notice of Exempt Offering of Securities."  A copy of that Notice is attached as Exhibit 18.

67.     The Notice listed the Stone Family Address as the principal place of business of the Berone Capital Fund.  It listed four "Related Persons" all with the UPS Store Address:

(a) Fabian Stone - Executive Officer

(b) Jeremiah Beguesse - Executive Officer

(c) Berone Capital Partners LLC - General Partner

(d) Berone Capital LLC - Investment Manager

68.     The Notice stated that Berone Capital Fund, LP was going to operate as a "Hedge Fund" with a minimum investment of $1,000,000 but no definite offering amount.

**D.  Prime Creates Fraudulent Story About $188 Million Georgia Loan**

69.     Starting in March 2022, the Federal Reserve began to quickly raise interest rates, ultimately leading to a prime rate of 8.5% which became effective on July 27, 2023, a dramatic 5% increase in a little over a year.  The following chart shows those interest rates increases:

| Effective Date | Rate |
| --- | --- |
| 7/27/2023 | 8.50% |
| 5/4/2023 | 8.25% |
| 3/23/2023 | 8.00% |
| 2/2/2023 | 7.75% |
| 12/15/2022 | 7.50% |
| 11/3/2022 | 7.00% |
| 9/22/2022 | 6.25% |
| 7/28/2022 | 5.50% |
| 6/16/2022 | 4.75% |
| 5/5/2022 | 4.00% |
| 3/17/2022 | 3.50% |

70.     These interest rate increases caused many borrowers challenges in obtaining funding from traditional bank lenders, and caused them to look to private equity lenders.

71.     Upon information and belief, Roglieri viewed the rising interest rates as an opportunity to defraud third parties by the strategy described hereafter.

72.     Roglieri knew that in order to gain the confidence of third parties, he needed to make them believe that Prime had the ability to make large commercial loans.  To do this, he joined with other individuals to create an entirely fraudulent story about Prime and past lending deals that it had allegedly done.

73.     On March 17, 2022 (the same day the Fed started raising interest rates), Roglieri (through Prime Commercial) put out a public relations newswire announcing that "Prime Capital Ventures, which serves as Prime Commercial Lending's Large Balance Real Estate Fund" had funded a "successful $188 million deal with ALUX Properties, LLC for The Bailey, slated to be the first 5-Star luxury hotel and mixed-use property in Atlanta, GA."  A copy of this PR newswire is attached hereto as Exhibit 19.

74.     As part of his marketing campaign, Roglieri created a slick YouTube video touting the alleged $188 million loan to ALUX Properties.  Among other things, that video stated about Prime: "We Are Not Bankers . . . We Are Entrepreneurial Bankers."[3]

---

[3] The Prime website (primecommerciallending.com) states on its homepage that Prime is "A Boutique Investment Bank."  Any statements that Prime or Prime Commercial Lending are "banks" or "bankers" is false.



75.     This marketing was a complete fraud, as Prime Capital Ventures never made any such loan to ALUX Properties.

76.     In fact, a search of land records in Atlanta (Fulton County) reveal that ALUX Properties never owned any real estate there and there is no recorded mortgage or other collateral loan documents recorded by Prime.

77.     On May 2, 2022, Roglieri doubled down on the marketing by having his affiliated company, DealMaker Magazine, publish an article entitled "Roglieri Unveils Prime Capital Ventures, Prime Commercial Lending's Newest Fund."  A copy of the article is attached as Exhibit 20.

78.     The article states that Prime was "a fund specifically designed to provide capital for large development, commercial development and commercial real estate transactions from $50 million to more than $1 billion."

79.     The article describes Prime as a "subsidiary" and "in-house fund" of Prime Commercial.

80.     The description of Prime as a "subsidiary" of Prime Commercial is contrary to Prime's own allegation in its federal court pleadings that it is wholly owned by Roglieri.

81.     In the article, Roglieri said that Prime would offer non-recourse lines of credit with rates at 4% to 6% with interest-only payments, but would require borrowers to provide 20% cash upfront based on the total project cost.  The 20% would be paid to Prime to hold "as prepaid interest throughout the term of the loan."  As interest payments became due "we would just deduct it from the 20% down payment.  It's a unique way of doing things, but it ensures our payback, and it serves as additional collateral for the loan throughout the term."

82.     In order to convince third-parties that Prime was a legitimate lender, Roglieri claimed in the article that Prime (just founded some 6 months before) had already funded multiple large commercial lending deals including:

(a) the $188 million "Bailey" project in Atlanta;

(b) apartment complexes in South Korea for $110 million and $300 million; and

(c) $2.3 billion in Dubai for a "massive mixed use property in the city's center."

83.     Upon information and belief, the alleged projects in South Korea and Dubai were completely fabricated to induce unsuspecting victims to deposit funds with Prime on the basis that it was going to provide a loan.

84.     In June 2022, a lawsuit was filed in Superior Court in Fulton County, Georgia against ALUX Properties and various other defendants (the "ALUX Complaint").  A copy of the verified ALUX Complaint is attached hereto as Exhibit 21.

85.     The complaint details how the ALUX Properties deal was used to steal $10,000,000 from a third party investor.  At Paragraphs 80 and 81 it details how "Kris Roglieri, the CEO of

Prime Capital Ventures, verified the wiring instructions for the $10,000,000 wire transfer, and later created a video with Defendant Brandon Wheeless in Atlanta" about the alleged hotel project.

86.    Notably, Exhibit E to the ALUX Complaint is a December 14, 2021[4] $169,320,000 Development Line of Credit Agreement with a Delaware entity called Blackwater Capital Group, LLC which required a $10,000,000 ICA Payment.  The form of the Development Line of Credit Agreement used by Blackwater Capital Group is identical to the form of agreement that Prime used with Compass-Charlotte as described below.

