# EXHIBIT H



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

****************************************************

COMPASS-CHARLOTTE 1031, LLC.,


                              Plaintiff,

                    -v-   24-cv-55

PRIME CAPITAL VENTURES, LLC., et al.,

                    Defendants.

****************************************************


                 TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MAE A. D'AGOSTINO
                  January 22, 2024
             445 Broadway, Albany, New York

**A P P E A R A N C E S**


FOR THE PLAINTIFF:

HINCKLEY, ALLEN & SNYDER, LLP.
BY:  Christopher V. Fenlon, Esq.
     James Tuxbury, Esq.
30 South Pearl Street
Albany, New York 12207

PARKER POE ADAMS & BERNSTEIN, LLP.
BY:  Will Esser, Esq.
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202


FOR THE DEFENDANT:

HOGAN LOVELLS US, LLP
BY:  Pieter H.B. Van Tol, III, Esq.
390 Madison Avenue
New York, New York 10017


RECEIVER:

LEMERY, GREISLER, LLC.
BY:  Paul A. Levine, Esq.
677 Broadway
Albany, New York  12207

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1      COURT CLERK:  Today is Monday, January 22nd,

2   2024, the time is 9:10 a.m.  The case is

3   Compass-Charlotte 1031, LLC versus Prime Capital

4   Venture, LLC, et al., case number 24-cv-55.  We are here

5   today for an order to show cause hearing.

6      May we have appearances for the record,

7   please.

8      MR. FENLON:  Good morning, your Honor,

9   Christopher Fenlon, Hinkley Allen & Snyder, on behalf of

10   plaintiff.

11      THE COURT:  Good morning.

12      MR. TUXBURY:  Good morning, Jim Tuxbury,

13   Hinkley Allen on behalf of plaintiff.

14      THE COURT:  Good morning.

15      MR. ESSER:  Good morning, your Honor.  Will

16   Esser, Parker Poe, on behalf of the plaintiff.

17      THE COURT:  Good morning.

18      MR. VAN TOL:  Good morning, your Honor, Pieter

19   Van Tol from Hogan Lovells, on behalf of Defendant Prime

20   Capital Ventures.

21      THE COURT:  Good morning to you.

22      MR. LEVINE:  Good morning, your Honor.  Paul

23   Levine; I'm the receiver.

24      THE COURT:  Okay.  Good morning.  Well,

25   gentlemen, I thought I was going to be sitting by the

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    fireplace watching football this weekend but I wasn't.

2    I was reviewing all of the papers and I have some

3    questions that you can answer just from where you're

4    sitting before I delve into other issues.

5            The first question that I have is -- I suppose

6    that I will ask defense counsel -- is:  Can you tell me

7    the relationship between all of these Berone entities

8    such as Berone Capital Fund, Berone Capital Partners,

9    Berone -- I will do it this way.  Berone Capital Fund,

10   LP, Berone Capital Partners, LLC, Berone Capital, LLC,

11   Berone Capital Equity Fund, 405 Motorsports, f/k/a

12   Berone Capital Equity Partners, LLC.

13           Do you know what the exact relationship is

14   with Prime Capital Ventures?  Because it appears that

15   there's a very significant issue about what the

16   relationship is.  So what's your take on it?

17           MR. VAN TOL:  My take, your Honor, is that

18   Prime Capital Ventures mostly dealt with or at least all

19   I've seen is Berone Capital Fund, LP.  I don't know what

20   those other entities are.  Most of the documents just

21   say Berone without any differentiation.  And my

22   understanding of the relationship is my client was

23   introduced to Berone sometime in 2022, entered into a

24   joint venture agreement with Berone, was then dealing

25   with a -- what I will call an intermediary or middle

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   person called Reign, which then was supposed to

2   introduce and facilitate the relationship between Prime

3   and Berone.  So the money would go through Reign to

4   Berone.

5           So to answer Your Honor's question as briefly

6   as I can, they are the hedge fund to which Prime Capital

7   would send funds as part of the transaction with

8   borrowers.

9           THE COURT:  And you're aware, are you not,

10  that Berone Capital Fund, LP, is taking the position

11  that they never had a joint venture agreement with your

12  client?  Correct?

13          MR. VAN TOL:  I'm keenly aware of that,

14  your Honor.

15          THE COURT:  Okay.  Have a seat.  As a matter

16  of fact, as I ask these questions, you don't have to

17  stand up.  I'm looking for clarity.

18          Mr. Fenlon, do you contest the fact that

19  Compass-Charlotte and at least Prime Capital Ventures

20  have a binding arbitration agreement?

21          MR. FENLON:  Your Honor, my partner,

22  Mr. Tuxbury, is here to address the legal arguments with

23  respect to the arbitration.

24          THE COURT:  Okay.  Same question for

25  Mr. Tuxbury.  Do you deny or contest that there is a

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   binding arbitration agreement between Compass-Charlotte

2   and Prime Capital Ventures or whatever we want to --

3   Prime Capital Venture, LLC?

4          MR. TUXBURY:  No, we don't dispute that.

5   There is an arbitration agreement in the letter of

6   credit agreement itself.

7          THE COURT:  So, ultimately, regardless of what

8   decisions I make on some of the matters that have been

9   brought before me, you believe this case will go to

10   arbitration?

11          MR. TUXBURY:  That's a different question,

12   your Honor.

13          THE COURT:  Okay.

14          MR. TUXBURY:  That's -- historically, Prime

15   has not been asserting any arbitration demand and of

16   course arbitration is waivable.  What we believe we have

17   filed here is a necessity for a provisional remedy --

18          THE COURT:  That, I understand.

19          MR. TUXBURY:  -- in aid of arbitration.  With

20   receiver in place, the determination of the adjudication

21   of claims vis-a-vis Compass and Prime will be within the

22   purview of the receiver.  Whether there will be an

23   arbitration or not, that's for a decision down the road.

24   If the entity representing Prime and presumably Prime

25   search that arbitration clause for the litigation of the

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   merits of this dispute, then I would agree, yes, there's

2   an arbitration agreement.  The substantive merits of the

3   underlying contract dispute would go there if that was

4   asserted by Prime.

5           I'm just making a point that it's a waivable

6   claim, even though it's -- according to litigator

7   dispute notwithstanding an arbitration agreement, so I

8   put --

9           THE COURT:  Having read their papers, I'm

10  pretty confident that they will be asserting that

11  they -- there should be an arbitration.  You have read

12  the papers too, correct?

13          MR. TUXBURY:  Of course, your Honor.  I was

14  making the point that the receiver -- part of the

15  receiver's jurisdiction is assertion of claims on behalf

16  of Prime in -- in this fiduciary duties to the Court to

17  oversee the account information and the -- the receiver

18  then would have control over that determination going

19  forward on that issue.

