UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

COMPASS-CHARLOTTE 1031, LLC,

                          Plaintiff,

    -against-

                                           Case No.: 24-cv-55
PRIME CAPITAL VENTURES, LLC                  (MAD/CFH)
BERONE CAPITAL FUND, LP
BERONE CAPITAL PARTNERS LLC
BERONE CAPITAL LLC
BERONE CAPITAL EQUITY FUND I, LP
405 MOTORSPORTS LLC f/k/a Berone Capital Equity
Partners LLC

                         Defendants.

_____


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT PRIME CAPITAL VENTURES, LLC'S EMERGENCY MOTION FOR STAY OF ORDER APPOINTING RECEIVER

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................. 3

    I.    COMPASS-CHARLOTTE'S VERIFIED COMPLAINT ................................................ 3

    II.    APPOINTMENT OF A TEMPORARY AND PERMANENT RECEIVERSHIP ................................. 4

    III.    ARBITRATION DEMAND ............................................................................ 6

    IV.    FBI RAID ............................................................................................ 7

ARGUMENT ...................................................................................................................... 7

    I.    PRIME DID NOT MEET THE HEIGHTENED STANDARD TO STAY THE RECEIVERSHIP
APPOINTMENT PENDING PRIME'S INTERLOCUTORY APPEAL. ........................................... 7

        A.    Prime Cannot Show a Substantial Possibility of Success on Appeal .......................... 8

        B.    The Absence of a Stay Will Not Irreparably Harm Prime. ....................................... 24

        C.    Compass-Charlotte Will Suffer Irreparable Harm if the Stay is Granted................... 24

        D.    Public Interest Does Not Support a Stay. ................................................................ 25

    CONCLUSION ................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AAAG-California, LLC v. Kisana*,
  439 F. Supp. 3d 1265 (D. Utah 2020) .................................................. 16
*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*,
  136 F.3d 82 (2d Cir. 1998) ................................................................. 10
*B. Riley FBR, Inc. v. Clarke*,
  2018 WL 7253601 (D. Minn. Nov. 21, 2018) ..................................... 17
*Banco Central de Paraguay v. Paraguay Humanitarian Found., Inc.*,
  2005 WL 1561504 (S.D.N.Y. June 30, 2005) ..................................... 15
*Becker v. Poling Transp. Corp.*,
  356 F.3d 381 (2d Cir. 2004) ............................................................... 16
*Borden v. Meiki Milk Prods. Co., Ltd.*,
  919 F.2d 822 (2d Cir. 1990) ............................................................... 12
*Brenntag Int'l. Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999) ............................................................... 21
*Carnegie Inst. of Washington v. Fenix Diamonds, LLC*,
  544 F. Supp. 3d 440 (S.D.N.Y. 2021) ................................................... 7
*Culwick v. Wood*,
  2020 WL 4597322 (S.D.N.Y. Apr. 14, 2020) ..................................... 16
*D.B. Zwirn Special Opportunities Fund, LP v. Tama Broad., Inc.*,
  550 F. Supp. 2d 481 (S.D.N.Y. 2008) ................................................. 20
*Desir v. Spano*,
  259 A.D.2d 749 (2d Dept. 1999) ........................................................ 10
*Esbitt v. Dutch-Am. Mercantile Corp.*,
  335 F. 2d 141 (2d Cir. 1964) .............................................................. 18
*Falcon Ventures LLC v. Haystack Ventures Int'l. LLC.*,
  2017 WL 6940538 (C.D. Cal. July 24, 2017) ..................................... 11
*Fed. Ins. Co. v. U.S. Distrib. Inc.*,
  2006 WL 3726139 (N.D.N.Y. Dec. 15, 2006) ..................................... 12
*Firemen's Ins. Co. of Newark, N.J. v. Keating*,
  753 F. Supp. 1146 (S.D.N.Y.1990) .................................................... 22
*Frye v. Brown*,
  189 A.D.2d 1031 (3d Dept. 1993) ........................................................ 9
*General Mills, Inc. v. Champion Petfoods USA, Inc.*,
  2020 WL 915824 (S.D.N.Y. Feb. 26, 2020) ....................................... 12
*Gonzalez v. Beth Israel Med. Ctr.*,
  262 F. Supp. 2d 342 (S.D.N.Y. 2003) ................................................. 11
*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) ........................................................................... 15
*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ................................................................. 13, 14, 15

ii

*Hirschfeld v. Bd. of Elections,*
  984 F.2d 35 (2d Cir. 1993)..................................................................................8

*Hnot v. Willis Grp. Holdings Ltd.,*
  241 F.R.D. 204 (S.D.N.Y. 2007) ......................................................................7

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.,*
  889 F.2d 1274 (2d Cir. 1989).........................................................................10

*In re Feit & Drexler, Inc.,*
  760 F.2d 406 (2d Cir.1985).............................................................................22

*In re McGaughey,*
  24 F.3d 904 (7th Cir. 1994) ............................................................................19

*Jin v. Metro. Life Ins. Co.,*
  310 F.3d 84 (2d Cir. 2002)..............................................................................11

*Larouche v. Webster,*
  975 F. Supp. 490 (S.D.N.Y. 1996) ...................................................................8

*Mass. Mut. Life Ins. Co. v. Thorpe,*
  260 A.D.2d 706 (3d Dept. 1999) .......................................................................9

*Meehan v. Brookliv LLC,*
  2022 WL 523545 (E.D.N.Y. Feb. 21, 2022)....................................................7

*Morse/Diesel, Inc. v. Trinity Indus., Inc.,*
  67 F.3d 435 (2d Cir. 1995)..............................................................................10

*Netsphere, Inc. v. Baron,*
  703 F.3d 296 (5th Cir. 2012) ..........................................................................23

*Novartis Consumer Health, Inc. v. Johnson & Johnson Consumer Pharm. Co.,*
  290 F.3d 578 (3d Cir. 2002)............................................................................24

*On-Time Disposal, Inc. v. N. Jersey Recycling, LLC,*
  2015 WL 5544434 (S.D.N.Y. Sept. 17, 2015)...............................................23

*Opticians Ass'n. of Am. v. Indep. Opticians of Am.,*
  920 F.2d 187 (3d Cir. 1990)............................................................................24

*Owens v. Gaffken & Barriger Fund LLC,*
  2009 WL 773517 (S.D.N.Y. Mar. 24, 2009) ...........................................13, 14

*Pashaian v. Eccelston Props.,*
  88 F.3d 77 (2d Cir. 1996)................................................................................21

*Payne v. White,*
  101 A.D.2d 974 (3d Dept. 1984) ....................................................................15

*Reed v. Knollwood Park Cemetery,*
  441 F. Supp. 1144 (E.D.N.Y. 1977) ...............................................................10

*Rodolitz v. Neptune Paper Prods., Inc.,*
  22 N.Y.2d 3838 (1968) ...................................................................................10

*Rosen v. Siegel,*
  106 F.3d 28 (2d Cir. 1997)............................................................................8, 9

*S.E.C. v. Babikian,*
  2014 WL 2069348 & n.3 (S.D.N.Y. Apr. 21, 2014) ......................................17

*S.E.C. v. GPB Cap. Holdings, LLC,*
  2023 WL 8468467 & n.16 (E.D.N.Y. Dec. 7, 2023) ......................................18

*S.E.C. v. Am. Bd. of Trade, Inc.,*
  830 F.2d 431 (2d Cir. 1987)......................................................................18, 21