87.    On September 13, 2022, the Georgia Superior Court appointed a receiver over ALUX Properties and other defendants.  A copy of that order is attached hereto as Exhibit 22.

88.    The receiver appointed by the Georgia court was fortunately able to recover the $10,000,000 in that case as it was sitting in an account at PNC Bank in the name of Vanguard Holdings Group, LLC.  However, the Georgia court concluded that the entire situation was "a scheme to defraud Plaintiffs out of $10,000,000" and referred to the Development Line of Credit with Blackwater Capital Group, LLC as a "total fraud."[5]  A copy of that judgment is attached hereto as Exhibit 23.  A final judgment was entered against ALUX Properties, LLC and certain conspiring entities on August 4, 2023 (attached as Exhibit 24).

89.    Despite knowing that Prime never made any loan to ALUX Properties, Roglieri and Prime never removed their online YouTube video and continued to list it (and the video) on the

---

[4] December 14, 2021 is also the date that Prime was formed as a Delaware limited liability company.

[5] The exact relationship between Prime, Roglieri, Blackwater Capital Group, LLC, and Vanguard Holdings Group, LLC is presently unknown but the fact that Prime and Blackwater used an identical Development Line of Credit Agreement speaks volumes, as does the fact that it was Roglieri who "verified the wiring instructions for the $10,000,000.00 wire transfer" as part of the scheme to defraud the Georgia lawsuit plaintiffs.  Exhibit 21 at ¶ 80.

Prime website through at least January 9, 2024 (www.primecommerciallending.com/recently-funded):



90.     Even while ALUX Properties had been put into receivership in September 2022, Roglieri and Prime have continued to this day to tout that completely fictitious loan deal in order to ensnare unsuspecting third parties as victims.

91.     The Georgia Secretary of State's website lists ALUX Properties as dissolved in September 2023, yet Prime continues to tout the fictional deal on its website to this day. [6]

---

[6] Prime and Roglieri also added an air of legitimacy to their operation by including in the "About Us" section of their website, the picture and bio of their "Lead Counsel," an attorney at a well-regarded law

### E.  Prime and Berone Capital Enter Into a Joint Venture

92.     Based upon public representations made by Prime to the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court"), Prime and Berone Capital were partners in a joint venture agreement.

93.     Upon information and belief, a true and correct copy of that Joint Venture Agreement dated August 16, 2022 is attached hereto as Exhibit 25.

94.     The Joint Venture Agreement states that Berone Capital will be the "Managing Member" of the joint venture while Prime will be the "PC Member."

95.     The Joint Venture Agreement also states that "The business of the Agreement shall be to conducted [sic] business under the name Prime Capital Ventures, LLC or such other name as the Members may hereafter approve."

96.     Prime, as the PC Member, had the responsibility to identify third parties who needed a line of credit and then administer all aspects related to the line of credit.

97.     Berone Capital had the responsibility to obtain money for the proposed line of credit ("the Managing Member shall facilitate the initial Business LOC through Network Lenders necessary for the PC Member to identify and secure additional projects on an on-going basis.")

98.     Profits of the joint venture of the business conducted under the name of "Prime Capital Ventures, LLC" would be split by Prime and Berone Capital equally (50/50).

99.     Prime also publicly represented to the Bankruptcy Court that it was a "subscriber" in the Berone Capital Fund.

---

firm.  See Exhibit 8.  That section included a link which went directly to the law firm's webpage for that attorney.

100.    Before this information came out in the bankruptcy, Compass-Charlotte was unaware that Berone and Prime were joint venture partners and jointly operating under the name "Prime Capital Ventures, LLC."

**F.  Prime and Roglieri Start to Receive Deposits**

101.    With its joint venture agreement in place and based upon online marketing and in-person communications, Roglieri and Prime were able to convince multiple companies around the country to believe them and to wire money to Prime with the expectation that Prime was going to extend them loans or lines of credit.

102.    Upon information and belief, Roglieri and Prime took the money wired by borrowers and, instead of holding it in segregated interest accounts, used it for other purposes, including alternative investments and to fund Roglieri's flashy lifestyle.

103.    Upon information and belief, Prime and Berone never made any loans or lines of credit available to anyone or, if they did, only made a few small loans and defaulted on providing the promised loans to most borrowers.

104.    The first victim that Compass-Charlotte currently knows about is Onward Partners, LLC ("Onward").  Per federal court filings, in September 2022, Prime entered into a Business Expansion Line of Credit Agreement with Onward whereby Prime was required to provide a $107 million line of credit.  On September 22, 2022 Onward and its affiliate wired $20 million to Prime to establish an interest credit account (called an "ICA Payment"), which was to be used solely to pay interest payments once Prime had extended the line of credit.[7]

105.    Prime was required to make the first advance on the line of credit to Onward by February 9, 2023, but failed to do so, and has failed to do so since then.

---

[7] This was just a week or so after the Georgia Superior Court appointed a receiver over ALUX Properties.

106.     Onward demanded its deposit back but has never received the full amount.[8]   That led Onward to file a federal court lawsuit against Prime and Roglieri in the United States District Court for the District of Utah on November 13, 2023 alleging, among other things, fraud, conversion, unjust enrichment and piercing the corporate veil (Case No. 23-cv-833).  A copy of that complaint (the "*Onward* Complaint") is attached hereto as <u>Exhibit 26</u>.

107.     According to the *Onward* case docket, Roglieri's response to the *Onward* Complaint was due on December 6, 2023 and Onward's response was due on December 12, 2023. By failing to timely respond, Roglieri and Prime have admitted the allegations in the *Onward* Complaint, including the allegations about their fraud and conversion.

**G.  Prime Claims to Lose $20 Million in Alleged Scam with Berone Capital**

108.     On February 15, 2023 (just a few days after it was supposed to make the first advance to Onward), Prime filed a federal court lawsuit in the United States District Court for the Northern District of New York against third-party Reign Financial International, Inc. (Case No. 23-cv-207, NDNY).