20          THE COURT:  Right.  At this moment, I'm not

21  even dealing with the receiver issue.  I'm just dealing

22  with the fact that it appears that there's a binding

23  arbitration clause, and if at some point Prime Capital

24  Ventures wants to invoke that clause, they may.

25          MR. TUXBURY:  I agree, your Honor.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

```
 1          THE COURT:  Okay.  Will Berone defendants be a
 2   part of that arbitration, in your view?
 3          MR. TUXBURY:  I -- I -- I think it depends on
 4   the Berone parties, your Honor.  They're not signatories
 5   to the agreement.  We have allegations against them.
 6   While arbitration agreements are futures of contract
 7   between the parties, you can bring non-signatories into
 8   arbitration but it's difficult to bring a defendant
 9   non-signatory into an arbitration.
10          So I would -- if they were to object to the
11   application of arbitration over the dispute
12   between Compass and Berone, to be honest, I haven't
13   looked at that issue, your Honor, sufficiently but I
14   know from my experience that's an open question as
15   whether they could be dragged into arbitration.
16          THE COURT:  What's your view, Mr. Van Tol, as
17   to whether if there is an arbitration Berone defendants
18   will be a part of that?
19          MR. VAN TOL:  I have a similar view,
20   your Honor.  It's clear they're not in the agreement.
21   They claim that they have never seen the agreement so it
22   could be an uphill battle to join them in the
23   arbitration.
24          THE COURT:  As I understand it, Berone
25   defendants did not participate in the involuntary
```

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    bankruptcy proceeding.  Is that correct, Mr. Fenlon?

2              MR. FENLON:  That's correct, your Honor.

3              THE COURT:  Why was the involuntary bankruptcy

4    proceeding dismissed?  Has it been dismissed, by the

5    way?

6              MR. FENLON:  Your Honor, I did not represent

7    any of the creditors, so I'm going to defer to my

8    co-counsel.

9              THE COURT:  Has it been dismissed?

10             MR. ESSER:  The answer to that, your Honor, is

11   yes, although the bankruptcy court has retained

12   jurisdiction over several issues.  So if I could give a

13   little bit of detail to the Court on that.

14             The issue quickly became -- the voluntary

15   bankruptcy was filed on December 19th, interim trustee

16   put in place on December 21st.  The Court wanted the

17   interim trustee to immediately work with Prime to

18   discover what assets it had and whether it had the

19   ability to repay these various ICA deposits.

20             What ended up happening was that Prime made it

21   clear, contended that the vast majority of the ICA

22   deposits were being held in an account at RBC in the

23   name of Berone Capital.  The bankruptcy judge went ahead

24   and ordered Berone Capital to show up, to provide

25   information about that account.  Berone did not show up.

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   The Court entered contempt against them, they still did

2   not show up, and the Court expressed great concern that

3   a party who is allegedly holding the majority of the

4   funds was not before it.

5          So based upon that, the petitioning creditors

6   filed a motion to dismiss so that they could then

7   proceed in a forum where they could bring all parties.

8          THE COURT:  Okay.  The bankruptcy trustee in

9   the involuntary bankruptcy proceeding that had

10  been pending, am I correct that he issued a statement or

11  an opinion to the bankruptcy court that he could not

12  find the 50-plus million dollars that were supposedly

13  being held by Berone?

14         MR. ESSER:  Yes, that's correct, your Honor.

15  What -- there was a -- a -- basically a bank account

16  statement which was provided by Prime to the bankruptcy

17  interim trustee which purported to say that there was an

18  account held at RBC Capital Markets in the name of

19  Berone Capital Fund, LP, which was allegedly held for

20  the benefit of Prime Capital Ventures and listed some

21  $52 million on it.

22         Looking at the form which was provided, there

23  were some red flags about whether it was legitimate or

24  not.  It said it was page 1 of 1, so there was no

25  transactions details behind it.  It wasn't issued at the

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   end of the month.  There was some formatting things that

2   were very weird.  I don't have the exact number but we

3   attached that as an exhibit to the complaint.

4          The interim trustee ultimately ended up

5   talking with RBC and came back and informed the Court

6   and all the parties that RBC had -- had communicated to

7   him that that reported account statement was a fraud,

8   that it was not one that they prepared or came from

9   them, that they had looked at that what is referred to

10  as RBC Partnership account and that there was not

11  anywhere near $52 million in there.

12         We have received the records from them through

13  subpoena and there was more like $2 million in there.

14  So we still, as we sit here today, have a situation of

15  50 million-something unaccounted for, not tracked.

16         THE COURT:  Okay.  Now, Mr. Van Tol, I've read

17  various motion papers over the last 72 hours or so that

18  indicate that the statements by your client that the

19  Royal Canadian Bank was holding 50-plus million dollars

20  that Berone had -- Berone was holding $52 million for

21  the benefit of Prime.  I've read statements from the

22  bankruptcy trustee that the money has seemed to

23  vanished.

24         I've read documents that say that the Royal

25  Canadian Bank does not have anywhere near $52 million in

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   its account.  I've read statements that -- Prime

2   statement that Berone was in a joint venture with them

3   is not accurate.  In fact, Berone defendants have gone

4   so far as to say that they have never seen such an

5   agreement and that they have an opinion that the

6   agreement was electronically forged.

7          There are individuals, including the plaintiff

8   in this case, and the plaintiff that your law firm is

9   representing in Florida that would like to get access to

10  some or all of this $52 million and you don't want me --

11  you didn't want me to appoint a receiver and you don't

12  want me to keep a receiver in place.

13          Is that a fair summary on my part?

14          MR. VAN TOL:  Except for the last part, your

15  Honor.  We have no objection to a receiver staying in

16  place as to Berone.  We completely agree with the

17  plaintiff's efforts to get discovery from the Berone.

18  We have not objected at all.

19          THE COURT:  Why should I not want a receiver

20  in place for your client?

21          MR. VAN TOL:  Several reasons, your Honor.

22  Let me start with the most practical, which is it is

23  literally killing the business of Prime Capital.  Since

24  December 19th, when there was a wrongful involuntary

25  proceeding brought, Prime Capital's business has ground

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    to a halt.  It loses money every day even though there

2    are people who want to close their transactions with

3    Prime.  That's the practical reason.

4              THE COURT:  Could I just stop you for a

5    minute.