*Serio v. Black, Davis & Shue Agency, Inc.*,
   2005 WL 3642217 (S.D.N.Y. Dec. 30, 2005) ...................................................... 16
*Starke v. SquareTrade, Inc.*,
   913 F.3d 279 (2d Cir. 2019).................................................................................. 11
*Starter Corp. v. Converse, Inc.*,
   170 F.3d 286 (2d Cir. 1999).................................................................................. 10
*Syphers v. Scardino*,
   1985 WL 4283 (E.D. Pa. Dec. 5, 1985) ................................................................ 11
*Toyo Tire Holdings of Am. Inc. v. Cont'l. Tire N. Am., Inc.*,
   609 F.3d 975 (9th Cir. 2010) ................................................................................ 11
*Tuccillo v. Geisha NYC, LLC*,
   635 F. Supp. 2d 227 (E.D.N.Y. 2009) ................................................................... 24
*U.S. Bank Nat'l. Ass'n. v. Nesbitt Bellvue Prop. LLC*,
   866 F. Supp. 2d 247 (S.D.N.Y. 2012).................................................................... 18
*U.S. v. Priv. Sanitation Indus. Ass'n.*,
   44 F.3d 1082 (2d Cir. 1994).................................................................................... 8
*U.S. v. Zitron*,
   1990 WL 13278 (S.D.N.Y. Feb. 2, 1990)............................................................. 21
*Underground Electric Rys. Co. of London v. Owsley*,
   176 F. 26 (2d. Cir. 1909)....................................................................................... 10
*We Shall Overcome Found. v. Richman Org., Inc. (TRO Inc.)*,
   221 F. Supp. 3d 396 ............................................................................................. 17
*Wells Fargo Bank, N.A. v. Star Gasoline & Oil Distributor, Inc.*,
   2015 WL 419638 (S.D. Tex. Jan. 29, 2015).......................................................... 11
*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*,
   2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ........................................................ 17
*Zeltser v. Regal V. World-Wide Holdings*,
   111 F.3d 124 (2d Cir. 1997).................................................................................. 21

**Rules**

Fed. R. Civ. P. 62(c) ................................................................................................... 7

**Other Authorities**

Wright & Miller, Federal Practice and Procedure § 2983 ......................................... 18

## PRELIMINARY STATEMENT

On January 12, 2024 Plaintiff Compass-Charlotte 1031, LLC ("Compass-Charlotte") sought the appointment of a receiver to find (and return) Plaintiff's $16 million interest credit account deposit ("ICA") that Plaintiff had made to Defendant Prime Capital Venture LLC ("Prime") in April 2023.  Compass-Charlotte's ICA deposit has disappeared at Prime, along with the ICA deposits of other Prime counterparties.  Indeed, Prime and the other Defendants Berone Capital Fund, LP, Berone Capital Partners LLC, Berone Capital LLC, Berone Capital Equity Fund I, LP, and 405 Motorsports LLC f/k/a Berone Capital Equity Partners LLC (collectively "Berone Capital") have defrauded Compass-Charlotte and other victims of over $50 million in ICA deposits.  Rather than retain the ICA deposits for the benefit of Compass-Charlotte's financing, Prime, and its single managing Member Kris Roglieri, raided the ICA deposit accounts and spent tens of millions of dollars on luxury supercars, multi-million dollar watches, a real estate mansion, and private charter air travel.  There can be no doubt that Prime has been operating a criminal scheme to defraud innocent counterparties, including Compass-Charlotte.  In fact, the Federal Bureau of Investigations executed search warrants against Kris Roglieri and Kimberly "Kimmy" Humphrey (in addition to others) on Friday, February 2, 2024 seizing records, electronic devices, and stolen assets.

In opposing the appointment of a receiver, Prime has repeatedly represented that it transferred Compass-Charlotte's ICA deposit to Berone Capital for management and therefore no receiver was necessary.  Prime's counsel made this unequivocal representation at this Court's January 22, 2024 hearing.  Mr. Roglieri also testified before the Bankruptcy Court that Compass-Charlotte's ICA deposit was transferred by Prime to Berone Capital.  Prime, however, has failed to provide the basic documents of the alleged transfer to support this sworn testimony and

representation to this Court.  And Prime's bank account statements show this representation was false as Compass-Charlotte's deposit was used for other purposes (like buying a luxury car).  Prime has failed to marshal any evidence whatsoever to support its protestation of innocence and Mr. Roglieri has now engaged criminal defense counsel.

Now Prime makes this last-ditch attempt to continue its scheme by asking this Court to stay the appointment the Receiver.  See Dkt. No. 70 (the "Motion").  This motion comes *after* the Court already issued an order *not staying* the appointment of the receiver during the pendency of Prime's appeal.  Regardless of whether this Motion is assessed as a motion for reconsideration or motion to stay under Rule 62, Prime does not come close to meeting its heightened burden.

In particular, Prime cannot show that it is likely to succeed on the merits of its appeal to the Second Circuit.  Despite repeated assertions to the contrary, this Court clearly has the authority (from the Parties' agreement and case law) to appoint a receiver in this case.  Compass-Charlotte brings this action for breach of contract, conversion, and fraudulent inducement and asks, *inter alia*, that Prime be ordered to return Compass-Charlotte's property, *i.e.,* the ICA deposit, or that the Parties' be rescinded and Compass-Charlotte is put into the same position as if it had not been fraudulently induced into executing an agreement with Prime.

Further, there is no doubt that appointment of the receiver was correct (and necessary). The evidence that Prime operated a fraudulent enterprise is beyond doubt.  With each day, comes new revelations of misconduct, and new victims.[1]  Prime proclaims its innocence and asserts that it is also a "victim," but fails to provide an iota of evidence (or an affidavit from Mr. Roglieri) to

---

[1] By way of example, Compass-Charlotte has now become aware of yet another entity, SP Harbor QOZB LP, which provided Prime with a $2,500,000 deposit in October 2023 which Prime and Roglieri agreed they would "not deliver custody or possession of any of the Deposit Amount to anyone" and then promptly dissipated the deposit the day after receipt.  A declaration by SP Harbor regarding these facts and in support of the continuation of the receivership is filed alongside this Opposition.

support these claims.  Instead, Prime contends it is still gathering documents and its "investigation is ongoing."  The other elements for a receivership are squarely met.  Compass-Charlotte is likely to succeed on the merits of its underlying claims (Prime has admitted its need to return the ICA).  Compass-Charlotte will also suffer irreparable harm if a receiver is not appointed.

Finally, Prime cannot meet its burden of showing that it will suffer irreparable harm without the stay and that Compass-Charlotte will not suffer such harm if a stay is issued.  The reality is that Prime, Compass-Charlotte, and the public will also suffer harm if a stay is imposed.  Without the Receiver, Prime's assets will continue to be raided by its single managing member, Compass-Charlotte's ICA deposit will be lost, and the unsuspecting public will yet again be subject to Prime's fraudulent enterprise.  For the reasons outlined below, the Motion should be denied in its entirety.