109.      According to the First Amended Complaint in the Reign Lawsuit, Prime was induced by Reign to:

> deposit the [$20,000,000] Investment Funds with non-party hedge fund Berone Capital Fund, L.P. ("Berone"), under the pretense that such funds would be used by Reign to participate in a transaction platform involving arbitrage of international commercial private placement programs (the "Program").

---

[8] Onward is not the only victim who gave Prime an ICA Deposit in 2022 and has not received it back.  Upon information and belief, B&R Acquisitions gave Prime an ICA Deposit of $4.3 million in November 2022 (discussed further below) and was forced to file arbitration (which is still pending) when Prime failed to return that deposit.

<u>Exhibit 7</u> ¶ 11.  Reign then "took out a line of credit against Prime's account at Berone Capital and absconded with more than $12,000,000 dollars in loan proceeds."  *Id*. ¶ 12.  Based on this conduct, Prime sued Reign (but not Berone Capital) for "fraud, fraudulent concealment, breach of contract and conversion."[9]

110.    The Reign Lawsuit does not disclose that Berone Capital was a joint venture partner of Prime, and Berone Capital is not named as a plaintiff along with Prime (presumably because Prime and Berone Capital were joint venture partners conducting business under the name "Prime Capital Ventures, LLC").

111.    Upon information and belief, the $20 million that Prime sued for in the Reign Lawsuit was the same $20 million wired to it as described in the *Onward* Complaint.

112.    This indicates that Prime was not acting as a "banker" at any time, but was simply taking funds which were required to be held in escrow for interest payments, and using them for its own investment purposes.  It was also improperly taking the funds out of escrow and using them for purposes other than funding interest payments (on a loan it never made).

113.    Alternatively, Prime may have improperly used Onward's deposit funds to make a loan to a third party.  This is alleged in the alternative because of a February 24, 2023 entry on the Prime Commercial Facebook page which states that Prime "just funded Indigo Pharmaceutical for $20,000,000 for the construction of their new facility" in Las Vegas, Nevada.[10]

---

[9] Per the online docket, Reign International filed a motion to compel arbitration and no activity has happened in the Reign Lawsuit since September 2023.

[10] Counsel for Compass has searched Clark County, Nevada online land records and has not located any real property listed in the name of Indigo Pharmaceutical.  There is significant concern that this deal (like the alleged loan transaction with ALUX Properties) is also entirely fictitious.



114.    Or alternatively still, Beguesse and Stone may have used the $20 million for other

unknown purposes.  An online video posted on November 9, 2022 by a Dominican Republic law

firm (OCC Lawyers) states:

> Royal Closing is an exclusive closing service, offered by our firm
> OCC Lawyers, in which we ensure that you live a memorable
> experience while our team of expert lawyers is in charge of carrying
> out all the paperwork and procedures required for a safe transaction.
> Through this video, you will learn about the closing experience lived
> by Mr. Jeremiah Beguesse and Mr. Fabian Stone.

(https://www.youtube.com/watch?v=slkt1Y2IkyY).    The video shows Beguesse and Stone

popping champagne and eating lobster and other delicacies in a fancy setting.





115.    Upon information and belief, prior to April 2023, Prime took deposits from numerous other borrowers with the promise of making them loans, but never made those loans and used the deposits for other purposes.

116.    For instance, on April 5, 2023, Truss Financial LLC filed a lawsuit against Prime in Kings County Supreme Court.  The filed summons (attached as Exhibit 27) states:

> The nature of this action is for breach of various intercreditor agreements between the parties.  Defendant has failed to return to Plaintiff the sum of $13,400,000.00 in accordance with the aforementioned agreements, causing a broad range of damages to Plaintiff, including but not limited to the loss of $13,400,000.00, loss of business opportunities and other consequential damages resulting from Defendant's breach and wrongful and deceitful conduct.

### H. Prime Takes $15,902,250 from Compass-Charlotte, Never Makes it a Loan and Fails to Return Compass-Charlotte's Deposit

117.    Although Prime was failing to make loans or provide lines of credit to third parties from whom it already had taken ICA deposits, that did not stop it from making further promises and taking more ICA deposits from unsuspecting victims.

118.    Compass-Charlotte is the owner and developer of a parcel of commercial property in Charlotte, North Carolina.  In early 2023, it was looking for an almost $80 million loan to build a multi-family apartment building.  Compass-Charlotte was introduced to Prime through a loan broker.

119.    Before entering into any deal with Prime, Thomas F. Taft, Jr., the manager of Compass-Charlotte, reviewed Prime's website and its stories of making multiple loans, including the alleged $188 million dollar loan to ALUX Properties (https://primecommerciallending.com/). Mr. Taft also reviewed the Deal Maker magazine article, the news wire, and other publicly available online information about Prime.

120.    Among the representations on that website are that Prime is "A Boutique Investment Bank" with "Over $10 Billion in Transactions Financed."



121.     These statements are false and are intentionally made to deceive the public.  Neither Prime Commercial Lending nor Prime is "A Boutique Investment Bank" or any form of "bank." Indeed, Prime is not even registered to do business in New York.

122.     Mr. Taft reasonably relied upon each of the statements made on Prime's website and those news articles in concluding that Prime appeared legitimate.   In reliance upon this information, Mr. Taft, as manager of Compass-Charlotte, made the determination to do business with Prime.

123.     Kimberly "Kimmy" Humphrey, the Executive Vice President of Prime (and a key associate of Roglieri) traveled to Charlotte and met in person with Compass-Charlotte officers, including touring the site for the multi-family build.[11]

---

[11] Upon information and belief, Kimmy Humphrey is the sister of Prime's Chief Operating Officer Chris Snyder and resides in Virginia Beach, Virginia.  Plaintiff notes that on January 31, 2023, Prime purchased a 6,000 square foot mansion in Virginia Beach (600 Linkhorn Dr., Virginia Beach, Virginia) for $3,750,000 and continued to own the property as of December 20, 2023.  It is unknown whether this is where Ms. Humphrey presently resides or what possible business reason Prime could have for purchasing the property.