6              MR. VAN TOL:  Yes, your Honor.

7              THE COURT:  If indeed your client is supposed

8    to have access to $52 million, wouldn't that solve the

9    problem, paying back Compass-Charlotte the money that

10   they paid in and paying your law firm's client in

11   Florida the millions that they paid in?  I mean, why

12   shouldn't I have extreme concern about Prime Capital

13   Ventures?

14             MR. VAN TOL:  Because there's no evidence,

15   your Honor, that Prime Capital Ventures took -- let's

16   use Compass as an example.  There is no evidence that

17   Prime Capital Ventures took Compass's money and sent it

18   anywhere other than to Berone.  It went to Berone

19   accounts, it went to a Martin Carrow (phonetic), who is

20   associated with Berone.  That's -- that money is with

21   Berone.

22             What happened, your Honor, is when a borrower

23   says I want to do the transaction when I get my money

24   back, Prime Capital turns to Berone and says we have a

25   deal that's not happening.  Send the money back.  We

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

```
————COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55————
```

1   have to unwind the transactions that that money is being

2   used for.  We get it from Berone.  That's why,

3   your Honor, there's not 15.9 million to give back to

4   Compass.  That would be something that Prime would love

5   to get Compass off our back, of course.  But the issue

6   is that money, because that's how the deals work, went

7   to Berone.

8          And as to the other statements, your Honor, in

9   our sur-reply, we show that Berone was defrauding us.

10  Those statements that we have been getting since

11  December 2022 looked like the ones from December 26th

12  with some differences.  But each one said that this is

13  money being held for Prime Capital.  That turns out to

14  be a lie, and we found out about the lie when the

15  records came in.  I found out from my client on Saturday

16  night.  They compared what Compass has been able to find

17  compared to what Berone gave us.  They are two different

18  documents, your Honor.  Complete forgeries.

19          THE COURT:  Is there any defense attorney who

20  would like to respond to that?

21          MR. ESSER:  I would very much like to respond

22  to that, your Honor.  What if I had -- if I may have the

23  Court's indulgence, I brought a -- four documents for

24  all the records that I highlighted a couple of portions

25  that I think would be helpful, if I may hand them up.

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1          THE COURT:  Yes.  Please give them to my
2    courtroom deputy, Ms. Norton.
3          MR. ESSER:  Your Honor, may I stand at the
4    podium for this?
5          THE COURT:  Yes, you may.
6          MR. ESSER:  So, your Honor, this goes back to
7    the bankruptcy, and to give Your Honor some context,
8    when the Court appointed the interim trustee on December
9    21st in the bankruptcy, one of the things that the Court
10   orally did was to require Prime to provide evidence of
11   where Compass's deposit was.  $16 million.  So that was
12   a requirement from the Court on December 21st.
13          In response to that, Prime's counsel at the
14   time, Cullin, filed this letter with the bankruptcy
15   Court, and you'll note on page 2 the statement which
16   Prime made to the Court at that time.
17          Prime Capital has advised us what all of the
18   ICA deposits who are listed on Schedule I attached are
19   being held in Prime Capital's accounts, and if you then
20   turn to the last page of that letter, it specifically
21   has a schedule of ICA deposits and included on that
22   schedule is Compass's deposit.
23          If you then, your Honor, turn the page, the
24   next day, they -- Cullen and Dykman provided to our firm
25   in response to the judge's order even more clarity,

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    which was this next statement, which -- in which they

2    indicated that Compass's deposit was held at RBC.

3            Then, your Honor, Mr. Roglieri, the principal

4    and founder of Prime, showed up in the bankruptcy court.

5    This was his testimony to the Court and to the trustee

6    when asked about their business model for Prime and how

7    they treated and used ICA deposits.  So I will just read

8    the section here, your Honor.

9            My question -- this is the interim trustee

10   asking on the Court.  My question is those monies that

11   are provided by those borrowers were entered into those

12   transactions with Prime Capital Ventures and Prime

13   Capital Ventures received those funds.  Are those funds

14   then deposited into Berone Capital?  Is that where they

15   go?  Mr. Roglieri, the ICA funds?  Correct.

16   Mr. Roglieri, that is correct.

17           Then in response down a little further, the

18   trustee again asks, okay.  We will look at this number

19   that is provided under Prime Capital Ventures from

20   Berone Capital.  Is that the credit line, that

21   $50 million, or is that actual monies that were put into

22   Berone Capital from Prime Capital Ventures?

23   Mr. Roglieri, monies that were put into Berone Capital

24   from Prime.

25           Your Honor, all of those documents are public

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    record, part of the complaint.  What we then attached

2    was the last one, is the document which was filed under

3    seal and it is the Citi Bank account for Prime, which is

4    where the ICA deposit for Compass was sent.  And now if

5    Mr. Roglieri was telling the truth, which was that when

6    they received ICA deposits, they would send those ICA

7    deposits along to Berone, and Berone would work some

8    magic where it got a multiple on that and then offered a

9    line of credit back to the borrowers.

10          So if all of that were true what Mr. Roglieri

11   was saying, what we would see is some evidence that

12   Compass-Charlotte's deposit went into an account at

13   Prime and ended up being sent to Berone Capital.

14          That is not what the records show.  What we

15   have is -- the last document is the bank account

16   statement from Citi Bank, and if you look at page 4 of

17   that document, what you see is you see that the ICA

18   deposit from Compass-Charlotte was wired into the

19   account on April the 27th.  At the time when it was

20   wired into the account, you can see there was a negative

21   balance of $6.5 million in that account caused by, among

22   other things, a purchase on that same day of a million

23   dollars to RM Auctions, a company of selling luxury

24   cars.

25          There is no evidence whatsoever -- and I have

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    gone through all of the bank account records -- if Prime

2    contends that Berone Capital has 50-something million

3    dollars of ICA deposits, it would be very simple for

4    Prime to show here are our records.  Here are the wires

5    which show that we sent 50-something million dollars

6    over to Berone.  Your Honor, those records don't exist.

7            We have gone to the various banks, we have

8    gotten all of the records that we can relating to Prime

9    Capital Venture's accounts.  We have tracked over and

10   over ICA deposits coming into those accounts, and rather

11   than being sent to Berone, they are used to pay back

12   other people who are claiming their ICA deposits back.

13   They are being used to buy watches, they are being used

14   to buy cars.  They are used -- things of that nature.

15           When we received the RBC statements, which

16   conclusively demonstrated that Berone did not have

17   $52 million in that account, both the receiver, that's

18   Mr. Levine and I, immediately went to back to Mr. Van

19   Tol and said, Mr. Van Tol, here are the RBC statements.

20   They show Berone doesn't have $52 million in it.  If

21   your client in fact gave $52 million to Berone, please

22   give us the bank account statements.  Show us the track --

23   the funds going to Berone so that we can team together

24   and go after Berone to locate these monies.

25           If Berone has been lying to your client, then

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    clearly it's in the advantage of all the parties here to

2    chase after them.  There has been radio silence, and the

3    reason for that is because none of the bank account

4    statements show any money going to Berone after that

5    initial $20 million which took place in November of

6    2022, and for which Prime sued Reign Capital in February

7    of 2023 and that case was before the Court here.