## FACTUAL BACKGROUND

### I.   COMPASS-CHARLOTTE'S VERIFIED COMPLAINT

On January 12, 2023, Compass-Charlotte filed suit against Defendants—including Prime—based upon Defendants' participation in what appears to be a multi-state, multi-victim Ponzi scheme holding claims for well over $50 million for the return of deposits which were paid to Defendants and then not returned.  Dkt. No. 1.  The Verified Complaint specifically alleges an ongoing fraud whereby Defendants promise to provide third parties with multi-million dollar loans in the form of lines of credit with attractive interest rates, collect 20% up front in cash from the third party that Defendants purport will be held in a segregated ICA Account for purposes of funding interest payments on the line of credit, but never actually fund (and never intend to fund) the lines of credit and instead use the monies intended to be placed in ICA Accounts for Defendants' personal enjoyment.  *Id.*  In an effort to appear legitimate to sophisticated borrowers like Compass-Charlotte and corral unsuspecting victims to participate in the Ponzi scheme, Prime

made multiple materially false misrepresentations regarding the success of its business—including touting multi-million dollar deals that never actually closed. *Id.* ¶¶ 69-91.

The Compass Prime Agreement, which Compass-Charlotte elected to terminate after not receiving any line of credit advances from Prime, specifically provided that:

> Borrower shall remit the ICA Payment in accordance with the terms and time period set forth in Recital C. Upon the funding of the First Advance, the ICA Payment ***shall remain part of the Interest Credit Account*** and subject to the provisions of this Agreement, and not refundable to Borrower unless otherwise specifically provided for in this Agreement. ***All credits to the Interest Credit Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances*** as and when such interest payments are due and payable. Upon Borrower's exit and payoff of the LOC, absent the occurrence of an Event of Default, if there is a remaining balance in the ICA, the excess amount shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to Borrower.

Dkt. No. 1-29, § 3.6 (emphasis added).

Thus, in an effort to reclaim its ICA Account, Compass-Charlotte filed its Verified Complaint, pleading four substantive causes of action: (1) a breach of contract claim seeking money damages in the amount equal to Compass-Charlotte's ICA deposit; (2) a fraud in the inducement claim essentially seeking a rescission of the Compass Prime Agreement and subsequent access to Compass-Charlotte's ICA Account; (3) a conversion claim seeking the return of Compass-Charlotte's ICA Account due to Defendants "exercise and control over Compass-Charlotte's property and hav[ing] refused to return Compass-Charlotte's property"; and (4) a North Carolina Unfair and Deceptive Trade Practices claim. Dkt. No. 1 ¶¶ 166-194.

## II.   APPOINTMENT OF A TEMPORARY AND PERMANENT RECEIVERSHIP

In tandem with its Verified Complaint, Compass-Charlotte filed a motion for emergency relief in the form of an order to show cause seeking the appointment of a permanent receiver to oversee Prime's business, permission to take expedited discovery from third-party financial institutions, and (while the emergency motion was pending), appointment of a temporary receiver.

Dkt. No. 6.  This Court granted the relief sought in that emergency motion in a matter of hours, placed Prime under a temporary receivership, and set a date for the Parties to be heard on the necessity for a permanent receiver.  Dkt. No. 8.

On January 22, 2024, counsel for both Compass-Charlotte and Prime were heard on the permanent receiver question.  Prime's counsel argued vehemently against the need for a receivership, relying on its sur-reply filed just a day before the hearing alleging the Berone entities are the only bad actors in the scheme and that Prime is a victim of the Berone entities in the same way Compass-Charlotte is.  Dkt. Nos. 57, 70-4.  Counsel for Prime reiterated Prime's position that it forwarded all ICA deposits to the Berone entities, and was misled into believing those funds were being held for the benefit of Prime.  Dkt. No. 70-4 at 12:14-21 (Van Tol:  "There is no evidence that Prime Capital Ventures took Compass's money and sent it anywhere other than to Berone.  It went to Berone accounts.").  Following the hearing, the Court entered its Order granting Compass-Charlotte's emergency motion for a permanent receivership.  Dkt. No. 56.

Following his appointment, Receiver Paul Levine, Esq. submitted multiple status reports to the Court.  Dkt. Nos. 37, 61, 65.  These reports detail the Receiver's efforts to locate Prime's corporate assets, including meeting with Kris Roglieri and counsel for Prime, Peter Van Tol, as well as the Receiver's initial findings of fact.  *Id.*  In particular, the reports describe the various documents and information the Receiver requested from Prime, including evidence that can establish Prime's theory that the Berone entities are bad actors.  Dkt. 61.  Notably, Prime has not offered this Court, nor the Receiver *any* evidence that Prime ever wired any money to Berone Capital outside of a singular instance in 2022, and has not provided the Receiver with *any*

documents to support Prime's assertion that Prime wired the ICA deposits to be held in ICA Accounts with Berone Capital.[2]

In his efforts, the Receiver uncovered that Prime had a pattern of using its corporate monies to fund the lavish lifestyle of Prime's affiliates—including Kris and Tina Roglieri, and Kimberly Humphrey.  Dkt. Nos. 37, 61.  As a result, the Receiver filed a Third Party Complaint on behalf of Prime against various third parties that benefited from the use of Prime's assets, and sought an Order to Show Cause for Attachment and Expedited Discovery as to those Third Party Defendants. Dkt. Nos. 71, 72.  Like Compass-Charlotte's emergency motion for a receiver and expedited discovery, the Receiver's requests were swiftly granted.  Dkt No. 78.  To date, the Receiver is continuing to oversee Prime and is ascertaining Prime's remaining assets for the benefit of Prime's creditors, despite Prime's continued refusal to cooperate.

## III.    ARBITRATION DEMAND

In exercising its rights under the Compass Prime Agreement, Prime submitted a Demand for Arbitration against Compass-Charlotte on January 24. 2024, seeking arbitration of the claims asserted in the instant litigation.  *See* Tuxbury Decl. Ex. A.[3]  Consistent with that demand, Compass-Charlotte is working with Prime's counsel to select a potential arbitrator and scheduling necessary dates to further that arbitration.  *See* Tuxbury Decl. Ex. B.  While Compass-Charlotte maintains there are procedural questions regarding Prime's ability to commence arbitration

---

[2] Ironically, Prime submitted an affidavit from Kris Roglieri as part of its opposition to Compass-Charlotte's recently filed Motion to Disqualify Hogan Lovells attesting to the fact that Roglieri allegedly gave Prime "informed consent" regarding an ongoing conflict of interest.  Dkt. No. 92-9.  At no point in any of the aforementioned motion papers regarding the Receiver's appointment and/or expedited discovery did Prime submit any such evidence (in the form of a client affidavit or otherwise) to support its claims that Prime is an innocent party.

[3] "Tuxbury Decl." refers to the Declaration of James L. Tuxbury and corresponding exhibits, filed alongside this Opposition.

without consent of the Receiver, Compass-Charlotte is nonetheless engaged in productive discussions as of the date of this Motion. *Id.*

## IV.    FBI RAID

On February 2, 2024, related to the uncovering of Prime's participation in the Ponzi scheme, counsel for Prime informed the Parties that the Federal Bureau of Investigation ("FBI") executed various search warrants, including at the homes of both Kris Roglieri and Kimberly Humphrey. *See* Tuxbury Ex. C. Those implicated in the FBI's investigation are in the process of retaining criminal counsel. *Id.*[4]

To date, Prime has yet to provide any evidence to the Receiver or Compass-Charlotte supporting Prime's assertion that it transferred Compass-Charlotte's ICA deposit (and the other ICA deposits Prime received during 2023) to Berone Capital.