124.    On March 27, 2023, Prime represented that it had the ability to fund a $75 million loan in the form of a "Commitment to Fund Letter."  Prime promised to fund $75,725,000 "via a non-recourse, asset-backed Line of Credit" with a term of 60 months and an interest rate of 7.5%. (Exhibit 28).

125.    The interest rate promised by Prime was attractive because the Federal Reserve prime rate was at 8.0% at that time (as listed in the chart above).

126.    Compass-Charlotte (as borrower) then entered into an April 24, 2023 Development Line of Credit with Prime (as lender), whereby Prime was to make a loan for $79,511,250 (the "Compass Prime Agreement").  A copy of the Compass Prime Agreement is attached hereto as Exhibit 29 (and is virtually identical to the Blackwater Capital form which the Georgia Court held to be a "total fraud").

127.    The Compass Prime Agreement was signed by Kris Roglieri as C.E.O. of Prime.

128.    Section 10.12 of the Compass Prime Agreement states: "Lender hereby represents and warrants to Borrower that it has the financial ability and wherewithal to fund the LOC in the full amount of the Maximum Amount" (*i.e.* $79,511,250).

129.    Upon information and belief, this representation and warranty was false at the time it was made, and Prime did not have the financial ability to fund $79,511,250 on the line of credit to Compass-Charlotte.  Indeed, Prime had already defaulted on funding lines of credit to Onward and other victims.

130.    Pursuant to the terms of the Compass Prime Agreement, Compass-Charlotte wired the sum of $15,902,250 to Prime as an "ICA Payment" on April 27, 2023 to Prime's account at Citi Bank N.A., 388 Greenwich Street, New York, New York (the "Compass Deposit").  The Compass Deposit was to be held in an "Interest Credit Account" held by Prime.  The agreement

specifically provided that "All credits to the Interest Credit Account shall be used . . . for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable." Exhibit 29, Section 3.6.

131.    Prime received the Compass Deposit in its Citi Bank account.

132.    Prime never disclosed to Compass-Charlotte that the Compass Deposit would leave the Citi Bank Account.

133.    Compass-Charlotte understood that the Compass Deposit would be held by Prime and not used for any other purpose other than interest payments due on advances Prime made under the line of credit.

134.    Based upon, *inter alia*, the terms of the Compass Prime Agreement and Prime's instructions to wire the funds to its New York Citi Bank account, Prime led Compass-Charlotte to believe that the Compass Deposit would remain in the Citi Bank account, so that it would be available to satisfy the interest payments.

135.    Since April 27, 2023, Prime has had the Compass Deposit, but never advanced any funds or provided a line of credit.  On October 27, 2023, Compass-Charlotte demanded the return of its deposit.

136.    Compass-Charlotte also demanded to know where the Compass Deposit was held and for Roglieri, Humphrey, and Prime to provide bank account statements showing where the Compass Deposit was held.  Roglieri and Humphrey told Compass-Charlotte that the Compass Deposit was not in the Citi Bank account, but was held at RBC with a hedge fund and they just needed to get the funds released from a line of credit.  Compass-Charlotte asked for a contact at RBC to confirm the Compass Deposit was there, but Prime refused to provide that information.

137.     Roglieri and Prime have admitted orally and in writing on numerous occasions (both directly and through counsel) that Compass-Charlotte is entitled to the return of the Compass Deposit and that it was due to be returned no later than December 12, 2023.  Indeed, in a December 11, 2023 text to Compass-Charlotte, Roglieri stated: "Hello Tom we are waiting for the wire from rbc.  This is for the full amount.  It was done just waiting for it to come into our account here.  I'm checking every hour."   This and other communications promising immediate return of the Compass Deposit are attached hereto as Exhibit 30.

### I.  Prime Fails to Return Deposits to Numerous Victims

138.     Prime's pattern and practice of taking deposits from unsuspecting victims, not making loans and then failing to return the deposits (or only returning the deposits after being sued) has been ongoing for an extensive period of time.  For instance, in addition to the lawsuits described above, the following lawsuits / arbitration have been filed against Prime:

(a) *B&R Acquisition Partners v. Prime Capital Ventures* (JAMS arbitration) (filed in August 2023) (alleging $4,300,000 ICA payment made on November 30, 2022 for a purported $22,575,000 loan that was never made and the deposit never returned) (Prime was initially represented by Shepherd Mullin in that arbitration, but it withdrew from representation and, upon information and belief, Prime has defaulted and no new counsel has appeared);

(b) *Camshaft CRE 1, LLC v. Prime Capital Ventures, LLC*, 2023-023173-CA-01 (Circuit Court, Miami-Dade County, Florida) (filed September 15, 2023) (complaint attached as Exhibit 31) (alleging May 2023 payment of $13,400,000 ICA Payment to Prime and failure of Prime to return deposit).[12]  Prime failed to respond to the Camshaft complaint and on May 19, 2023 (just a

---

[12] Camshaft first sued Prime on July 14, 2023 in case 2023-019591-CA-01 in Miami-Dade County Circuit Court but took a voluntary dismissal and filed the currently pending lawsuit in September.

few hours after the involuntary bankruptcy was filed against Prime), Camshaft filed a Motion for Entry of Judgment against Prime (attached as Exhibit 32) in the amount of $12,400,000 and "requiring specific performance from Prime to return the ICA Payment in the sum of Twelve Million Four Hundred Thousand Dollars ($12,400,000.00) to Camshaft within seven (7) calendar days of the issuance of this Final Judgment."[13]

(c) *The Lion Group DFW, LLC v. Prime Capital Ventures, LLC*, 23-DCV-341617 (Texas State Court - 146th Judicial District Court) (filed September 21, 2023) (believed to relate to a similar ICA deposit situation although pleadings have not been obtained and the lawsuit was dismissed, indicating that The Lion Group may have been paid) (copy of docket attached as Exhibit 33).