8           So there is no evidence of any transfer of

9    funds to Berone from at least March or April of 2023 to

10   the present date.  If such exists, we have asked for it,

11   haven't been provided.  So at this point in time, it

12   looks to us, from looking at the bank accounts records,

13   that Mr. Roglieri has simply spent that money and used

14   it to repay old people's money with new, which of course

15   is a classic definition of Ponzi scheme.  So that's what

16   the records show, your Honor.

17           THE COURT:  Okay.  Thank you.

18           MR. VAN TOL:  May I respond just briefly,

19   your Honor?

20           THE COURT:  Yes, of course.

21           MR. VAN TOL:  Very simple explanation.  I hate

22   to say anything in this case is simple but as of April

23   and May of 2023, Prime Capital had an account with

24   Berone that held $20 million.  That $20 million helped

25   secure the 15.9 sent in by Compass and the evidence of

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   that is Exhibit 9 to my declaration submitted over the

2   weekend with a sur-reply.

3           Now, we have found out since -- in the past

4   few days that that statement from -- that is RBC -- let

5   me back up.  I messed it up.  Exhibit 6 is what my

6   client received from Berone showing 20 million.

7   Exhibit 9 is actually how much money was in there as of

8   March 2023 and it was nowhere close to $20 million.

9           So the short answer is the 15 million was

10  already there, being held and secured for anyone who had

11  a deal with Prime.  What Prime didn't know is Berone was

12  then transferring the money elsewhere, according to what

13  we know.

14          MR. ESSER:  The $20 million which came into

15  that account was an ICA deposit from Onward Holdings,

16  who did not receive their money back and has sued Prime

17  in federal court in Utah.  So that $20 million has

18  nothing whatsoever to do with Compass.  It was Onward

19  Holding's money and regardless of that, if you simply

20  read the complaint which Prime filed in federal -- in

21  this Court, Prime alleged that that money was lost and

22  absconded by Reign International.

23          THE COURT:  It was what?

24          MR. ESSER:  They say it was absconded with by

25  the defendant, Reign International, who they sued.  So,

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    at the same time -- I think what Mr. Van Tol is trying

2    to argue is that at the same time his client is suing a

3    third party saying this $15 million has gone and

4    disappeared and been lost, oh, but Berone has given us

5    an account statement which shows 20 million so we can

6    rely upon that.

7             Those two are entirely contradictory, and

8    moreover, it -- the whole point which we are making,

9    your Honor, is Mr. Roglieri very clearly testified to

10   the bankruptcy court that the actual ICA deposit monies,

11   when they came in were sent to Berone, not some -- not

12   something else.  It wasn't secured by some other money

13   that already existed there.

14            The bankruptcy court ordered him to tell us --

15   to tell us specifically where is our deposit?  Where is

16   our $16 million and what he represented to the Court,

17   what's included in the filings was -- he represented

18   that our 16 million, not some -- not somebody else's,

19   not something that secured ours, our 16 million was at

20   RBC.  That was false and untrue and the money was spent

21   otherwise.

22            THE COURT:  Okay.

23            MR. VAN TOL:  May I -- I promise this is

24   brief.

25            THE COURT:  Listen, I'm not trying to stop

```
———COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55———
```

 1   anybody from talking.  There is issue upon issue here

 2   and I'm looking for clarity, which is why I'm not

 3   handling this in a traditional motion way.  May it

 4   please the Court?  I move for for the following three

 5   reasons.  So go ahead.

 6             MR. VAN TOL:  As I said, I will be brief.

 7   This is a fundamental disagreement that will be resolved

 8   in the arbitration.  The question is under the credit

 9   agreement when the money comes in, according to Compass

10   that money has to sit in an account.  That's it.  It

11   can't go anywhere else.  We say that can't be the case.

12   This money is being used to obtain a loan from elsewhere

13   and you knew that coming into it.  So --

14             THE COURT:  Why did your client tell the

15   bankruptcy court that it immediately goes to Berone?

16             MR. VAN TOL:  It does.  It does, your Honor.

17   But money is fungible.  Berone -- we contacted Berone

18   and say, hey, Reign doesn't have the money.  They say

19   that's Reign, that's not us.  We have your money.  We

20   have $20 million.  Here's an account statement to prove

21   it.  So the debate that we're having with Compass and

22   Compass in good faith has an argument that we should

23   hold that money.  Our argument is that's antithetical to

24   the way this deal works.  We don't have to hold the

25   money.  We have to be able to pay back the money to you

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1  when you asked for it.  That's what the 20 million was

2  securing, your Honor.

3          THE COURT:  Yes, Mr. Levine.

4          MR. LEVINE:  Judge, the parties have said many

5  other things I was going to present to the Court. It's

6  astounding to me that Prime Venture Capital,

7  Mr. Roglieri, would rely upon a two-person shop for this

8  hedge fund to take control over $52 million.  I mean, if

9  nothing else, and that they don't know where that money

10  is, they didn't monitor the situation, to me that shows

11  gross mismanagement of their business and other people's

12  monies.

13          THE COURT:  Let me briefly turn to a different

14  topic that is of significant concern to me.

15          Mr. Van Tol, your law firm is representing a

16  client Camshaft in Florida that has its own lawsuit

17  against Prime.  They're looking to clawback millions of

18  dollars that they contend are due them.  So you've got

19  your law firm representing Camshaft in Florida trying

20  to, as I said, get money from Prime and here you are and

21  your law firm in the Northern District of New York

22  representing Prime.

23          On its face, it seems totally unacceptable.

24  You say in your papers, oh, not to worry, Judge, we have

25  the consent of our clients to do this.  It doesn't take

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    a complicated legal argument to understand how troubling

2    this is to the Court.

3            When you received consent from Camshaft, did

4    you tell them that at the time you were just simply

5    representing Prime in an involuntary bankruptcy?  Is

6    that what you told them?  Or somebody told them?  I

7    don't know if it was you or somebody from your law firm.

8            MR. VAN TOL:  It wasn't me, your Honor, but my

9    understanding was we -- because only the bankruptcy was

10   going on, that's all we could represent to them.  But we

11   represented to them that we would come back to them if

12   it got to be a bigger issue.

13           THE COURT:  It's gotten bigger.

14           MR. VAN TOL:  And Camshaft has no problem with

15   that, your Honor.  We will get you written evidence of

16   that.  They have completely, knowingly consented to the

17   representation as did Prime.

18           THE COURT:  Do you have written proof of that?

19           MR. VAN TOL:  We are obtaining written proof

20   as Mr. Esser requested; we will get that for him.  But

21   the understanding from the very beginning is we are in

22   for Prime Capital.  Camshaft has no problem with it

23   because, your Honor, they don't believe that either an

24   involuntary bankruptcy or receivership helps them at

25   all.