## ARGUMENT

## I.    PRIME DID NOT MEET THE HEIGHTENED STANDARD TO STAY THE RECEIVERSHIP APPOINTMENT PENDING PRIME'S INTERLOCUTORY APPEAL.[5]

Even if the Court had not already rejected a stay of the receivership pending appeal, Prime cannot meet the heavy burden justifying a stay during its interlocutory appeal. Fed. R. Civ. P.

---

[4] Prime's counsel, Hogan Lovells US LLP, has known that Prime was under investigation by the U.S. Attorneys' office since at least December 20, 2023. *See* Dkt. No. 105-1 (Declaration of William L. Esser IV) at ¶¶ 20-21.

[5] It's not entirely clear that the legal standards typical to a motion for stay are applicable to Prime's Motion. On January 29, 2024, the Court issued an order *sua sponte* staying discovery pending appeal and expressly held that "the appointment of the receiver is not stayed." ECF No. 68 ("January 29th Order"). Later that day, Prime filed the present Motion. ECF No. 70. Prime's Motion does not acknowledge that the Court already addressed the question of a stay of the receivership pending appeal or identify any basis why the Court should reconsider its decision to deny a stay of the receivership pending appeal. *See e.g.*, *Meehan v. Brookliv LLC*, 2022 WL 523545, *2-3 (E.D.N.Y. Feb. 21, 2022) (finding defendants' motion was "effectively a motion for reconsideration" as the court had already "denied the defendants' request for exactly the same relief," and that defendants failed to address or meet the standard for reconsideration); *Carnegie Inst. of Washington v. Fenix Diamonds, LLC*, 544 F. Supp. 3d 440, 451 (S.D.N.Y. 2021) ("The Court rejects plaintiffs' disguised motion for reconsideration, which identifies no legal or factual basis for departing from the law of the case."). In the event the Court treats Prime's Motion as one for reconsideration, Prime fails entirely to satisfy that standard. Prime has not identified new controlling law or available evidence that would support reversing the Court's January 29th Order. Nor has Prime identified any fact or data that the Court overlooked in declining to stay the receivership. Moreover, Prime has not shown that there is a need to correct a "clear error" or that if the receivership remains in place pending appeal it will result in "manifest injustice" to Prime. *Hnot v. Willis*

62(c) provides that "[u]nless the court orders otherwise, the following are not stayed after being entered, even if an appeal is taken:  (1) an interlocutory or final judgment in an action for an injunction *or receivership*." (emphasis added).   A party seeking a stay pending appeal under Federal Rule 62 bears a "difficult burden."  *See U.S. v. Priv. Sanitation Indus. Ass'n.*, 44 F.3d 1082, 1084 (2d Cir. 1994).  In determining whether to grant a stay pending appeal, the Second Circuit considers four factors:  (1) whether a movant has demonstrated a substantial possibility of success on appeal; (2) whether the movant will suffer irreparable injury absent a stay; (3) whether a party will suffer a substantial injury if a stay is issued; and (4) the public interest.  *Id.* (citing *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993)).  All of the factors weigh heavily in favor of Compass-Charlotte and denial of a stay of the receivership pending Prime's appeal.

### A. <u>Prime Cannot Show a Substantial Possibility of Success on Appeal</u>

First, Prime's Motion fails to show that Prime will succeed on appeal, much less that Prime has a substantial possibility of success.  Indeed, Prime's Motion is conspicuously silent on the standard of review on its appeal.   The standard of appellate review for receivership appointments is abuse of discretion.  *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997) ("We review a decision to appoint (or not to appoint) a receiver for an abuse of discretion.")  Under this deferential standard of review, there is an abuse of discretion only "when the court applies an incorrect legal standard or relies on a clearly erroneous finding of fact" or when the Court "makes an error in the substance or form of its order."  *Id.* at 31 (internal citation and quotation marks omitted).

Applying that abuse of discretion standard, Prime is not likely to prevail on the merits of its appeal because it is unable to establish this Court applied an incorrect legal standard or relied

---

*Grp. Holdings Ltd.*, 241 F.R.D. 204, 207 (S.D.N.Y. 2007) (internal citation and quotation marks omitted).  These reconsideration criteria are "strictly construed against the moving party."  *Larouche v. Webster*, 975 F. Supp. 490, 492 (S.D.N.Y. 1996) (citing cases).

on erroneous findings of fact in granting Compass-Charlotte's motion for the appointment of the Receiver. *Id.* at 34. The present Motion reflects merely re-litigation of the merits of the receivership, and does not make any showing that Prime is likely to succeed on the abuse of discretion standard before the Second Circuit.

### 1. This Court Had the Authority to Appoint the Receiver.

Central to Prime's Motion is its claim that this Court lacked authority to appoint the receiver. Mot. at 5-13. On this argument, Prime raises two grounds: (i) the arbitration agreement bars a receivership; and (ii) the Court cannot appoint a receiver because Compass-Charlotte has asserted legal claims. Prime is wrong on both grounds.

### i. *The Parties Expressly Bargained for Their Entitlement to Seek Provisional Remedies from This Court, Including Receivership.*

First, Prime's argument that the Parties' arbitration agreement bars the appointment of a receiver is virtually identical to Prime's original arguments against appointment of the receiver, and Compass-Charlotte incorporates by reference its original motion for appointment of the receiver and supporting papers. Dkt. No. 6. Prime's Motion posits that the Parties' "arbitration provision . . . does not authorize a receivership" and "only allows the parties to resort to the courts for the narrowest purposes." Mot. at 7. This argument ignores the language that was bargained for by the Parties when entering the Compass Prime Agreement, and would render the carve-out in the arbitration clause essentially superfluous. Foundational contract principles make certain Prime's position should be rejected.

"The most fundamental canon of contract interpretation, taking precedence over all others, is that primary attention be given to the purpose of the parties in making the contract." *Mass. Mut. Life Ins. Co. v. Thorpe*, 260 A.D.2d 706, 709 (3d Dept. 1999) (citations omitted); *see also Frye v. Brown*, 189 A.D.2d 1031, 1033 (3d Dept. 1993) ("Undoubtedly, the ultimate goal in contract

interpretation is realization and effectuation of the parties' intent." (citations omitted)). Under New York law, a court deciding a contract interpretation case must first determine whether the contract is ambiguous. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 443 (2d Cir. 1995). A contract is unambiguous if the language "has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). A contract that is unambiguous "is to be interpreted in accordance with its clear language so as to effectuate the intent of the parties." *In re Desir v. Spano*, 259 A.D.2d 749, 750 (2d Dept. 1999) (internal citations omitted). For decades, courts have refused to interpret a contract in a way that would "contradict the clearly express language of the contract." *Reed v. Knollwood Park Cemetery*, 441 F. Supp. 1144, 1148 (E.D.N.Y. 1977) (citing *Rodolitz v. Neptune Paper Prods., Inc.*, 22 N.Y.2d 3838 (1968)).