(d) *Sturm v. Prime Capital Ventures, LLC,* 23-cv-1033 (N.D.N.Y. - filed on August 22, 2023) (sought recovery of a $2,000,000 ICA Payment made in connection with promise of a $15,000,000 loan per an October 2022 Acquisition Line of Credit Agreement) (complaint attached as Exhibit 34).  Prime did not respond to the lawsuit and thereby admitted the allegations against it related to conversion, unjust enrichment, and civil theft (among others).  A certificate of default was entered against it on September 15, 2023.  The lawsuit was dismissed on October 18, 2023 when, upon information and belief, Prime finally returned the $2,000,000 to Sturm.

139.    In addition to Prime victims who filed lawsuits, there are additional victims, such as Newlight Technologies (ICA deposit of $2,500,000 wired to Prime on May 24, 2023).  *See* Declaration of Michael Collins (Prime Bankruptcy Case, Doc. 5)

---

[13] Upon information and belief, Prime still holds $12,400,000 of Camshaft's ICA deposit and has not returned it.

140.    Figuring out what has happened to the missing $50+ million will benefit all victims of Prime and Berone, including Camshaft.

141.    At the same time that Roglieri and Prime were taking deposit money from borrowers and not making loans, Roglieri was living a life of extreme luxury.  This is highlighted by, among other things, a July 24, 2023 article published by Gentleman Avenue which lists Kris Roglieri as the owner of a Maserati MC12 (copy attached as Exhibit 35).  Per the article, "The Maserati MC12 is worth between $2 to $2.5 million today" and there are only 62 such cars in the world.  The article states:

> Besides his financial enterprises, Roglieri has an impressive collection of eclectic modified supercars housed at Team LoanSharks.   The loudest SVJ, 3 Novitec N-Largos, and significantly modified AMGs are included, as well as of course the Maserati MC12. [14]

142.    The reference to "Team LoanSharks" appears to refer to Roglieri's Instagram handle, as he puts out messages under that handle.

143.    Some online pictures of Roglieri's lifestyle include:

---

[14] It appears that Roglieri may hold his "supercars" collection in a New York limited liability company named FUPME, LLC (which Plaintiff understands to be short for one of Roglieri's online hashtags #FUCKYOUPAYME).  This appears to be the case based on a February 17, 2023 lawsuit which FUPME, LLC filed in Albany County Supreme Court related to Roglieri's attempt to buy a Mercedes-Benz AMG One Hypercar, Production Slot #197 for $2,344,440.  *See FUPME, LLC v. Traveon Devonta Rogers. et. al.*, case no. 901648-23 (Albany County Supreme Court) at ¶ 11 (alleging that Roglieri is the "sole member and manager of FUPME, LLC") (copy of complaint attached hereto as Exhibit 36).  A detailed online video showing the many cars in that supercar collection can be viewed here: www.youtube.com/watch?v=Fm_p8upe_S8 and the cars are individually listed at exclusivecarregistry.com/collection/teamloansharks.







### J.  The Prime Involuntary Bankruptcy

144.    After not receiving the Compass Deposit back despite many promises to do so, Compass-Charlotte joined with other creditors seeking the return of their ICA deposits and filed the Prime Bankruptcy Case.  The petitioning creditors also filed an emergency motion to appoint an interim trustee which was granted by the Bankruptcy Court on December 21, 2023 (Prime Bankruptcy Case Doc. 13).

145.    The Bankruptcy Court's order specifically required "that any person in possession of the Debtor's property and records (including, without limitation, Prime Commercial Lending, LLC, Kris Roglieri, and Kimberly "Kimmy" Humphrey) shall immediately turnover such property and records to the Interim Trustee, as directed by the Interim Trustee."

146.    On December 26, 2023, Prime (through its then bankruptcy counsel Cullen and Dykman) filed a letter with the Bankruptcy Court (Prime Bankruptcy Case Doc. 16) (attached as Exhibit 37) in which it argued that "Prime Capital can demonstrate that there is not cause to appoint an interim trustee under section 303(g).  Prime Capital has advised us that all of the ICA deposit funds, which are listed on schedule 1 attached, are being held in Prime Capital's accounts and that it is assembling the evidence demonstrating this . . . ."

147.    The letter listed the following accounts:

| Prime Accounts | Total |
|---|---|
| RBC- Corporate: | $7,278,000 |
| RBC- Partnership: | $52,364,000 |
| Citi Bank: | $2,00,000 |
| Farmers: | $10,000 |
| Key Bank: | $2,000,000 |
| | |
| | |
| Total: | $61,652,000 |

And the following ICA deposits (which includes the Compass Deposit):

| Client Name | ICA Payment | Loan Advances | ICA Net Balance |
|---|---|---|---|
| Redated | $4,000,000 | $19,500,000 | $0 |
| Redated | $1,400,000 | $6,850,000 | $0 |
| Redated | $2,100,000 | $3,400,000 | $0 |
| Redated | $2,400,000 | $1,890,000 | $510,000 |
| Redated | $440,000 | $450,000 | $0 |
| Redated | $1,575,000 | $457,000 | $1,118,000 |
| Redated | $1,000,000 | $1,600,000 | $0 |
| Redated | $4,200,000 | $3,094,000 | $0 |
| Redated | $5,250,000 | $0 | $5,250,000 |
| Redated | $2,000,000 | $3,094,000 | ($594,000) |
| Redated | $3,000,000 | $5,250,000 | $0 |
| Redated | $45,000,000 | $0 | $15,000,000 |
| Compass | $15,902,250 | $0 | $15,902,250 |
| Newlight | $2,500,000 | $0 | $2,500,000 |
| Murfreesboro | $4,312,500 | $0 | $4,312,500 |
| Redated | $4,300,000 | $0 | $4,300,000 |
| Redated | $20,000,000 | $17,000,000 | $3,000,000 |
|  |  | **Total:** | **$51,298,750** |

148.    This letter was false at the time it was filed and was designed by Prime to mislead Plaintiff, the Bankruptcy Court and other creditors.