                    Lisa L. Tennyson, CSR, RMR, FCRR
                    UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1           THE COURT:  I have to -- you know,
2   Mr. Van Tol, I believe in clients being able to have the
3   attorneys of their choice but this is absolutely very,
4   very concerning, and you say Camshaft doesn't think it's
5   a good idea for there to be a receiver.  I'm not privy
6   to what exact conversations that you have had with
7   Camshaft, but I was a trial lawyer for a long time and
8   the conversation should be along the lines of, Camshaft,
9   we are in the Northern District of New York doing the
10  best we can to prevent that receiver be appointed to
11  keep monies status quo pending a possible arbitration,
12  money that could possibly be used to satisfy the case
13  that you have against Prime.

14           I mean, this can't be wink, wink, wink, don't
15  worry because Prime Capital Ventures, LLC, is different
16  from Prime Ventures something else.  I mean, I'm not --
17  I am not attempting to impugn your integrity or the
18  integrity of the law firm.  However, on its face, this
19  appears very, very irregular.

20           MR. VAN TOL:  May I explain the background,
21  your Honor?

22           THE COURT:  Please do.

23           MR. VAN TOL Tol:  There are other borrowers
24  who are in the position of Camshaft who sued Prime
25  Capital, one, and were paid a judgment because the

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    monies were available to pay the judgment.  When there

2    is an involuntary bankruptcy or a receivership, nothing

3    goes anywhere.

4           So I can't speak to Camshaft's motivation but

5    it makes perfect sense from a litigation point of view

6    to have someone like Prime open, doing business with

7    access to capital.  They -- even Compass cited to you

8    several cases, trust, financial.  They were paid.  Other

9    people were paid.  When they sued, they recovered on

10   their judgment.  So it is not irrational for a client to

11   say I'd rather have something to go after than to have

12   frozen assets.

13          THE COURT:  Well, from the record before me,

14   there's nothing to go after.  That's the problem.

15          MR. VAN TOL:  At the time no one knew that,

16   your Honor, that's the problem.  This was discovered

17   as -- again, Saturday night.  Before then, when -- when

18   Camshaft waived its -- any conflict, it believed, as

19   Compass did, that there was money to be had.  The idea

20   that the money isn't there is something that has been

21   established through this litigation.  There were

22   allegations of that, it was not known.  Emphasize it was

23   was not known until last week when the bank records came

24   in.

25          THE COURT:  This is quite a hornet's nest

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

1    and as a trial lawyer, I can't imagine why your law firm

2    would want to do this at this point in time, represent

3    Camshaft in Florida, trying to recover money and

4    represent the company that they're trying to recover the

5    money from here.

6           MR. VAN TOL:  Your Honor, that's why we

7    insisted on full disclosure to the clients.  That's why

8    we insisted on a waiver and we obtained the waiver

9    because at bottom, the interests align in the sense that

10   Camshaft wants Prime to be open for business.  Prime

11   wants to be open for business.  Those two interests are

12   perfectly aligned, your Honor.

13          THE COURT:  I don't think they are and I can't

14   agree with you, and if I were in your shoes, my level of

15   discomfort could not possibly be higher as a litigator.

16          The questions that are before me at this point

17   in time include whether it was appropriate for me to

18   appoint a receiver, whether the receiver should stay in

19   place, whether I should allow for further discovery

20   pending a potential arbitration, issues regarding a

21   potential conflict between Mr. Van Tol's law firm

22   representing Camshaft in Florida, which is trying to

23   recover money from Prime and at the same time

24   representing the interests of Prime.

25          I will note for the record that there has been

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   no appearance as of this morning from anyone

2   representing any of the Berone defendants.

3           Have plaintiff's counsel had any contact

4   whatsoever with any counsel for Berone?

5           MR. FENLON:  No.  No, your Honor.  I don't

6   believe the receiver has either but he can speak to

7   that.

8           MR. LEVINE:  Your Honor, I spoke to Jeremiah --

9           THE COURT:  Beguesse.

10          MR. LEVINE:  Beguesse on Thursday, I believe.

11  I strongly recommended that he get counsel.

12          THE COURT:  Okay.  But you haven't spoken to

13  any counsel?

14          MR. LEVINE:  No.  And in response to his --

15  the email's attached to my report in my response to

16  that, you know, I again recommended, among other things,

17  that he get counsel.

18          THE COURT:  Mr. Van Tol, have you had any

19  contact with any counsel for any Berone companies?

20          MR. VAN TOL:  None, your Honor.  I would note

21  for the record that apparently the receiver and Counsel

22  for Compass have had communications with Berone without

23  me being aware of those communications, so after the

24  fact.  I would hope that's an oversight and it wouldn't

25  continue.  I should be in all such conversations.


                Lisa L. Tennyson, CSR, RMR, FCRR
                 UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1          MR. LEVINE:  Your Honor?

2          THE COURT:  Yes.

3          MR. LEVINE:  In my role as receiver, I

4   respectfully disagree with that.  I need to talk to

5   whoever I need to talk to when I need to talk to them.

6   So I'm not -- I don't understand where that's coming

7   from.  Not a party here.

8          THE COURT:  I know.

9          MR. VAN TOL:  To be clear, your Honor, I

10  wasn't referring to what Mr. Levine does.  I'm referring

11  to the fact that Mr. Esser was on the communications and

12  I wasn't.  Mr. Levine is free to do as he sees fit.

13         MR. FENLON:  Your Honor, if I may.  I'm not

14  aware of any obligations on behalf of a party to

15  litigation to include all parties with communications

16  with a single other entity.  Berone is not represented

17  by counsel.  Of course if they were, we would have their

18  counsel in communications.  There's no objection to

19  include counsel.

20         THE COURT:  I have to agree.  I mean, if they

21  are represented, absolutely.

22         MR. ESSER:  Your Honor, if I may just add one

23  point to that.  The first communication I think of any

24  point in time was to the receiver on Thursday, and the

25  receiver ended up copying me I believe on a response to

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    them, basically asking about the details have you ever

2    seen this joint venture agreement, to which they

3    responded no.  And then I sent an email, copied to them

4    and said, well, have you ever had seen this RBC account

5    statement which was apparently put over.  That was

6    the extent of the communication I believe that

7    Mr. Van Tol is not on.

8              THE COURT:  Okay.  Does plaintiff need time to

9    make a -- let me say this.  From plaintiff's counsel, I

10   pretty much received a letter arguing that Mr. Van Tol

11   has a conflict.  It wasn't a formal motion.  Do you

12   intend to make a formal motion?

13             MR. ESSER:  Your Honor, some of --

14             THE COURT:  Go ahead.

15             MR. ESSER:  The answer is some of that will

16   end up depending upon what the Court ends up doing

17   today.  If the receiver is put in place permanently,

18   then we have the belief and the receiver steps in as a

19   new management for the company, has control of all his

20   assets, makes decisions about which counsel are hired

21   then as well.  Of course then it would be up to the

22   receiver whether or not he wanted to keep on retaining

23   Hogan or not, whether he thought there was any claim to

24   be made for return of fees from them, et cetera.