Prime's interpretation of the Compass Prime Agreement's arbitration clause strains the plain language to its most extreme. Section 13.8 is clear: "This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction." According to Prime, however, "provisional remedies" does not include a receivership, Mot. at 5-9, notwithstanding the multitude of case law and dictionary definitions to the contrary. *See* Dkt. No. 40 at 3-4 (citing *Underground Electric Rys. Co. of London v. Owsley*, 176 F. 26, 34 (2d. Cir. 1909), Black's Law Dictionary (11th ed. 2019), JAMS Comprehensive Arbitration Rules and Procedures, etc.). There is no doubt that a receivership is a provisional remedy and that under the

arbitration agreement and relevant case law this Court has authority to appoint a receiver to aid arbitration.[6]

Further, arbitration provisions are traditional creatures of contract, *see Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019), and the Court must accordingly enforce the provision as it was understood by the Parties when entering the Agreement. Prime contends that, because the Parties did not specify "receivership" in the contract language, no such provisional remedy should be available here. Mot. at 6-7. This contention flips on its head basic canons of contractual interpretation and Prime's reliance on *Wells Fargo Bank* actually undermines Prime's position. In *Wells Fargo Bank, N.A. v. Star Gasoline & Oil Distributor, Inc.*, 2015 WL 419638 (S.D. Tex. Jan. 29, 2015), the district court appointed a receiver prior to arbitration. In the arbitration agreement at-issue, the parties in *Wells Fargo Bank* provided that the Court could issue provisional remedies prior to arbitration. The inclusion of the phrase "such as" to identify examples of provisional remedies in *Wells Fargo Bank* does not mean the list of specifics was intended by the parties to be an exclusive list. *See, e.g.*, *Gonzalez v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 351 (S.D.N.Y. 2003) (citing *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 93 (2d Cir. 2002) ("The use of the phrase 'such as' demonstrates the Supreme Court meant the examples to be merely instructive, not exclusive."). Instead, the court in *Wells Fargo Bank* relied on the fact that it was vested with the authority by the parties to issue provisional remedies when it appointed a receiver. *Wells Fargo Bank,* 2015 WL 419638, at *3.

---

[6] Prime's contention that there is no case in which a court appointed a receiver prior to arbitration ignores case law to the contrary. *See Syphers v. Scardino*, 1985 WL 4283, *6 (E.D. Pa. Dec. 5, 1985); *Falcon Ventures LLC v. Haystack Ventures Int'l. LLC.*, 2017 WL 6940538, *6 (C.D. Cal. July 24, 2017) (In deciding whether to appoint a receiver prior to arbitration noting that the "Ninth Circuit has long recognized the authority of district courts 'to issue equitable relief in aid of arbitration.'") (quoting *Toyo Tire Holdings of Am. Inc. v. Cont'l. Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010)).

The same reasoning applies to the present case. Here, sophisticated parties expressly provided that provisional relief should be awarded *by this Court.* Compass-Charlotte and Prime could have adopted an arbitration clause without an express carve-out for the jurisdiction and authority of this Court, but instead affirmatively chose to vest this Court with the power to afford provisional remedies. That decision between the Parties should continue to be respected, as there is nothing ambiguous or imprecise about the arbitration clause's carve-out. Prime's contention that receivership is excluded from the broader definition of "provisional remedies" lacks a basis in the plain language of the agreement. If Prime wanted to narrow the general understanding of the term "provisional remedy," which includes receivership, Prime could have carved receivership out of that general term. Prime did not do so. The Court cannot change the terms of the contract that Prime executed. *See Fed. Ins. Co. v. U.S. Distrib. Inc.*, 2006 WL 3726139, *4 (N.D.N.Y. Dec. 15, 2006) (noting that the "[p]ublic interest favors enforcing private agreements between competent parties in the absence of fraud or other legal impediment").

Prime additionally argues that the appointment of the Receiver was not "in aid of arbitration," because the Receiver would ultimately delay or frustrate arbitration. Mot. at 5-7. Again, this position is strained and makes little practical sense. First, there are plenty of controlling cases where courts have rendered provisional remedies prior to an arbitration where the arbitration clause contains an "in aid of arbitration" qualifier. *See, e.g.*, *Borden v. Meiki Milk Prods. Co., Ltd.*, 919 F.2d 822, 826 (2d Cir. 1990). This is because the public policy behind vesting the Court with the power to afford provisional remedies is to prevent arbitrations from becoming a "hollow formality" by allowing one party to irreversibly alter the status quo. *General Mills, Inc. v. Champion Petfoods USA, Inc.*, 2020 WL 915824, *3 (S.D.N.Y. Feb. 26, 2020). Preventing any future arbitration between Compass-Charlotte and Prime from becoming a "hollow formality" is,

on its face, "in aid of arbitration."  Any other interpretation would render the "provisional remedies" term superfluous.  Yet that is just what Prime contends.  Prime argues that the receivership delays arbitration and therefore it is not in "aid of arbitration."  Mot. at 8-9.  But this logic would apply to any provisional remedy, so that according to Prime there is no scenario under which any provisional remedy would "aid arbitration."  Such an absurd interpretation would render the carve-out for this Court's jurisdiction meaningless.

Relatedly, Prime contends that the appointment of the Receiver is some type of "plan" by Compass to have Prime "waive" its arbitration right.  Motion at 8-9.  Prime's paranoia, however, has no basis in fact.  Indeed, not disclosed by Prime in its Motion, Prime has already filed a demand for arbitration and the Parties, *i.e.*, Compass-Charlotte and Prime, are collaboratively working towards identification of an arbitrator.  Tuxbury Decl. Ex. B.  Thus, far from delaying, impeding, or blocking arbitration, the receivership appointment is effectively working concurrently with the arbitration process.

ii. *The Existence of a Breach of Contract Claim Does Not Negate the Court's Authority to Appoint a Receiver.*

In the present Motion, Prime argues for the first time that the existence of money damages in the Verified Complaint bar the appointment of a receiver.  *See* Mot. at 9.  But Prime's newest effort to restrict this Court's authority to appoint a receiver mischaracterizes the nature of Compass-Charlotte's claims and its requested relief, as well as the governing cases law.  This procedural argument is a distraction, and fails for multiple reasons.

First, the two cases Prime relies upon—*Owens v. Gaffken & Barriger Fund LLC*, 2009 WL 773517 (S.D.N.Y. Mar. 24, 2009) and *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)—are entirely distinguishable from the instant litigation.  In *Owens*— unlike the present case—the complaint did not contain any evidence or allegation that the

13

defendant was presently engaged in and perpetrating an ongoing fraud.  Instead, the court found

that the only real fraud alleged was merely "a completed fraud—that is, the alleged fraud in

inducing them to invest in the Fund by misrepresenting the Fund's inherent risks."  *Owens*, 2009

773517, at *3.  There, the defendant was already under the supervision of non-defendant entities

at the time the lawsuit was filed, and 50 out of 55 of the plaintiff's investors voted against the

appointment of a receiver prior to the litigation's commencement.  *Id.* at *3, *4 ("We will not use

our equitable powers to resolve a dispute among investors in favor of a minuscule minority.").

Thus, *Owens* does not usurp the Court of authority to appoint a receiver where there is

overwhelming evidence that the defendant is engaged in an ongoing and rampant fraudulent

scheme.

   *Grupo* is similarly inapposite.  In *Grupo*, the defendant was accused of using unsegregated

monies to pay off other, legally valid, debts—*i.e.*, preferring certain debts over the plaintiff's.  527

U.S. at 312.  *Grupo* did not involve any allegation of fraud, and (again, unlike the present Compass-

Charlotte Verified Complaint) the plaintiff in that case only sought relief for breach of contract.

*Id.*  Here, Compass-Charlotte has already uncovered and pled that Prime (among others) is engaged

in a massive, multi-state, multi-victim Ponzi scheme.  *See generally* Dkt. Nos. 1, 37, 42, 61.