149.    For instance, the number and amount of ICA deposits in the letter to the Bankruptcy Court was significantly low as after filing that letter with the Court, Prime "discovered" it had over $8 million more in ICA deposits which it had received.

150.    The Bankruptcy Court orally ordered Prime to provide Compass-Charlotte with information about where the Compass Deposit was held.  On December 27, 2023, counsel for Prime provided to Compass-Charlotte a summary in which it identified a new, larger total of $59,690,084 in ICA deposits that Prime had received from third parties.  The summary sheet claimed that each of the Petitioning Creditors' deposits was held at RBC.  A copy of that summary is attached as Exhibit 38.

151.    On that summary, Prime then listed bank accounts in which it allegedly held $63,997,582 (apparently to try to prove that it was solvent) (although this amount was over $2 million higher than the letter provided to the Bankruptcy Court just the previous day).

152.    Prime also provided to Compass-Charlotte an alleged December 26, 2023 bank account statement from RBC purportedly showing an account at RBC holding over $52 million in the name of "BERONE CAPITAL FUND LP for benefit of: Prime Capital Ventures, LLC" (the "Berone RBC Statement"). A copy of the Berone RBC Statement is attached hereto as Exhibit 39.

153.    These statements and information were false when provided and were designed to throw Compass-Charlotte off the trail of tracking down the Compass Deposit.

154.    The interim trustee subsequently informed the Court that he was not receiving the information from Prime required by the Court in its December 21, 2023 order. Among other things, Prime refused to allow the interim trustee into its offices or provide any access to computers or records. (To this date, Compass-Charlotte understands that the interim trustee was not ever able to gain access to Prime's offices).

155.    The Court demanded that Roglieri appear on the telephone on the afternoon of December 28, 2023 to answer questions. (Prime Bankruptcy Case Doc. 27)

156.    Roglieri appeared telephonically and proceeded to provide a number of false statements to the Court. For instance, the following is transcribed from the audio recording before the Bankruptcy Court on December 28, 2023 (Prime Bankruptcy Case Doc. 28) as questioning between the interim trustee (Chris Dribusch), Roglieri, and Assistant United States Trustee Lisa Penpraze:

```
Dribusch:      Does the firm have an accountant?
Kris Roglieri: We outsource that.
Dribusch:      I'm sorry, who is the accountant?
Kris Roglieri: Sardone & Sardone, CPA.
```

Penpraze:      Do you have access to Prime Capital books and records remotely?
Kris Roglieri: Uh, not from my computer I don't, no.
Penpraze:      Who would have that, sir?
Kris Roglieri: Our CPA firm.
Penpraze:      So the CPA is the only one with remote access to the books and records of the company?
Kris Roglieri: They completely handle our accounting, one hundred percent.
Penpraze:      So you can't go in and access the records of your company, remotely?
Kris Roglieri: I can request the records.
Penpraze:      And the CPA, did you say Cardona with a "C"?
Kris Roglieri: Sardone, s-a-r-d-o-n-e.
Penpraze:      Where are they located?
Kris Roglieri:  In Rochester NY
Penpraze:      So other than Sardone, no employees of Prime has access to the books and records remotely?
Kris Roglieri: That is correct. [15]

157.    Following the December 28, 2023 hearing, Prime's alleged accountants who "completely handle [Prime's] accounting, one hundred percent" responded in an email to the interim trustee that "I am confused by the email.  I do not have the books and records for this company.  I have no record of this company."  (Exhibit 40).

158.    Roglieri also stated to the Bankruptcy Court that whenever Prime received ICA deposits, it sent those deposits to Berone Capital to "add it to our fund account."  (Exhibit 41 at p. 5).

159.    Following that hearing, the Bankruptcy Court entered a show cause order setting a hearing for January 2, 2024 and enjoining Prime and its principals from "transferring or in anyway dispensing funds from any accounts in [Prime's] possession to prevent the further dissolution of [Prime's] purported estate."  (Prime Bankruptcy Case Doc. 23).

160.    The interim trustee informed the Bankruptcy Court that he had communicated directly with RBC and informed the Court that the Berone Capital RBC Statement was a

---

[15] An internally prepared transcript of Mr. Roglieri's comments at that hearing was transcribed and is attached hereto as Exhibit 40.

fabrication.  He informed the Bankruptcy Court that while RBC did hold an account in the name

of Berone Capital, that account was not held for the benefit of Prime and only held a miniscule

amount of funds (and nowhere near the alleged $52+ million shown on the Berone Capital RBC

Statement which had been provided on December 27, 2023 as Prime's proof of Compass-

Charlotte's deposit being held).

161.    At that juncture, the Bankruptcy Court expressed great concern about not knowing

where the $50+ million in creditor ICA deposits had gone.  The Bankruptcy Court also expressed

concern as to whether the matter could proceed before it since it did not have jurisdiction over

Berone Capital.  Nevertheless, the Bankruptcy Court entered an order on January 3, 2024 (Prime

Bankruptcy Case Doc. 33) in which it ordered that:

> Berone Capital Fund, L.P., Berone Capital, LLC, Berone Capital
> Partners LLC or any affiliated entity disclose to the interim trustee
> by 9:30 a.m. eastern time on Thursday, January 4, 2023 the current
> value of Prime Capital Ventures, LLC interest in the Berone Capital
> Fund, L.P. or any other fund/investment held through Berone
> Capital, LLC, Berone Capital Partners LLC, or any affiliate and
> provide corroboration (e.g. third party bank or financial institution
> account statements) of the existence and location of such funds.