25             So to the extent the Court grants relief

1    requested and keeps the permanent receiver, then

2    Mr. Levine can make that decision.  I -- my assumption

3    sitting here is that he will choose not to continue to

4    allow them to represent Prime.

5              THE COURT:  You think that if I continue with

6    the receiver in place, he's going to make the decision

7    who is representing Prime?

8              MR. ESSER:  Yes.

9              THE COURT:  You don't think that's the Court's

10   decision?

11             MR. ESSER:  Well, I believe that the receiver,

12   if he is appointed in the capacity as new management for

13   the company, then would make that decision on a

14   going-forward basis of who he would use going forward.

15             THE COURT:  Yeah, probably not.

16             MR. ESSER:  Okay.

17             THE COURT:  Mr. Van Tol?

18             MR. VAN TOL:  Nothing, your Honor.  Thank you.

19             THE COURT:  Okay.  In any case, do you intend

20   to make a formal motion?

21             MR. FENLON:  Your Honor, to the extent that

22   Hogan continues to represent Prime, yes, plaintiff will

23   make a motion to disqualify them.

24             THE COURT:  All right.  And, Mr. Van Tol, you

25   will need time to respond?

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1          MR. VAN TOL:  Yes, your Honor, please.

2          THE COURT:  Are there any -- is there any

3     other briefing on any issue that the plaintiff feels is

4     necessary before I make a decision on whether the

5     receiver should be made permanent at this time?

6          MR. FENLON:  No, your Honor.  We think the

7     Court has a complete record upon which to make a

8     determination on that issue and that's the sole issue

9     that we believe is currently before the Court for

10    determination today.

11         THE COURT:  Do you need any more time to

12    brief, Mr. Van Tol?

13         MR. VAN TOL:  No, your Honor.  While we're

14    here, I did want to make two more points of

15    receivership, but as to written submissions, no.

16         THE COURT:  Go ahead on the receivership.

17         MR. VAN TOL:  Two points, your Honor, and they

18    relate to cases I can cite to you.  The first is case

19    law is clear that where you are a party seeking legal

20    remedies in a lawsuit, you can't use a receivership

21    process to secure those monies so that they are later to

22    collect.  And that case is Zyppah case -- Z-Y-P-P-A-H --

23    Southern District.  Also the JDG Mortgage case, both of

24    them said if you are in a case even if you're alleging

25    fraud, if you want damages, you can't get a

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   receivership, and Compass has been upfront, your Honor.

2   They say you want a receiver because we want to make

3   sure the money is there to collect.  That theory

4   secondly also violates the Owens case out of the

5   Southern District which cites Supreme Court precedent

6   *Grupo Mexicano*.

7           In *Grupo Mexicano*, there is an attempt to get

8   an injunction to secure a future money judgment.  It's

9   exactly what going on here, your Honor.  That is not the

10  use of a receivership.  Your Honor is well familiar with

11  receiverships.  They come up a lot in property

12  situations where a company says I want a receivership to

13  secure this hotel because I'm going to foreclose on it,

14  and that's an important third point, which is the Star

15  City Case that is cited -- sorry -- Star Texas Case

16  cited to you for the fact that there can be provisional

17  remedy during an arbitration.

18          That arbitration clause, your Honor,

19  specifically said you can appoint a receiver.  That's

20  not uncommon when there's a bank trying to foreclose.

21  Our arbitration clause does not say that.  It says in

22  aid of arbitration, in other words, force people to

23  arbitrate.  It's a very broad waiver of any court

24  proceedings.  It doesn't work -- it doesn't fit

25  together, your Honor.  Receiverships are not for

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   litigation cases that are headed to arbitration where

2   you're seeking damages.

3         THE COURT:  Well, in aid of arbitration, don't

4   you think that what the plaintiffs are trying -- the

5   plaintiff is trying to do in terms of figure out where

6   the money is, what money is available would aid an

7   arbitrator?  I mean, when you go to arbitration, it's

8   all about money.

9         MR. VAN TOL:  That's the problem, your Honor.

10  You can't use a receiver to secure money damages.

11  That's not the use of a receiver.

12        THE COURT:  I don't think they are trying to

13  secure the money damages.  I think they're trying to

14  sort out what if any money is even in contention, and as

15  far as arbitrators go, when they are trying to arbitrate

16  a case, yes, they listen to the substantive claims to

17  try to decide whether there is liable but then if they

18  find liability, they are obviously trying to figure out

19  a number.

20        I know you make a significant distinction in

21  your papers about this.  That you don't dispute that

22  there can be provisional remedies.  What you're saying,

23  the provisional remedy that the plaintiff is looking for

24  is not an aid of the arbitration.

25        MR. VAN TOL:  That's correct, your Honor.


                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    It's an -- it's an aid of securing money so that it can

2    collect on it.  And I understand their theory.  The

3    problem with it is it's against Supreme Court precedent,

4    it's against other cases.  It's against the use of

5    receivership.

6            If they want to go to the arbitration and ask

7    the arbitrator for a receiver, they should do so.  I

8    will object then but that's the proper forum to do it.

9    It's not here -- respectfully, your Honor, your hands

10   are tied here when it comes --

11           THE COURT:  I'm not sure they are.  I'm not

12   sure they are.  But go ahead.

13           MR. VAN TOL:  Just for simple reason and,

14   again, not suggesting any -- that the Court is thinking

15   about doing anything that isn't, you know -- let me back

16   up.  Let me just say it again.

17           It is the fact that the Supreme Court and

18   other courts have said if you are suing for money

19   damages, which Compass is, and you are saying you want

20   them to secure the money, which Compass is, you can't do

21   that.  Compass is putting on the hat saying, well, we

22   represent all other creditors, we want to collect all

23   money for that.  They are one plaintiff, your Honor, one

24   plaintiff with a $15.9 million claim that needs to be

25   arbitrated.  And that's it, your Honor.  The case law

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   does not permit you to do what Compass is asking you to

2   do.

3           THE COURT:  Okay.  Hold on, Mr. Levine.

4           MR. TUXBURY:  Certainly, your Honor.  This

5   Court clearly has the authority to issue a -- a --

6   appoint a receiver here.  In fact, the Second Circuit

7   addresses similar claim in the General Mills case where

8   it was a challenge to the Court jurisdiction issue,

9   preliminary injunction in aid of arbitration.  It's an

10  argument without merit and in board -- in the Second

11  Circuit, it noted that if provisional remedies such as

12  preliminary injunctions or in our case receivership,

13  weren't available to maintain the status quo, which is

14  what we're -- what we ask for first page of our motion

15  is we need to identify where the accounts are.