Compass-Charlotte has presented evidence that indicates Prime lied to the Bankruptcy Court about

its involvement in the scheme.  *See* Dkt. No. 42.  Further, the Receiver, despite a very thorough

and diligent investigation, has been unable to identify any evidence that Prime ever wired the ICA

deposits to Berone Capital.  *See* Dkt. Nos. 37, 61.  Instead, the Receiver has identified evidence of

substantial misconduct by Prime.  *Id.*  Even in the last few days, the FBI executed search warrants

against Prime and seized evidence as part of the U.S. Attorneys' investigation into Prime and its

managing member Mr. Roglieri.  *See* Tuxbury Ex. C.  This is a severe case of an ongoing fraud—

a Ponzi scheme—the most important factor in the determination to appoint a receiver, and a factor that was absent from both *Owens* and *Grupo*. Indeed, this is clearly a case of an entity engaging in systemic asset dissipation and criminal wrongdoing to hide the ICA deposits. Thus, the present Receiver appointment is far afield from the preliminary injunction sought in *Grupo* and *Owens* that barred the defendants from selling assets wholly unrelated to the plaintiffs' actions.[7]

Second, Prime's assertion that Compass-Charlotte's Verified Complaint seeks "only legal remedies," Mot. at p. 9, mischaracterizes the Complaint and ignores Compass-Charlotte's prayers for relief. To be clear: this is not a case seeking solely legal damages. Compass-Charlotte's conversion claim states that "Prime . . . intentionally and without authority exercised control over Compass-Charlotte's *property* and [has] refused to return Compass-Charlotte's *property*." Dkt. No. 1 ¶ 182 (emphasis added). Said otherwise, Compass-Charlotte is seeking the return of its ICA Account, which was intended to be a specific, identifiable, singular sum of money given solely "for purposes of satisfying interest payments under the Loan." *See* Dkt. No. 1-29, Recital C (making clear a new account was to be established to hold only Compass-Charlotte's money). Just like ordinary chattel, "money can be the subject of a conversion action when it can be identified and segregated." *Banco Central de Paraguay v. Paraguay Humanitarian Found., Inc.*, 2005 WL 1561504, *1 (S.D.N.Y. June 30, 2005) (quoting *Payne v. White*, 101 A.D.2d 974, 976 (3d Dept. 1984)). Here, the relief sought on Compass-Charlotte's conversion claim is not run-of-the-mill breach of contract damages, but restitution, as it seeks the return of Compass-Charlotte's lost or stolen specific property that Prime wrongfully converted for its benefit. *See Great-West Life &*

---

[7] It is also unclear whether, on these facts, *Grupo* would even apply to any form of preliminary relief other than the issuance a preliminary injunction freezing a party's assets. The extremely limited amount of cases that cite *Grupo* as a bar to the issuance of a receiver (including *Owens*) are distinguishable from this case and Compass-Charlotte has not located any precedent in any federal jurisdiction to support the argument that *Grupo* bars a Court from appointing a receiver after being presented evidence of an ongoing Ponzi scheme.

*Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 216 (2002) (defining restitution of money as "the return of identifiable funds . . . belonging to the plaintiff and held by the defendant—that is, . . . restitution traditionally available in equity.").

That the prayer for relief does not specifically call out the word "restitution" is of no import. *See generally*, *Becker v. Poling Transp. Corp.*, 356 F.3d 381, 390 (2d Cir. 2004) (court looks to facts alleged, rather than legal label, to determine nature of claim). Federal courts interpreting the Restatement (Third) of Restitution & Unjust Enrichment have held the law is "clear that equitable relief is available against a person who obtains a benefit by an act of . . . conversion." *AAAG-California, LLC v. Kisana*, 439 F. Supp. 3d 1265, 1274 (D. Utah 2020) (internal quotations omitted). Compass-Charlotte had a property interest in the creation of a separate account to hold its ICA deposit for a specific purpose, and the conversion claim seeks the return of exactly that: the ICA Account. While the Verified Complaint lists the ICA deposit as the minimum number sought to be returned, the Compass Prime Agreement maintains that, in the event of default, Compass-Charlotte was entitled to "a refund of the ICA Payment *and any additional amounts in the ICA*[.]" Dkt. No. 1-29, § 13.7(b) (emphasis added). The conversion claim seeks not only the return of the ICA deposit, but also any additional amounts held—which are (or should be) identifiable funds belonging to Compass-Charlotte.[8] *See Serio v. Black, Davis & Shue Agency, Inc.*, 2005 WL 3642217, *8 (S.D.N.Y. Dec. 30, 2005) ("[E]quitable interest arises from the terms of the agency contract, which specifies that the premium funds were to be held by BDS in a separate account and that, except for the commissions owed to BDS, the funds belonged to Frontier.").

---

[8] The Southern District of New York has additionally indicated that, where a party brings valid claims for both breach of contract and conversion, preliminary remedies are available notwithstanding *Grupo*. *See, e.g.*, *Culwick v. Wood*, 2020 WL 4597322, *3 (S.D.N.Y. Apr. 14, 2020) (noting *Grupo* barred a request for preliminary relief because Plaintiff's conversion claim was previously dismissed).

Moreover, Prime ignores that Compass-Charlotte also has asserted a fraud in the inducement claim. Federal courts post-*Grupo* have indicated that a prayer for relief seeking rescission of a contract based on fraudulent inducement is "equitable relief arising from [an] alleged fraud" that permits the court to award provisional remedies notwithstanding *Grupo*. *See, e.g.*, *B. Riley FBR, Inc. v. Clarke*, 2018 WL 7253601, *3 (D. Minn. Nov. 21, 2018). Compass-Charlotte seeks exactly that. The Verified Complaint alleges that Prime made material false statements to Compass-Charlotte in order to induce Compass-Charlotte to enter into the Compass Prime Agreement and, had Compass-Charlotte known those representations were false, it would not have entered into the Agreement. Dkt. No. 1 ¶¶ 175-178. Through the fraud in the inducement claim, Compass-Charlotte seeks to "put the parties back in the same position they were in prior to the making of the contract," which—by definition—is the effect of rescission. *See We Shall Overcome Found. v. Richman Org., Inc. (TRO Inc.)*, 221 F. Supp. 3d 396, 413 ("In order to justify the intervention of equity to rescind a contract, a party must allege fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof.") (internal citations omitted).

Thus, this case sounds in law *and in equity*, and the Court had authority and discretion to award provisional remedies, including the appointment of the Receiver. *See S.E.C. v. Babikian*, 2014 WL 2069348, *3 & n.3 (S.D.N.Y. Apr. 21, 2014) (*Grupo* "does not bar equitable prejudgment remedies in a case that claims equitable relief as well as money damages."); *see also Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, 2000 WL 1610790, *1 (S.D.N.Y. Oct. 27, 2000) ("courts have held that where the particular funds sought to be frozen are also the funds at issue in the suit, a preliminary injunction is proper.").