162.    Berone Capital failed to respond to the Bankruptcy Court's order, so on January 4,

2024, the Bankruptcy Court entered a show cause order for Berone Capital to appear on January

9, 2024 or be sanctioned $1,000 a day for failing to provide information.  (Prime Bankruptcy Case

Doc. 46)

163.    On January 5, 2024, the interim trustee reported to the Bankruptcy Court that the

other bank account information provided by Prime was false.  For instance, the Prime account at

KeyBank which the Debtor informed the Court had a $2 million balance only had a balance of

around $2,000.  (A copy of the KeyBank account statement was filed by the U.S. Trustee at Prime

Bankruptcy Case Doc. 86 but subsequently placed under seal by the Bankruptcy Court).

164.     Faced with the multiple misstatements and misrepresentations by Prime directly to the Bankruptcy Court and to creditors and the fact that the Bankruptcy Court lacked ability to more fully go after Berone Capital (which was not a debtor before it), the petitioning creditors filed a January 7, 2024 motion to dismiss the Bankruptcy Case so that they could pursue recovery of their deposits in a different forum where they hoped to quickly try to track down what happened to the missing $50+ million in ICA Deposits.  (Prime Bankruptcy Case Doc. 74).[16]   The Bankruptcy Court granted that dismissal motion on January 9, 2024 (Prime Bankruptcy Case Doc. 87), but only after stating that it would be shortly entering a sanctions order and judgment against Berone Capital for failing to comply with the Bankruptcy Court's orders.   On January 10, 2024, the Bankruptcy Court entered the sanctions order against Berone Capital (Prime Bankruptcy Case Doc. 97) (attached as Exhibit 42).

165.     Compass-Charlotte therefore immediately turns to this Court for relief.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract against Prime)**

166.     The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

167.     The Compass Prime Agreement is a valid contract.

168.     Compass-Charlotte performed its obligations under the Compass Prime Agreement.

169.     Prime breached the Compass Prime Agreement by failing and refusing to make payment to Compass-Charlotte in the amount of $15,902,250.00, after Compass-Charlotte

---

[16] Prime also filed a motion for judgment on the pleadings a few minutes before Petitioning Creditors filed their motion to dismiss (Prime Bankruptcy Doc. 72), but that motion was never ruled upon and Prime consented to Petitioning Creditors' motion to dismiss.

exercised its right to terminate the Compass Prime Agreement pursuant to Section 13.7 of the Compass Prime Agreement.

170.    Prime's breach has damaged Compass-Charlotte in an amount to be determined at trial, but believed to be in excess of $15,902,250.00, plus interest.

## SECOND CLAIM FOR RELIEF
### (Fraud in the Inducement against Prime and Berone Capital)

171.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

172.    As set forth above, Prime made material false representations in order to induce Compass-Charlotte to enter into the Compass Prime Agreement, including statements that it has provided millions (or billions) of dollars in commercial loans, had the financial ability to fund the loan contemplated by the Compass Prime Agreement, and would only use the ICA Payment "for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable."  Prime also made the false representations on its website and news articles as laid out more fully above.

173.    Berone Capital is a partner in a joint venture with Prime pursuant to a joint venture agreement dated August 16, 2022, which states Berone Capital will be the "Managing Member" of the joint venture while Prime will be the "PC Member."

174.    As such, Berone Capital is liable for Prime's actions, and Prime's conduct and statements are attributable to Berone Capital.

175.    Prime's and Berone Capital's representations were false when they were made and Prime and Berone Capital knew them to be false.  Further, Prime and Berone Capital knew or had reason to know that Compass-Charlotte was relying on its statements.  Thus, Prime and Berone Capital's statements were reasonably calculated to deceive.

176.    Prime and Berone Capital made its false statements with the intent to deceive Compass-Charlotte into entering into the Compass Prime Agreement and thereby obtaining the $15,902,250 ICA Payment.

177.    Compass-Charlotte reasonably and justifiably relied on these representations.

178.    Compass-Charlotte was, in fact, deceived by Prime's and Berone Capital's statements, and it would not have entered into the Compass Prime Agreement had it known that those representations were false.

179.    Compass-Charlotte has been damaged as a result of Prime and Berone Capital's fraudulent inducement which led to Compass-Charlotte entering into the Compass Prime Agreement.  Specifically, Compass-Charlotte has been damaged in the amount of the $15,902,250 ICA Payment that it sent to Prime pursuant to the LOC Agreement and in reliance upon Prime and Berone Capital's representations.

180.    Consequently, as a result of Prime and Berone Capital's fraudulent inducement, Compass-Charlotte is entitled to recover from Prime the $15,902,250 ICA Payment, plus interest, and punitive damages as allowed by law.

### THIRD CLAIM FOR RELIEF
**(Conversion against Prime and Berone Capital)**

181.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

182.    Prime and Berone Capital have intentionally and without authority exercised control over Compass-Charlotte's property and have refused to return Compass-Charlotte's property.

183.    The $15,902,250.00 belongs to Compass-Charlotte.

184.    Prime and Berone Capital have no authority in law or equity to retain Compass-Charlotte's $15,902,250.00.

185.    Prime and Berone Capital have unlawfully exercised dominion over Compass-Charlotte's $15,902,250.00, in derogation of Compass-Charlotte's rights.

186.    Compass-Charlotte has demanded the return of its money and the deposit has not been repaid.

187.    Accordingly, Compass-Charlotte has suffered damages in an amount to be determined at trial, but believed to be in excess of $15,902,250.00, plus interest.