16          We have heard representations today where the

17  accounts are, we have received the accounts, we have

18  heard from the receiver.  Nobody knows where the

19  accounts are.  Otherwise, an arbitration becomes a

20  hollow formality.  And on top of that, I would add it's

21  not clear that an arbitrator in New York has the

22  authority to put an end to receivership as Your Honor

23  clearly does.

24          My brother cites a Southern District case,

25  Stone, for that proposition.  But in that case, the

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    arbitrator appointed a receiver after the arbitration

2    order was issued.  It was more of a collection agent who

3    was put in place to oversee the collection of revenues

4    from a theater production.

5              The Court there even said not clear whether

6    the first instance they could do this.  So it truly is

7    asking this Court to send this matter to arbitration, to

8    an individual or entity that probably doesn't have the

9    authority to issue the receivership while the Second

10   Circuit has made abundantly clear you do, and in fact

11   the parties' agreement makes it clear.  13.8 --

12   specifically the parties carved out that any party can

13   go to a court for provisional remedies.

14             And on top of that, lest there be any doubt,

15   the parties agree to the application of the JAMS rules

16   which similarly provide for the parties to go to a court

17   to seek provisional remedies receivership.  Black's Law

18   Dictionary, Second Circuit authority is a provisional

19   remedy.

20             THE COURT:  I read the JAMS language that says

21   that there can be provisional remedies but, Mr. Van Tol

22   is making a distinction saying that your -- your request

23   that I appoint a permanent receiver goes more to issues

24   about finding money that can potentially satisfy your

25   client should your client be successful in arbitration.

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    So he is making a little bit of a distinction saying

2    that yes, the arbitration agreement is under JAMS says

3    that you can move for provisional remedies, but he's

4    saying it has to be in support of or in furtherance of

5    the arbitration, and that's where the distinction lies.

6          MR. TUXBURY:  The receivership would -- would

7    aid in furtherance of arbitration because it would

8    maintain the status question.  You look at the elements

9    of the factors for receivership here.  There are all

10   met.  We have fraud, we have irreparable harm.  We have

11   a risk that the money will be dissipated.

12          We -- you heard from my colleague outlining

13   what happened to Compass's money as we can see the

14   accounts with the expenditures on RM Auction and the

15   like.  So we are not seeking to attach the specific

16   money damages.  We're claiming here.  We are asking for

17   appointment of receiver because that's the only way to

18   ensure that any arbitration is not a hollow formality,

19   that we need to identify what money is actually

20   available, where it is.

21          As my brother said moments ago, they believe

22   they sent it all on their own.  There's no evidence of

23   that.  Now they say they don't know where the money is.

24   So a receivership here is undoubtedly an aid of

25   arbitration because without it, there's nothing to

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    arbitrate because it's all gone away.  So I think we

2    have -- this Court, I would call it, clearly has the

3    authority to exercise discretion and it's a -- it's

4    an exercise of discretion when we look at the factors.

5    I think they're clearly met here.

6              THE COURT:  Okay.

7              MR. VAN TOL:  Your Honor?

8              THE COURT:  Mr. Van Tol.

9              MR. VAN TOL:  Big distinction between a

10   preliminary injunction, maintaining status quo and a

11   receivership.  A receivership is a very broad remedy

12   which entails taking over of a company.  Compass did not

13   seek an injunction saying there's a piece of property

14   there, your Honor, stop it from going anywhere.  That is

15   not what they sought.

16             The cases they cite are completely different

17   from what they're really trying to do which is they're

18   asking you to make sure that there's enough money for

19   them to collective at the end of the day.  While I

20   understand their motivation, your Honor, it's simply --

21   it's simply against Supreme Court precedent.

22             MR. LEVINE:  Thank you, Judge.  Just a couple

23   points.  I would think that Prime Capital needs to be

24   here, wants to be here because they're pointing the

25   finger at Berone.  It seems like they need to make a

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    cross claim against Berone.  So one way -- one way or

2    the other, they -- they should want to be in this court

3    that's where Berone is.

4              THE COURT:  Well, Berone is not here, just for

5    the record.

6              MR. LEVINE:  I understand but they -- they

7    have been -- they're a defendant, they are a named

8    party.  They may not be defending but they're here.  The

9    other points are, Judge, I mean, it -- there are other

10   victims here.  This is not strictly a two-party dispute.

11             THE COURT:  Well, it is for me a two-party

12   dispute.

13             MR. LEVINE:  I understand.

14             THE COURT:  It's Compass versus Prime Capital

15   Venture, LLC, for me.

16             MR. LEVINE:  I understand that, Judge, but if

17   I -- if I remain in place and if I'm able to recover

18   monies, I think there will be a big question of what we

19   do with those monies and that's -- that's where the --

20   the -- the inquiry may get broader.  There's also a

21   question of what -- what monies a receiver, if I can

22   remain in place, can recover from parties that are --

23   that are from -- the individuals and/or entities that

24   are not parties to this case presently.

25             So it's really a much broader situation than I

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    think is -- is apparent just on its face.  That's my

2    point, your Honor.

3              THE COURT:  Okay.

4              MR. TUXBURY:  If I could just address --

5    there's a distinction somehow in provisional remedy, a

6    preliminary injunction and a receivership.  The question

7    here for the Court is that provisional remedies.  If

8    there was some account out there with $15 million, let's

9    say, a preliminary injunction by Compass would be the

10   appropriate provisional remedy in aid of arbitration.

11   We don't have that here.

12             What we have here is -- we don't know where

13   the money is.  No one knows where the money is.  There's

14   evidence that it's fraud.  So a proper provisional

15   remedy in this case, as in other cases, Cypher

16   (phonetic) case, for example, that we cite is the

17   appointment of a receiver here.  So we are talking

18   about the toolkit available to the Court, not to

19   identifying the $15 million but here as to simply aid

20   the arbitration by maintaining the status quo.

21             THE COURT:  Okay.

22             MR. VAN TOL:  Your Honor, on the fraud point,

23   your Honor, it's become apparent to us, and I agree with

24   the Mr. Levine to the extent that we likely have cross

25   claims against Berone.  The focus should should be on

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    Berone.  Berone lied to Prime Capital.  They are the
2    fraudster here, your Honor.  If you want to put any
3    company into receivership, it's Berone.
4            Prime Capital has been cooperating with anyone
5    who wants to go after Berone.  We did not object to any
6    subpoenas going to Berone.  It was a vastly illuminating
7    to us that we had been lied to.  So what they're
8    essentially asking for is a receivership against a
9    company that on this record before Your Honor is a
10   victim of another party who isn't even here today.
11           THE COURT:  There are allegations that your
12   principal allegations lied at a bankruptcy hearing.
13   I've read the first report from the receiver, I know you
14   have too, which indicates that your client couldn't
15   produce any records at the time of the meeting, that he
16   didn't know where records were, that somebody living in
17   his home in Virginia might have the records.
18           MR. VAN TOL:  Your Honor, I was at that
19   meeting and I have to correct at least part of that
20   statement.  Mr. Levine asked Mr. Roglieri if he had
21   access to the underlying files for each deal.  He said
22   they are kept by Miss Humphrey and she lives in Virginia
23   Beach.  If I want to get those records, I email her, she
24   sends them to me.  It's not that Mr. Roglieri can't go
25   on his own computer system; he can.  He's the -- he's

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1      the head of the company, your Honor.  He has 25 people

2      working for him.