### 2. The Permanent Receiver is Necessary and Appropriate.

While Compass-Charlotte indisputably maintains it has done so, Prime provides no support for its proposition that Compass-Charlotte needed to satisfy a "clear and convincing" standard before this Court could appoint a receiver. Indeed, as early as two months ago, courts rejected that same argument outright. *See S.E.C. v. GPB Cap. Holdings, LLC*, 2023 WL 8468467, *12 & n.16 (E.D.N.Y. Dec. 7, 2023) ("The Objectors have provided no arguments or caselaw to support application of the 'clear and convincing' standard in this context. Rather, the appointment of a receiver 'lies in the discretion of the court' and 'the form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion.'" (quoting Wright & Miller, Federal Practice and Procedure § 2983)). That issue aside, in exercising its discretion, courts consider the following factors when deciding whether to appoint a receiver:

> Fraudulent conduct on the part of the defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*U.S. Bank Nat'l. Ass'n. v. Nesbitt Bellvue Prop. LLC*, 866 F. Supp. 2d 247, 255 (S.D.N.Y. 2012).

Various motivations necessitate the need for a receiver, particularly "to prevent the dissipation of a defendant's assets," *S.E.C. v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 426 (2d Cir. 1987), and "to conserve the existing estate." *Esbitt v. Dutch-Am. Mercantile Corp.*, 335 F. 2d 141, 143 (2d Cir. 1964) (approving appointment). Here, each of the relevant factors tips heavily in Compass-Charlotte's favor, and the practical need for a receivership in this instance is evident from the face of the Verified Complaint and the subsequent third-party discovery.

       i.    *Prime Has Engaged in Rampant, Fraudulent Conduct.*

The presence of actual fraud is the first, and perhaps most important, factor in the determination to appoint a receiver. *See, e.g.*, *In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994) ("The appointment of a receiver is an especially appropriate remedy in cases involving fraud and the possible dissipation of assets since the primary consideration in determining whether to appoint a receiver is the necessity to protect, conserve and administer property pending final disposition of a suit."). Prime contends in its Motion that there is insufficient evidence of fraud by Prime, that Prime is the victim of Berone Capital, and that with respect to the exorbitant luxury items purchased with the ICA deposits for Prime's sole manager, Mr. Roglieri, the "investigation is ongoing." Mot. at 14-16. These contentions lack credibility. Perhaps most troubling, Prime (despite having access to exculpatory evidence) has not submitted a single sworn affidavit from Prime or Mr. Roglieri to support its protests of innocence.

Unsurprisingly, Prime focuses its argument on other factors in an attempt to subvert the Court's attention away from its already uncovered fraud. In addition to the multitude of allegations outlined in the Verified Complaint regarding Prime's material misrepresentations made to its creditors, the evidence already uncovered to-date has conclusively shown:

- Prime's sole member lied to the Bankruptcy Court when he testified that over $50 million in ICA deposits was being held in an account at Berone Capital (Dkt. No. 37 ¶ 41);

- Prime has failed to provide any proof to the Receiver or otherwise that it ever wired any money to Berone Capital, outside of a singular transaction (that does not amount to anywhere near $50+ million) (Dkt. No. 37 ¶¶41-44);

- Prime has failed to provide the Receiver with any requested documentation related to Prime's books and records (Dkt. No. 61);

- Prime used ICA monies to purchase private airfare and luxury assets for its sole-member and other Third Party Defendants' benefit, including a $2.25 million wristwatch, multiple luxury vehicles, and a mansion (Dkt. Nos. 37 ¶¶ 54-67, 90 ¶¶ 11-18, 21-23);

- Prime covered various overdrafts in its accounts with ICA deposits, and paid off old ICA creditors with new ICA deposits after the creditors sued Prime in various federal and state jurisdictions (Dkt. No. 37 ¶¶ 49-53); and

- Berone Capital has questioned the alleged Joint Venture Agreement between itself and Prime, calling into question the legitimacy of the Joint Venture Agreement Prime's counsel submitted to this Court and the Bankruptcy Court.  *See* Dkt. No. 37 ¶¶ 31-42.

The Receiver continues to be the only barrier between Prime's Ponzi scheme and the future harm creditors and the general public will suffer should Prime continue to run its business as it had done before.  Further, with each update and filing, the Receiver identifies more evidence of misconduct.  Indeed, in the Receiver's absence, it is probable that Prime will continue to dissipate or hide its few remaining assets, and it is possible Prime will obstruct the conservation of its existing estate.

Prime's continued reliance on its blanket, unsupported allegation that Berone Capital is the sole party liable for the fraudulent conduct is unpersuasive.  First, it is not Compass-Charlotte's burden to prove the *type* of fraud at-issue, it is only Compass-Charlotte's burden to establish that there *is* fraud.  To that end, through its allegations against Berone Capital, Prime agrees there is fraud.[9]  Second, the evidence presented thus far (and mentioned above) makes clear Prime was involved in the Ponzi scheme.  *See, e.g.*, Dkt. Nos. 37 ¶¶ 54-67, 90 ¶¶ 11-18, 21-23.

      ii.    *Compass-Charlotte Has Shown it Will Suffer Irreparable Harm in the Absence of a Receiver.*

Second, the Court correctly found that Compass-Charlotte had shown irreparable harm absent a receiver.  In arguing the opposite in the Motion, Prime ignores the line of cases holding a defendant's impending insolvency or overall deteriorating financial condition is enough, on its own, to satisfy this factor.  *See, e.g.*, *D.B. Zwirn Special Opportunities Fund, LP v. Tama Broad.,*

---

[9] Indeed, Prime simultaneously contends that it is partners with Berone Capital under the Joint Venture Agreement, that Berone Capital has committed fraud, and that Berone Capital should remain in receivership, all while contending that Prime alone should be released from the receivership pending appeal.

*Inc.*, 550 F. Supp. 2d 481, 491-92 (S.D.N.Y. 2008) (imminent danger found where Defendants are subject to impending insolvency); *U.S. v. Zitron*, 1990 WL 13278, *2 (S.D.N.Y. Feb. 2, 1990) (quoting Weinstein, Korn & Miller, New York Civil Practice ¶ 5228.04 at 52-466 (1989)) ("[t]he need for a receivership is obvious when . . . leaving the property in the custody of the judgment debtor creates a risk of fraud or insolvency."); *Brenntag Int'l. Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) (affirming a finding of irreparable harm to plaintiff in light of defendant's insolvency); *see also Am. Bd. of Trade*, 830 F.2d at 436 (affirming appointment of receiver in light of defendants' deteriorating financial condition); *Zeltser v. Regal V. World-Wide Holdings*, 111 F.3d 124 (2d Cir. 1997) (affirming injunction based on defendant's likely insolvency and plaintiff's potential inability to collect on a judgment); *Pashaian v. Eccelston Props.*, 88 F.3d 77, 87 (2d Cir. 1996) (affirming finding of irreparable harm based on defendant's insolvency).

Prime has yet to offer a scintilla of evidence showing it has assets sufficient to return Compass-Charlotte's ICA deposit, much less satisfy the $70+ million owed to creditors for missing ICA deposits. In an effort to create the appearance of sufficient assets to avoid insolvency, Prime points to evidence ***from 2022*** that it had $20 million as sufficient to cover any claim by Compass-Charlotte for its $16 million ICA deposit. Mot. at 12. This is simply more disassembling by Prime. Rather than point to ***current*** evidence of available assets or satisfy a judgment in favor of Compass-Charlotte, or identify ***current*** evidence that Prime is not insolvent, Prime attempts to distract the Court with citation to a 2022 bank transaction. All that does is draw keen attention to the fact that Prime cannot—***and will not***—provide any evidence from 2023 about what happened to Compass-Charlotte's April 2023 ICA deposit of $16 million.

Indeed, the evidence presented thus far establishes only that Prime is not in any position to pay off its creditors and is thus insolvent. *See generally* Dkt. Nos. 37, 61. Any assets that do

remain are at risk of being removed or threatened from this Court's jurisdiction, which is another reason for finding this factor weighs in favor of Compass-Charlotte. *See Firemen's Ins. Co. of Newark, N.J. v. Keating*, 753 F. Supp. 1146, 1153 (S.D.N.Y.1990); *see also In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir.1985) ("even where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant intended to frustrate any judgment on the merits by transferring its assets out of the jurisdiction.") (internal quotations and citations omitted). Compass-Charlotte has established that, instead of holding its ICA deposit in an Account as Prime was supposed to per the Compass Prime Agreement, Prime either (a) spent the money outright on its sole-member's luxury lifestyle; or (b) siphoned the money offshore to a hedge fund account at the Royal Bank of Canada for purposes of gaining a benefit from those monies' returns. *See* Dkt. No. 42 at 4-7.

Not even considering the fact that Compass-Charlotte is out nearly $16 million (which is, of course, seriously harming Compass-Charlotte's business ventures), Compass-Charlotte has shown it will suffer irreparable harm sufficient to continue the appointment of the Receiver under this Circuit's precedent.

       iii.    <u>*Compass-Charlotte Will Continue to Show its Probability of Success on the Merits.*</u>

This Court has already concluded that Compass-Charlotte will likely succeed on the merits of its breach of contract claim. *See* Dkt. No. 56 ("There is no dispute as to liability between Prime Capital and Plaintiff."). Thus, this is no longer a "mere allegation," Mot. at 17, as Prime posits, but an express finding that Prime is likely liable to Compass-Charlotte for the ICA deposit. This is due to Prime's multiple admissions that the ICA Account belongs to Compass-Charlotte. *See* Dkt. No. 1 ¶ 137, Ex. 30. In a surprising turn, Prime now suggests it was entitled to keep Compass-Charlotte's $16 million even though Prime never issued any line of credit to Compass-Charlotte.

Mot. at 17-18. This novel argument, Prime admits, was devised *after* this litigation commenced. But this tortured reading of the contract does not negate that the fact that Prime has to return the ICA deposit to Compass-Charlotte, a position Prime has repeatedly conceded to Compass-Charlotte and this Court.

Further, the cases cited by Prime in its attempt to argue Compass-Charlotte will not succeed on the merits are not controlling and/or present remarkably different facts than those presented here. In *Netsphere, Inc. v. Baron*, a receivership was appointed primarily to "control a vexatious litigant." 703 F.3d 296, 305 (5th Cir. 2012). Unlike the instant litigation, there was no admission that the property had to be returned to the plaintiff. There was also no allegation of fraud nor was there any risk of a dissipation of assets. To Compass-Charlotte's benefit, the court in *Netsphere* recognized applicable situations where a receiver might be appropriate: (1) "to prevent [a] corporation from dissipating corporate assets"; and (2) if there had been evidence "that any discrete assets subject to the [] agreement were being moved beyond the reach of the court." *Id.* at 306. Similarly, in *On-Time Disposal, Inc. v. N. Jersey Recycling, LLC*, there was no evidence in the record of any sort of fraud or dissipation of assets, nor was there an express finding that a breach of contract had occurred. 2015 WL 5544434, *3 (S.D.N.Y. Sept. 17, 2015). The dispute in that case was over the mere failure to pay pursuant to the terms of a settlement agreement. *Id.* at *1-2. Again helpful to Compass-Charlotte's argument, the *On-Time* court found a receivership was inappropriate "because Plaintiff has failed to demonstrate or proffer any evidence from which the Court may conclude that Defendant[]'s assets may be dissipated." *Id.* at *4.

Accordingly, there is no doubt that the Court correctly appointed the Receiver over Prime. As a result, Prime is not likely to succeed on its appeal in showing an abuse of discretion by this Court and a stay pending that appeal is therefore unwarranted.

**B. <u>The Absence of a Stay Will Not Irreparably Harm Prime.</u>**

Prime also fails to show how, if at all, it will suffer harm if the current receivership is not stayed.   Indeed, as this Court has already recognized, it is actually to Prime's benefit that the Receiver continue to control the business.  *See* Dkt. No. 58 at p. 18.   If Prime were actually concerned with discovering where the missing $70+ million in missing ICA deposits is, it would support the appointment of a third-party to help it do so.  Arguing to the contrary only furthers Compass-Charlotte's allegation that Prime is seeking to remove the Receiver in order to continue its Ponzi scheme.

Further, if Prime is suffering any harm by virtue of the current receivership, such harm is entirely self-inflicted and cannot serve as the basis for removing the receivership.  *See Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 247-48 (E.D.N.Y. 2009) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) for the proposition that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself"); *see also Opticians Ass'n. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (finding that party "can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself").  Prime has not shown it is capable of running its business absent engaging in fraud, and has continuously made materially false representations to this Court and the Bankruptcy Court.  Any harm Prime is suffering is tied directly to Prime's own actions and, as such, is not a proper basis for finding irreparable harm.

**C. <u>Compass-Charlotte Will Suffer Irreparable Harm if the Stay is Granted.</u>**

For the reasons set forth above, *supra* Argument § I(A)(2)(ii), it is clear Compass-Charlotte will suffer irreparable harm in the event the receivership is stayed.   It is likely that Prime will dissipate its remaining assets and that Prime will resume its wrongdoing.

**D.  Public Interest Does Not Support a Stay.**

Finally, the public interest favoring arbitration cannot simultaneously outweigh the public policy of protecting the public from fraud.  *See* Motion at p. 22 ("The issuance of a stay here would vindicate the public interest in arbitration").  The need for neutral oversight of a business that is actively engaged in a Ponzi scheme is critical to maintaining public trust in the markets and general business population.  Indeed, maintaining the status quo through the ongoing receivership also protects the interests of the multitude of other creditors currently suing Prime.  Accordingly, Prime cannot justify a stay of the receivership during the pendency of its interlocutory appeal.

## CONCLUSION

For the foregoing reasons, Prime's "Emergency Motion" for Stay of Order Appointing Receiver should be denied with prejudice, and the Court should grant any further relief it deems just and proper.

DATED:     February 7, 2024
             Albany, New York                 **HINCKLEY, ALLEN & SNYDER LLP**

                                     By:    */s/ Christopher V. Fenlon*
                                             */s/ James L. Tuxbury*
                                             Christopher V. Fenlon
                                             James L. Tuxbury (*pro hac vice*)
                                             Kieran T. Murphy
                                             30 South Pearl St., Suite 901
                                             Albany, NY 12207-3492
                                             T: 518-396-3100
                                             F: 518-396-3101
                                             E: cfenlon@hinckleyallen.com
                                                jtuxbury@hinckleyallen.com
                                                kmurphy@hinckleyallen.com

                                           **PARKER, POE, ADAMS & BERNSTEIN LLP**

                                           William L. Esser, IV (*pro hac vice*)
                                           Eric H. Cottrell (*pro hac vice*)
                                           620 South Tyron St., Suite 800
                                           Charlotte, NC 28202
                                           T: 704-335-9507
                                           F: 704-334-4706
                                           E: willesser@parkerpoe.com
                                               ericcottrell@parkerpoe.com

                                               *Attorneys for Plaintiff*
                                               *Compass-Charlotte 1031, LLC*

26