**FOURTH CLAIM FOR RELIEF**
**(Unfair and Deceptive Trade Practices in Violation of N.C.G.S. 75-1.1, *et seq.* (the "UDTPA") against Prime and Berone Capital)**

188.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

189.    As described above, Prime and Berone Capital have engaged in unfair and deceptive conduct in violation of N.C.G.S. 75-1.1, et seq., including, among other things, fraud, false representations and conversion of Compass-Charlotte's ICA deposit.  Such acts and practices violate the UDTPA because they are deceptive, immoral, unethical, oppressive, unscrupulous, and substantially injurious and involve conduct external to the Compass Prime Agreement.

190.    As described herein, the acts and practices by Defendants are in or affecting commerce in North Carolina.

191.    As described herein, the acts by Defendants present substantial aggravating circumstances.

192.    Defendants' actions proximately caused Compass-Charlotte actual damages in the amount of $15,902,250.00, plus interest.

193.    Pursuant to N.C.G.S. § 75-16, Compass-Charlotte is entitled to trebling of its actual damages.

194.    Pursuant to N.C.G.S. § 75-16.1, Compass Charlotte is entitled to recover attorney's fees in this action.

## FIFTH CLAIM FOR RELIEF
### (Request for Appointment of Receiver)

195.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

196.    By way of an Emergency Motion filed with this Complaint, Compass-Charlotte seeks the appointment of a general receiver with all of the usual powers, including but not limited to, the power to: (a) take exclusive possession, custody, and control of all of Defendants' books and records and assets, wherever located; (b) exclusively operate and manage Defendant's businesses until further order of this Court; and (c) pursue such further and other relief as may be proper, necessary or just under the circumstance.  Pending the hearing of Plaintiff's Emergency Motion filed with this Complaint, and pursuant to Rule 66 of the Federal Rules of Civil Procedure, Compass-Charlotte requests a temporary receiver be appointed.

197.    At a minimum, the Court should appoint a limited receiver to review the books and records of Prime and Berone Capital and report back to the Court on a weekly basis as to whether (a) Prime and Berone Capital are providing open and complete access to records for receiver to review; (b) the amount and location of ICA deposits made by Plaintiff and other creditors; and (c) whether Prime and Berone Capital are legitimate entities or are running a fraudulent scheme.

198.    Appointment of a receiver is proper under FED. R. CIV. P. 66 and the equitable power of the Court.

199.    The appointment of a receiver is necessary, for the reasons stated herein, to prevent the dissipation of Defendants' assets pending further action of the court, to ensure that Defendants do not remove their assets, including the Compass Deposit, from the jurisdiction of the Court, and to collect the books and records of Prime and Berone Capital to determine the amount and location of ICA deposits made by Plaintiff and other creditors, and identify whether Prime and Berone Capital are legitimate entities or are running a fraudulent scheme.

**WHEREFORE**, Compass-Charlotte respectfully requests that the Court:

A.    Appoint a General Receiver over Prime and the Berone Capital entities to take control of all their property and operations for the benefit of their creditors;

B.    Pending a hearing on Plaintiff's Emergency Motion, appoint a Receiver to ascertain whether the Defendants are legitimate businesses and report its findings to the Court in a timely fashion;

C.    Bar Defendants from destroying, altering or concealing any records (including both physical and digital records).

D.    Authorize Plaintiff to take expedited discovery without the requirement of a meeting pursuant to FED. R. CIV. P. 26(f), and without regard to the limitation of FED. R. CIV. P. 30(a)(2) and 30(d);

E.    Pending a hearing on Plaintiff's Emergency Motion, authorize limited interim expedited discovery permitting Plaintiff to immediately subpoena certain third party banks and financial institutions that are believed to have critical information about the location of Defendants' assets;

F.    Enter judgment against Defendants in the amount of damages as may be proven at trial, including punitive damages;

G.   Award Compass-Charlotte its attorneys' fees pursuant to applicable law;

H.   Tax the costs of this action against Defendants;

I.   For trial by jury on all issues so triable; and

J.   Grant Compass-Charlotte such other and further relief as the Court deems just and

proper.

DATED:   January 12, 2024
         Albany, New York                    HINCKLEY, ALLEN & SNYDER LLP

                                    By:   */s/ Christopher V. Fenlon*
                                          Christopher V. Fenlon
                                          Kieran T. Murphy
                                          30 South Pearl St., Suite 901
                                          Albany, NY 12207-3492
                                          T: 518-396-3100
                                          F: 518-396-3101
                                          E: cfenlon@hinckleyallen.com
                                             kmurphy@hinckleyallen.com

                                          PARKER, POE, ADAMS & BERNSTEIN LLP

                                          Will Esser (*pro hac vice* to be filed)
                                          Eric H. Cottrell (*pro hac vice* to be filed)
                                          620 South Tyron St., Suite 800
                                          Charlotte, NC 28202
                                          T: 704-335-9507
                                          F: 704-334-4706
                                          E: willesser@parkerpoe.com
                                             ericcottrell@parkerpoe.com

                                          *Attorneys for Plaintiff Compass-Charlotte
                                          1031, LLC*

**VERIFICATION**

**THOMAS F. TAFT, JR.** hereby declares that he is a manager of Compass-Charlotte 1031, LLC, the Plaintiff in this action and, as such, he is authorized to provide this verification; that he has read the foregoing and attached Verified Complaint, and that the same is true of his own personal knowledge and/or based upon those documents attached as exhibits to the Complaint, except for the following:

a)   those matters stated upon information and belief, which he believes to be true;

b)   the facts alleged regarding a search of land records for ALUX Properties and the Stone Family Address in Georgia (as he did not conduct those searches); and

c)   the information about B&R Acquisitions' arbitration.

A substantial part of the information contained in the Complaint comes from publicly filed court pleadings before the bankruptcy court or other courts, or based upon court hearings, or based upon information publicly available through online searches, and Thomas F. Taft, Jr. refers to those documents (particularly the exhibits to the complaint) as the source of that information.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of January, 2024

Thomas F. Taft, Jr.