3              THE COURT:  At the bankruptcy, did he indicate

4      that somebody was his accountant and then that

5      accountant was contacted and said I've never done any

6      work for Prime?

7              MR. VAN TOL:  I can explain that as well,

8      your Honor.

9              THE COURT:  Please do.

10             MR. VAN TOL:  Mr. Sardone is the accountant

11     for all of the Prime entities.  He had not heard of

12     Prime Capital Ventures because Prime Capital Ventures

13     had not yet filed a tax return.  Prime Capital Ventures

14     came into being in late 2022, started business in '23.

15     It has not yet filed a tax return.  Mr. Sardone then

16     spoke to Mr. Roglieri, who then told Mr. Sardona what

17     Prime Capital is, he called the trustee and said I'm

18     happy to work with you on that account, I hadn't heard

19     for that reason.

20             They are confecting what they call a lie, your

21     Honor, when it is Mr. Roglieri saying he thought his

22     accountant knew about it, his accountant didn't because

23     it's a new entity.

24             It's as simple as that.  That's not a fraud

25     allegation that holds up.  None of the allegations --

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    look at the allegations in the complaint.  They have

2    alleged that Berone and Prime Capital together run Prime

3    Ventures, LLC.  That's not true, it's a sole member,

4    that's wrong.

5              They have alleged that we lied about the

6    $52 million being in a bank account.  That's not the

7    case.  We were defrauded by someone else.

8              They've alleged that we don't have an

9    accountant.  Also not in the case, your Honor.  These

10   are the flimsiest of fraud allegations and the key is

11   they're allegations.  This is not the clear and

12   convincing evidence that you need to appoint a receiver.

13             MR. ESSER:  Just one -- just one point,

14   your Honor.

15             THE COURT:  Yes.

16             MR. ESSER:  That was to -- Mr. Van Tol, I'm

17   sure, unintentionally misspoke.  The record is

18   100 percent clear that the entity was formed in 2021.

19   It was issuing press releases in early 2022.  So as

20   Mr. Levine properly said in his report, they never filed

21   any tax returns for 2022, and they are well past any

22   extension deadline for that.  And obviously, as

23   Mr. Van Tol has now said, they didn't even have an

24   accountant.  They can't produce financial statements.

25             The most simple, basic stuff.  As receiver

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1   said, they have given him nothing.  The Court has

2   ordered them -- the bankruptcy court previously had

3   ordered them to provide records, which they failed to do

4   to the interim trustee.  Your Honor ordered them to

5   provide records like financial statements and other

6   things to the trustee; they have failed to do that.

7          So that point about the tax returns is

8   100 percent incorrect.  They were formed in 2021.

9          MR. VAN TOL:  I'm sorry to correct Counsel

10  again, and I do accept that Prime was formed in 2021,

11  didn't start doing the joint venture until '22, the

12  business was in '23.

13         THE COURT:  The joint venture that Berone says

14  doesn't visit.

15         MR. VAN TOL:  Berone who has defrauded,

16  your Honor.

17         THE COURT:  You know, I certainly, sitting

18  here listening to the issues in this case, can't figure

19  out who committed a fraud upon whom but there are very,

20  very concerning aspects of this matter.

21         MR. VAN TOL:  Your Honor, if you read our

22  sur-reply, you will see you can put the two exhibits

23  side by side; they're not the same.  And we have the

24  emails where Prime -- excuse me -- where Berone sent

25  statements to us that say 20 million and now we find out

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    they are two or three.  But to one last point about what

2    Mr. Esser said, it is not the case that there was a

3    failure to cooperate with the interim trustee.  We have

4    submitted the declaration of Miss Humphrey who goes

5    through the documents that we gave to the trustee.  We

6    offered to meet with the trustee; he didn't take us up

7    on that offer.  Not blaming him.  It was the holidays.

8         However, it is not the case that there was a

9    lack of cooperation.  Plaintiffs haven't gotten

10   everything they wanted because plaintiffs always want

11   everything.  We are in litigation.  They haven't served

12   any document requests on Prime Capital, they haven't

13   done anything that you would expect except, to their

14   credit, two third-party subpoenas where we're looking at

15   the periphery.  But as to Prime, there's been no

16   document requests from plaintiff to give us the records.

17        The receiver has asked us for, we're working

18   on them.  We are doing that in good faith.

19        THE COURT:  Okay.  I think that I understand

20   the positions of both sides.  I have actually read every

21   word of the voluminous papers that have been submitted.

22   I will give plaintiff a brief period of time to submit a

23   formal motion on the issue of Mr. Van Tol's law firm

24   representing both entities, the one in Florida and this

25   case, and I will get a decision out on the issue

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

1    regarding whether the receiver will be permanent or

2    temporary as soon as is practicable.

3              The receiver will stay in place pending that

4    written decision that I will file.

5              MR. VAN TOL:  Would you like to set a briefing

6    schedule for that?  I don't think we have one yet.

7              THE COURT:  Yes, I -- we can do that but from

8    what I'm hearing, there are -- I haven't heard that

9    there's any significant opposition to the fact that

10   there is a binding arbitration clause.  So I would just

11   ask you to speak amongst yourselves to determine whether

12   or not such a motion is really necessary because no

13   matter what I decide, you can still be marching toward

14   your arbitration, and I am not hearing anything from the

15   other side that is saying, oh, no, this case is not

16   going to be arbitrated.

17             So talk and confer before you feel that you

18   need to make a motion on arbitration.

19             MR. VAN TOL:  Thank you, your Honor.  We will.

20             THE COURT:  Okay.  Thank you.  Court stands

21   adjourned.

22             MR. VAN TOL:  Thank you, your Honor.

23             (Proceeding concluded.)

24                  * * * * * * * * *

25


                  Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

COMPASS-CHARLOTTE 1031 v PRIME CAPITAL VENTURE - 24-cv-55

C E R T I F I C A T I O N


I, Lisa L. Tennyson, RMR, CSR, CRR, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


     /s/ Lisa L. Tennyson
     Lisa L. Tennyson, RMR, RPR, FCRR


Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY