**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**COMPASS-CHARLOTTE 1031, LLC,**

                              **Plaintiff,**                **1:24-CV-55**
                                                **(MAD/CFH)**

 -against-

**PRIME CAPITAL VENTURES, LLC**
**BERONE CAPITAL FUND, LP**
**BERONE CAPITAL PARTNERS LLC**
**BERONE CAPITAL LLC**
**BERONE CAPITAL EQUITY FUND I, LP**
**405 MOTORSPORTS LLC f/k/a Berone Capital Equity**
**Partners LLC,**
                              **Defendants.**
_____

**PAUL A. LEVINE as RECEIVER,**

                        **Third-Party Plaintiff,**

 -against-

**KRIS D. ROGLIERI, TINA M. ROGLIERI, KIMBERLY**
**A. HUMPHREY, PRIME COMMERCIAL LENDING,**
**LLC, COMMERCIAL CAPITAL TRAINING GROUP,**
**THE FINANCE MARKETING GROUP, NATIONAL**
**ALLIANCE OF COMMERCIAL LOAN BROKERS**
**LLC, FUPME, LLC,**

                        **Third-Party Defendants.**

_____

**APPEARANCES:**                       **OF COUNSEL:**

**HINCKLEY, ALLEN & SNYDER LLP**      **CHRISTOPHER V. FENLON, ESQ.**
30 South Pearl Street, Suite 901          **KIERAN T. MURPHY, ESQ.**
Albany, New York 12207               **JAMES L. TUXBURY, ESQ.**
Attorneys for Plaintiff

**PARKER POE ADAMS &**               **WILL ESSER, ESQ.**
**BERNSTEIN LLP**                       **ERIC H. COTTRELL, ESQ.**
620 South Tyron Street, Suite 800

Charlotte, North Carolina 28202
Attorneys for Plaintiff

**HOGAN LOVELLS US LLP**          **PIETER H.B. VAN TOL, III, ESQ.**
390 Madison Avenue                **PETER W. BAUTZ, ESQ.**
New York, New York 10017
Attorney for Defendant Prime Capital
Ventures, LLC, and Third-Party Defendants
Kimberly A. Humphrey, Prime Commercial
Lending  LLC, Commercial Capital Training
Group, LLC, The Finance Marketing Group,
National Alliance of Commercial Loan
Brokers LLC, FUPME, LLC, and Kris
D. Roglieri

**O'CONNELL, ARONOWITZ LAW FIRM**          **BRIAN M. CULNAN, ESQ.**
54 State Street – 9th Floor                **PETER A. PASTORE, ESQ.**
Albany, New York 12207
Counsel for Third-Party Defendant
Tina M. Roglieri

**LEMERY GREISLER, ESQ.**          **PETER M. DAMIN, ESQ.**
677 Broadway – 8th Floor           **ROBERT A. LIPPMAN, ESQ.**
Albany, New York 12207
Counsel for the Receiver Paul A. Levine

**CERTILMAN BALIN ADLER**          **NICOLE MILONE, ESQ.**
**& HYMANN LLP**                   **THOMAS J. MCNAMARA, ESQ.**
90 Merrick Avenue – Ninth Floor    **JASPREET S. MAYALL, ESQ.**
East Meadow, New York 11554
Attorneys for Defendants Berone Capital
Fund, LP, Berone Capital Partners LLC,
Berone Capital LLC, Berone Capital Equity
Fund I, LP, and 405 Motorsports LLC

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On January 12, 2024, Plaintiff Compass-Charlotte 1031, LLC ("Plaintiff") filed a

complaint and an emergency motion seeking the appointment of a receiver and expedited

discovery.  *See* Dkt. Nos. 1, 6.  Plaintiff alleges a breach of contract claim against Defendant
Prime Capital Ventures, LLC ("Prime Capital"), and fraud in the inducement, conversion, and
unfair and deceptive trade practice claims against Prime Capital and the "Berone Defendants"—
Berone Capital Fund, LP, Berone Capital Partners, LLC, Berone Capital LLC, Berone Capital
Equity Fund I, LP, and 405 Motorsports LLC.  *See* Dkt. No. 1.  Prime Capital opposed
appointment of a receiver, *see* Dkt. Nos. 12, 13, and the Berone Defendants did not respond.

Following a January show cause hearing, the Court appointed a permanent receiver, Paul
Levine, Esq., over all Defendants.  *See* Dkt. No. 56.  Prime Capital seeks to stay the appointment
pending its appeal to the Second Circuit, and the Berone Defendants have now appeared and
moved to vacate the appointment.  *See* Dkt. Nos. 70, 148.  The Receiver filed a Third-Party
complaint against Third-Party Defendants Kris Roglieri, Kimberly Humphrey, Tina Roglieri,
Prime Commercial Lending, LLC ("Prime Commercial"), Commercial Capital Training Group,
LLC ("CCTG"), the Finance Marketing Group ("FMG"), National Alliance of Commercial Loan
Brokers ("NACLB"), and FUPME, LLC ("FUPME"), alleging fraudulent conveyance, breach of
fiduciary duty, corporate waste, conversion of corporate assets, and theft of corporate opportunity.
*See* Dkt. No. 71.

Presently pending before the Court are the motions to stay or vacate the receivership;
Plaintiff's motion to disqualify Prime Capital's counsel; the Receiver's motions for pre-judgment
attachment over Third-Party Defendants' assets, dismissal of Third-Party Defendant Kris D.
Roglieri, and an anti-litigation injunction; and various letter motions.  *See* Dkt. Nos. 58, 67, 70,
72, 115, 118, 130, 148.  The Court has also considered whether it can proceed with this action
pending an individual bankruptcy proceeding brought by Third-Party Defendant Kris Roglieri.
*See* Dkt. Nos. 141-45.

## II. BACKGROUND

Plaintiff alleges that it paid Prime Capital $15,902,250 in April 2023 as an interest credit account ("ICA") payment to secure a loan for $79,511,250 pursuant to a credit agreement.  Dkt. No. 1 at ¶¶ 124-130.  Prime Capital deposited Plaintiff's $16 million into a Citibank account.  *See id.* at ¶¶ 130-31.  Prime Capital never advanced the agreed-upon loan and Plaintiff sought the return of its ICA deposit.  *See id.* at ¶¶ 134-35.  To date, Prime Capital has not returned the funds.

In June 2022, a lawsuit was filed in Fulton County, Georgia against ALUX properties. *See id.* at ¶ 84.  The complaint in that action details a $10 million ICA deposit used to secure a $169 million loan.  *See id.* at ¶ 86.  The complaint also includes a reference to Mr. Roglieri, the CEO of Prime Capital, as the individual who verified the wiring instructions for the $10 million. *See id.* at ¶ 85.  Mr. Roglieri was not a named defendant in that action.  The Georgia Superior Court appointed a receiver in that action and the receiver recovered the $10 million.  *See id.* at ¶¶ 87-88.  Plaintiff alleges that the line of credit agreement used in that case is identical to the one presented to Plaintiff.  *See id.* at ¶ 86.

In September 2022, Prime Capital entered into a similar agreement as Plaintiff, but with Onward Partners, LLC ("Onward"), whereby Onward provided Prime Capital with $20 million as an ICA deposit to secure a $107 million loan.  *See id.* at ¶ 104.  Onward paid the $20 million, but Prime Capital did not advance any funds.  *See id.* at ¶ 105.  Onward sued Prime Capital and Mr. Roglieri but Prime Capital and Mr. Roglieri did not appear in that case.  *See id.* at ¶¶ 106-07; *see also Onward Holding v. Prime Capital Ventures et al.*, No. 2:23-CV-833 (D. Utah).  Onward was awarded a default judgment.  *See Onward*, No. 2:23-CV-833, Dkt. No. 17.

In February 2023, Prime Capital filed a lawsuit in the Northern District of New York against Reign Financial International, Inc. ("Reign").  *See Prime Capital Ventures, LLC v. Reign Financial International, Inc.,* No. 1:23-CV-207 (N.D.N.Y.).  According to Prime Capital's complaint, Reign was supposed to deposit $20 million of Prime Capital's investment funds with Berone Capital Fund LP for "Reign [to] participate in a transaction platform involving arbitrage of international commercial private placement programs."  Dkt. No. 4 at ¶ 12.  Prime Capital alleged that "Reign took out a line of credit against Prime's account at Berone Capital and absconded with more than $12,000,000 dollars in loan proceeds."  *Id.* ¶ 14.[1]

In this case, Plaintiff contends that "the $20 million that Prime sued for in the Reign Lawsuit was the same $20 million wired to Prime Capital as described in the *Onward* Complaint." Dkt. No. 1 at ¶ 111.

On October 27, 2023, Plaintiff demanded the retune of its deposit.  *See id.* at ¶ 135. Plaintiff contacted Prime Capital, through Mr. Roglieri and Ms. Humphrey, to seek the return of its deposit.  *See id.* at ¶ 136.  They told Plaintiff that the deposit was no longer in a "Citi Bank account, but was held at [the Royal Bank of Canada ("RBC")] with a hedge fund and they just needed to get the funds released from a line of credit."  *Id.*

Plaintiff and numerous other creditors subsequently initiated an involuntary bankruptcy proceeding against Prime Capital.  *See In re Prime Capital Ventures, LLC*, No. 23-11302 (Bankr. N.D.N.Y.).  Plaintiff alleges in this case that Prime Capital objected to the appointment of a bankruptcy trustee, arguing that it held $61,652,000 in accounts and $51,298,750 in ICA deposits, including Plaintiff's ICA deposit.  *See* Dkt. No. 1 at ¶¶ 146-47.  Prime Capital later "discovered" that it had an additional $8 million in ICA deposits.  *Id.* at ¶ 149.  Over Prime's objections, the

---

[1] The *Reign* case is currently stayed pending the defendants retaining new counsel.

Bankruptcy Court appointed an interim trustee. *See In re Prime Capital*, No. 23-11302, Dkt. No. 15.

As alleged by Plaintiff, at some point during the bankruptcy proceedings, Prime Capital provided Plaintiff with a bank account statement from RBC which listed an account in the name of "BERONE CAPITAL FUND LP for benefit of: Prime Capital Ventures, LLC," which held over $52 million. *Id.* at ¶ 152; *see also* Dkt. No. 1-39. Mr. Roglieri represented to the Bankruptcy Court that Prime Capital's accountant was Sardone & Sardone, CPA. *See* Dkt. No. 1 at ¶ 156. He also stated that "whenever Prime received ICA deposits, it sent those deposits to Berone Capital to 'add it to our fund account.'" *Id.* at ¶ 158. The interim trustee contacted Sardone and it responded, "I am confused by the email. I do not have the books and records for this company. I have no record of this company." *Id.* at ¶ 157.

The interim trustee contacted RBC and learned that "while RBC did hold an account in the name of Berone Capital, that account was not held for the benefit of Prime and only held a miniscule amount of funds . . . ." *Id.* at ¶ 160. The Berone Defendants never appeared in the bankruptcy proceeding and the Bankruptcy Court sanctioned them for failing to appear. *See In re Prime Capital*, No. 23-11302, Dkt. Nos. 46, 107.

In response to Plaintiff's complaint and request for the appointment of a receiver, Prime Capital, represented by Mr. Pieter Van Tol of Hogan Lovells, LLP, argued that appointment of a receiver was inappropriate because "there is written evidence from Berone Capital Fund that Prime Capital has the benefit of approximately $52 million." Dkt. No. 12 at 17. Prime Capital asserted that there was no evidence to support that the bank statement was false. *See id.* at n.4. Prime Capital also argued that the Court should dismiss the complaint and compel arbitration

based on a binding arbitration provision in the credit agreement between Plaintiff and Prime Capital.

On January 19, 2024, the Receiver filed his first status report. *See* Dkt. No. 37. In it, he explained that he met with Mr. Roglieri and Mr. Van Tol, and contacted the Berone Defendants' principals — Jeremiah Beguesse and Fabian Stone. *See id.* at ¶ 12. The Receiver learned that all of Mr. Roglieri's companies, including Prime Capital, and Third-Party Defendants Prime Commercial, NACLB, CCTG, and FMG, were housed at the same office in Albany, New York. *See id.* at ¶¶ 15-16. Mr. Roglieri stated that no paper files existed at the office and that if the Receiver needed documents, Mr. Van Tol or Ms. Humphrey would e-mail them. *See id.* at ¶ 21. Mr. Roglieri explained that Prime Capital's new accountant was Steven Hutchington in Virginia, and that Prime had three bank accounts: an RBC account with $7 million, a KeyBank account with $1,500, and a Farmers State Bank account with $27,000. *See id.* at ¶¶ 23-24. He also stated that Prime Capital's relationship with the Berone Defendants was that the Berone entities were a hedge fund, and Prime Capital paid an initial subscription fee of $20 million to the Berone Defendants. *See id.* at ¶ 26.

In e-mail responses to the Receiver, Messrs. Beguesse and Stone disputed that they entered into a joint venture agreement with Prime Capital as alleged in Plaintiff's complaint. *See* Dkt. No. 37 at 16-21. Plaintiff attached the joint venture agreement to its complaint, which purports to contain Mr. Stone's signature as the Managing Member of Berone Capital. *See* Dkt. No. 1-25 at 8. Messrs. Beguesse and Stone assert that the joint venture agreement was forged and that the Berone Defendants never produced the alleged RBC "Berone statement." Dkt. No. 37 at 16-21.

On January 21, 2024, Mr. Van Tol submitted a sur-reply to Plaintiff's initial emergency motion, arguing that Prime Capital was a victim of the Berone Defendants' fraud, and that Prime Capital did not commit any wrongdoing. *See* Dkt. No. 43-1 at 2. Mr. Van Tol argued that "Prime Capital now has evidence that earlier statements provided by Berone (for the account with RBC Capital Markets ending in 0011) are not the same as the statements maintained by RBC Capital Markets." *Id.* at 6. Mr. Van Tol asserted that this "new" evidence came from subpoenas issued by the Receiver for the RBC accounts compared to records that Prime Capital received from the Berone Defendants. *Id.*

On January 22, 2024, the Court held its first show cause hearing. *See* Text Minute Entry 01/22/2024. During that hearing, Mr. Van Tol asserted that Prime Capital is the victim of the Berone Defendants' fraud. *See* Dkt. No. 83 at 41. He explained that the $20 million in an account held by the Berone Defendants was used to secure the $15.9 million from Compass. *See id.* at 18-19. Plaintiff's counsel disagreed with Prime Capital's counsel on every point but agreed that there is a binding arbitration provision in the credit agreement between Plaintiff and Prime Capital. *See id.* at 4-5. The Berone Defendants did not appear at the hearing.

On January 24, 2024, the Court entered a Memorandum-Decision and Order granting Plaintiff's request for appointment of a permanent receiver and expedited discovery. *See* Dkt. No. 56. The Court appointed the Receiver to have authority over all of the named Defendants. *See id.* The next day, Prime Capital moved to stay expedited discovery during the pendency of Prime Capital's motion to compel arbitration and dismiss the complaint based on the arbitration provision in the credit agreement. *See* Dkt. No. 58. Prime Capital then filed an interlocutory appeal from the Court's Memorandum-Decision and Order. *See* Dkt. No. 60.

The Receiver filed a second status report, explaining that he had received information from the bankruptcy trustee.  *See* Dkt. No. 61 at ¶ 2.  As part of that information, the Receiver learned that a $2 million watch had been purchased by Prime Capital and worn by Mr. Roglieri. *See id.* at ¶ 5.  The Receiver explained that he requested "proof" from Prime Capital "of Prime's transmittal of monies to the Berone entities."  *Id.* at ¶ 4.  Prime Capital did not produce the requested information.  *See id.*  Prime Capital did produce the $2 million watch to the Receiver. *See* Dkt. No. 65 at ¶ 3.

On January 26, 2024, Plaintiff filed its motion to disqualify Hogan Lovells from representing Prime Capital.  *See* Dkt. No. 67.  Plaintiff argues that disqualification is necessary because while Hogan Lovells is representing Prime Capital, it is simultaneously representing a party, Camshaft CRE 1, LLC ("Camshaft"), who sued Prime Capital in Florida.  *See id.* at 1. Hogan Lovells, represented by independent counsel, responded in opposition.  *See* Dkt. Nos. 92, 93.

On January 29, 2024, the Court stayed discovery during the pendency of Prime Capital's interlocutory appeal, but declined to stay the receivership.  *See* Dkt. No. 68.  That same day, Prime Capital filed an "Emergency Motion to Shorten Time and Set Briefing Schedule on Motion to Stay."  Dkt. No. 70.  Prime Capital sought an expedited briefing schedule on its motion to stay the receivership pending resolution of its interlocutory appeal.  *Id.*

Also on that same day, the Receiver filed a Third-Party Complaint against the Third-Party Defendants Kris Roglieri, Tina Roglieri, Kimberly Humphrey, Prime Commercial, CCTG, FMG, NACLB, and FUPME.  *See* Dkt. No. 71.  The Receiver alleges that Mr. Roglieri is the founder, CEO, or sole member of the various named entities.  *See id.* at ¶¶ 15-21.  Mr. Roglieri stated that Prime Capital has no employees but does have business associates who are independent

contractors. *See id.* at ¶ 20. The Receiver avers that there were numerous "instances where Prime has agreed to provide lines of credit and received ICA deposits for the lines of credit but has failed to fund the loans or return the full ICA deposits." *Id.* at ¶ 25. These included, for example, the Onward agreement, *see id.* at ¶¶ 26-32, the Compass agreement, *see id.* at ¶¶ 41-49, and the Camshaft agreement, *see id.* at ¶¶ 50-52. The Receiver contends that there is "$63,364,750 in the known missing ICA deposits from Prime borrowers." *Id.* at ¶ 71. The Receiver alleges that a significant portion of the ICA deposits were used by Mr. "Roglieri making substantial luxury purchases with Prime funds related to vehicles, watches, jewelry, antiques and private plane charters." *Id.* at ¶ 76. This includes a $3 million home in Virginia Beach, Virginia, purchased by Prime Capital and in which Ms. Humphrey lives. *See id.* at ¶¶ 81-83. The Receiver brought the Third-Party Complaint in Prime Capital's name, alleging claims for fraudulent conveyance, breach of fiduciary duty, theft of corporate opportunity, conversion, waste, and piercing the corporate veil. *See id.* at ¶¶ 85-118.

The same day the Receiver filed the Third-Party complaint, he filed an Emergency Motion for a temporary restraining order seeking pre-judgment attachment over the Third-Party Defendants' assets related to Prime Capital. *See* Dkt. No. 72. Prime Capital responded in opposition identifying "a number of facial deficiencies" in the emergency motion. Dkt. No. 74 at 1. The Receiver filed a letter, arguing that Prime Capital did not have standing to raise any issues on the Third-Party Defendants' behalf. *See* Dkt. No. 77.

On January 30, 2024, the Court ordered the Third-Party Defendants to show cause why their assets should not be subject to a pre-judgment attachment. *See* Dkt. No. 78. The Court entered the temporary restraining order and scheduled a second show cause hearing. *See id.*

As detailed in an e-mail from Mr. Van Tol to all other counsel, on February 2, 2024, the Federal Bureau of Investigations "executed search warrants at the homes of Kris Roglieri and Kimberly Humphrey . . . ."  Dkt. No. 106-4 at 2.

On February 6, 2024, the Berone Defendants appeared and filed an answer to the complaint.  *See* Dkt. Nos. 96, 97.  In their answer, they deny the majority of the allegations in Plaintiff's complaint "but admit that any statement showing that Berone Capital held $52 million for the benefit of Prime was fabricated."  *Id.* at ¶ 19.  They assert that the joint venture agreement is fabricated.  *See id.* at ¶ 33.

On February 7, 2024, Mr. Van Tol responded opposing the Receiver's motion for pre-judgment attachment on behalf of all of the Third-Party Defendants, except for Mrs. Roglieri.  *See* Dkt. No. 103.  On that same day, the Receiver filed his third status report.  *See* Dkt. No. 107.  The Receiver noted that the $2 million watch was in his possession and would not be disposed of absent order of the Court.  *See id.* at ¶ 2.  The Receiver paid the insurance for the Virginia Beach house and filed a notice of pendency to encumber the title to the house.  *See id.* at ¶¶ 3-4.  He created bank accounts for Prime Capital and the Berone Defendants and was taking steps to transfer all funds and investments into those accounts.  *See id.* at ¶¶ 5-6.  The Receiver identified numerous other lawsuits against Defendants in other courts.  *See id.* at ¶¶ 7-8.  The Receiver set forth details of additional vehicles purchased by Mr. Roglieri and listed other entities that have contacted the Receiver complaining of similar claims as Plaintiff alleged in its complaint.  *See id.* at ¶¶ 25-30; *see also* Dkt. No. 90.

On Friday, February 9, 2024, the Receiver filed another motion for an order to show cause.  *See* Dkt. No. 118.  The Receiver sought to add additional vehicles as subject to pre-

judgment attachment and for an anti-litigation injunction to prevent other actions from being brought against any entities under the receivership, or Third-Party Defendants.

On February 15, 2024, approximately one hour before the Court was set to begin its second show cause hearing, Mr. Van Tol filed a suggestion of bankruptcy, notifying the Court that Third-Party Defendant Kris Roglieri filed an individual Chapter 11 bankruptcy petition. *See* Dkt. No. 136. The Court held the show cause hearing, at which point it addressed all of the pending motions and inquired of the parties as to how the bankruptcy filing would impact this case. *See* Dkt. No. 155. The Court ordered the parties to file letter briefs addressing the bankruptcy issue, which all parties did. *See* Dkt. Nos. 139, 141-45.

On March 8, 2024, the Berone Defendants filed an emergency motion for a temporary restraining order to vacate the receivership. *See* Dkt. No. 148. The Court entered an Order to Show Cause and scheduled its third show cause hearing. *See* Dkt. No. 149. Plaintiff and the Receiver responded in opposition, arguing that the Receiver should remain in place over the Berone Defendants. *See* Dkt. Nos. 153, 156. The Berone Defendants replied. *See* Dkt. No. 157.

## III. DISCUSSION

### A.   Dismissal of Third-Party Defendant Kris Roglieri

During the February show cause hearing, the Receiver sought to dismiss Third-Party Defendant Kris Roglieri from this action because of Mr. Roglieri's bankruptcy filing. *See* Dkt. No. 155 at 31. The Receiver restated this request in his letter brief filed after the hearing and in response to the Court's order. *See* Dkt. No. 143 at 1. Mr. Van Tol stated that he did not oppose this request. *See* Dkt. No. 155 at 31. He again agreed that dismissal is appropriate in his letter brief. *See* Dkt. No. 144 at 2. However, the parties have not stipulated to dismissal under Federal Rule of Civil Procedure 41(a)(1)(A), nor has the Receiver filed a notice of dismissal. *See* FED. R.

CIV. P. 41(a)(1)(A).  Mr. Roglieri has not served either an answer or motion for summary

judgment.  *See id.*

      Rule 41(a)(2) provides that, absent the defendant's consent, "an action may be dismissed"

by the plaintiff "only by court order, on terms that the court considers proper."  FED. R. CIV. P.

41(a)(2).  "Unless the order states otherwise, a dismissal under [Rule 41(a)](2) is without

prejudice."  *Id.*  "Voluntary dismissal without prejudice is not a matter of right.  However, 'the

presumption in this circuit is that a court should grant a dismissal pursuant to Rule 41(a)(2) absent

a showing that defendants will suffer substantial prejudice as a result.'"  *Paulino v. Taylor*, 320

F.R.D. 107, 109 (S.D.N.Y. 2017) (quoting *Banco Cent. De Paraguay v. Paraguay Humanitarian*

*Found., Inc.*, No. 01-CV-9649, 2006 WL 3456521, *2 (S.D.N.Y. Nov. 30, 2006)).  The Second

Circuit has set for the following five "[f]actors relevant to the consideration of a motion to dismiss

without prejudice":

> [1] the plaintiff's diligence in bringing the motion; [2] any "undue
> vexatiousness" on plaintiff's part; [3] the extent to which the suit
> has progressed, including the defendant's efforts and expense in
> preparation for trial; [4] the duplicative expense of relitigation; and
> [5] the adequacy of plaintiff's explanation for the need to dismiss.

*Zagano v. Fordham University*, 900 F.2d 12, 14 (2d Cir. 1990) (citations omitted).  "Courts have

also concluded that dismissal without prejudice would be improper if the defendant would suffer

some plain legal prejudice other than the mere prospect of a second lawsuit."  *Cortland Line*

*Holdings LLC v. Lieverst*, No. 5:18-CV-307, 2020 WL 1434472, *2 (N.D.N.Y. Mar. 23, 2020)

(quoting *Camilli v. Grimes*, 436 F.3d 120, 123 (2d Cir. 2006)) (internal quotation marks omitted).

"'Plain legal prejudice' . . . 'concern[s] . . . the plight of a defendant who is ready to pursue a claim

against the plaintiff in the same action that the plaintiff is seeking to have dismissed.'  Such

prejudice applies when 'a dismissal without prejudice conditions future litigation on a [plaintiff's]

actions.'" *Id.* (quoting, *inter alia*, *Kwan v. Schlein*, 634 F.3d 224, 230 (2d Cir. 2011)).  "Courts find such prejudice when a party could reassert [his] claims only in defense of any related suit that the party who dismissed the case could bring against [him]." *Id.* (quoting *Camilli*, 436 F.3d at 123) (internal quotation marks omitted).

Neither party addresses these factors or discusses Rule 41.  *See* Dkt. No. 143; Dkt. No. 144.  However, in the absence of any argument concerning prejudice to Third-Party Defendant Kris Roglieri, the Court grants the Receiver's request to dismiss him from this action without prejudice pursuant to Rule 41(a)(2).  *See Anselmo v. Woodruff*, No. 9:19-CV-0069, 2019 WL 4081643, *2 (N.D.N.Y. Aug. 29, 2019).

**B.      Bankruptcy-Related Stay of Proceedings**

It is well settled that when a debtor files a Chapter 11 bankruptcy petition, an automatic stay goes into effect.  *See Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994).  "The automatic stay is 'one of the fundamental debtor protections provided by the bankruptcy laws, designed to relieve the financial pressures that drove debtors into bankruptcy.'"  *In re Fogarty*, 39 F.4th 62, 71 (2d Cir. 2022) (quoting *Eastern Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998)).  "Because 'the automatic stay is imposed by Congressional mandate and not by court order,' no court action is needed for the stay to become effective."  *Id.* (quoting *In re Colonial Realty Co.*, 980 F.2d 125, 137 (2d Cir. 1992)).  "As a rule, the automatic stay under 11 U.S.C. § 362(a) does not apply to non-debtors."  *In re Durr Mech. Constr., Inc.*, 604 B.R. 131, 136 (Bankr. S.D.N.Y. 2019) (citing *Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.*, 235 F.3d 53, 58 (2d Cir. 2000) ("It is well established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants")).

14

The issue presented here is whether Mr. Roglieri's filing of an individual Chapter 11 bankruptcy petition stays this Court's action against Prime Capital and the Third-Party Defendant entities. Tina Roglieri and the other Third-Party Defendants and Prime Capital argue that the stay applies to Prime Capital and the Third-Party Defendant entities because they are wholly owned by Mr. Roglieri. *See* Dkt. Nos. 141, 144. Plaintiff, the Receiver, and the Berone Defendants argue that, upon dismissal of Mr. Roglieri from the action, the stay does not apply to Prime Capital and the Third-Party Defendants because there will be no adverse economic impact on Mr. Roglieri's estate should the Court proceed with this action. *See* Dkt. Nos. 142, 143, 145.

The filing of a Chapter 11 bankruptcy petition "operates as a stay" of:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; [and]

> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title[.]

*Fogarty*, 39 F.4th at 72 (quoting 11 U.S.C. § 362(a)(1)-(2)). In *Fogarty*, the Second Circuit determined that an automatic stay was violated when a foreclosure sale was completed against Fogarty as a named defendant. *See Fogarty*, 39 F.4th at 68. Because the automatic stay provisions apply to proceedings "against the debtor," the Second Circuit found the stay to be violated by the foreclosure action. *Id.* at 72-73. However, the Second Circuit did note that "if Fogarty had been dismissed from the case as a defendant before the Sale occurred, then the situation would perhaps be closer to the scenario presented in *Queenie*, and, as Fogarty appears to recognize, the Sale might not have violated the automatic stay." *Id.* at 76. The Court did not

analyze what the outcome would have been had Fogarty been dismissed from the foreclosure action because "that dismissal did not occur." *Id.*

In *Queenie*, the parties were the defendant Nygard International, and the plaintiffs, "Queenie Ltd. ("Queenie") and its president and sole shareholder, Marc Gardner ("Gardner"); and Heavenly Fabrics, Inc. ("Heavenly") and its president and sole shareholder, Joseph Heaven ("Heaven")." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 284 (2d Cir. 2003). "Queenie sued Nygard . . . , alleging infringement of two registered copyrights for fabric designs. In March 2001, Nygard counterclaimed against Queenie, Gardner, Heavenly, and Heaven." *Id.* "The jury rejected Queenie's copyright infringement claim and found the Counterclaim Defendants liable to Nygard for tortious interference with economic advantage. The jury awarded punitive damages of $250,000 each against Queenie and Heavenly and $500,000 each against Gardner and Heaven." *Id.* Gardner subsequently filed a voluntary Chapter 11 bankruptcy petition. *See id.*

The Second Circuit concluded that the automatic stay provisions of the bankruptcy code "unquestionably applie[d] to Gardner, . . . applie[d] to his wholly owned corporation, Queenie, but not to the Heavenly Appellants." *Id.* at 287 (citing *Koolik v. Markowitz*, 40 F.3d 567, 568-69 (2d Cir. 1994)). The Second Circuit determined this "because [Queenie] is wholly owned by Gardner, and adjudication of a claim against the corporation will have an immediate adverse economic impact on Gardner." *Id.* The Second Circuit concluded that the stay did not apply to the other entities. *See id.* at 288. The Second Circuit stated that "[t]he automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Id.* at 287. It then set forth three "[e]xamples" of claims where an automatic stay might apply to the non-debtor: "a claim to establish an obligation of which the debtor is a guarantor, . . ., a claim against the debtor's insurer,

16

. . ., and *actions where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant . . .'"   Id.* at 287-88 (internal citations omitted) (emphasis added).   It is under this third example that Prime Capital and the Third-Party Defendants contend that they fall.   *See* Dkt. Nos. 141, 144.

The Court also notes that insofar as an automatic stay applies to a debtor's "property of the estate," 11 U.S.C. § 362(a)(2), courts have concluded that "'[w]hen a member of an LLC files a bankruptcy petition, his interest in the LLC, and any rights he has under the LLC's operating agreement, becomes property of the estate.'"   *In re Maidan*, No. 8-19-77027, 2023 WL 2190228, *5 (Bankr. E.D.N.Y. Feb. 23, 2023) (quoting *In re Garcia*, 494 B.R. 799, 810 (Bankr. E.D.N.Y. 2013); citing *In re Dixie Mgmt. & Inv., Ltd. Partners*, 474 B.R. 698, 700 (Bankr. W.D. Ark. 2011); *Manson v. Friedberg*, No. 08-CV-3890, 2013 WL 2896971, at *3 (S.D.N.Y. June 13, 2013)).

Prime Capital asserts in its corporate disclosure statement that Mr. Roglieri is its sole member.   *See* Dkt. No. 14.   Third-Party Defendants, Prime Commercial, CCTG, NACLB, and FUPME state in their corporate disclosure statement that Mr. Roglieri is their sole member.   *See* Dkt. No. 104.   Third-Party Defendant FMG is a trade name and not  a corporation.   *See id.*   The Receiver alleges in his Third-Party Complaint that Mr. Roglieri is the sole member and owner of Prime Capital and that "Prime is significantly undercapitalized, and used as a façade through which funds are acquired, to be invested or used for K. Roglieri's exclusive benefit."   Dkt. No. 71 at ¶¶ 110, 112.   Based on these allegations, the Receiver brought a piercing the corporate veil claim against Mr. Roglieri.   *See id.* at ¶¶ 109-18.   Thus, as stated in Tina Roglieri's letter brief, the Receiver "is effectively arguing that Mr. Roglieri is the real party in interest as to the claims against Prime."   Dkt. No. 141 at 2.

However, as Plaintiff states in its letter brief, there is no pending action against Mr. Roglieri's membership interests at this juncture. Additionally, as the Court is dismissing Mr. Roglieri from this action, there will no longer be a piercing the corporate veil claim, and it takes the issue out of the situation set forth in *Fogarty*. *See* Dkt. No. 71 at ¶¶ 109-18.

"[T]he 'party seeking extension of the stay must put forth real evidence demonstrating an actual impact upon, or threat to, the reorganization efforts if the stay is not extended.'" *Stih v. Rockaway Farmers Mkt., Inc.*, 656 B.R. 308, 314 (E.D.N.Y. 2024) (quoting *Rodriguez v. AMGP Rest. Corp.*, No. 17-CV-4870, 2018 WL 4378164, *2 (E.D.N.Y. June 5, 2018)); *see also In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003) (citing *In re Third Eighty-Ninth Assocs.*, 138 B.R. 144, 146 (S.D.N.Y. 1992)) ("When the stay does not apply automatically, the debtor then bears the burden of demonstrating that circumstances warrant extending the stay").

It has also been stated that even where a court concludes that a non-debtor is the real party in interest, "an extension of the stay does not necessarily follow. . . ." *Cortes v. Juquila Mexican Cuisine Corp.*, No. 17-CV-3942, 2020 WL 13550200, *2 (E.D.N.Y. July 30, 2020). This is because "[s]ome [courts] have read *Queenie* as holding that the automatic stay always extends to a corporation wholly owned by a debtor, because the 'immediate adverse economic impact' standard is satisfied by virtue of that relationship alone." *Id.* (citing *Ng v. Adler*, 518 B.R. 228, 247 (E.D.N.Y. 2014); M.*E.S., Inc. v. M.J. Favorito Elec., Inc.*, No. 08-CV-183, 2010 WL 959604, *2 (E.D.N.Y. Mar. 15, 2010)). "Others, however, have declined to find or grant a stay in the absence of either a formal extension of the stay by the bankruptcy court or an affirmative showing of immediate adverse economic impact, finding that 'a bankruptcy filing by a parent does not automatically stay actions against a wholly owned subsidiary.'" *Id.* (collecting cases).

In *Cortes*, the court concluded that "without more, the fact that a non-debtor defendant is wholly owned by a debtor should not result in the extension of the bankruptcy to that third-party defendant." *Id.* The court found it to be "a truer application of the principles expressed in *Queenie* to grant the stay only where special circumstances—namely the prospect of immediate adverse economic effects—are present." *Id.* The rationale for such a conclusion was based on *Queenie*'s holding "that 'the stay applies to [the non-debtor corporation] because it is wholly owned by [the debtor], *and* adjudication of a claim against the corporation will have an immediate adverse economic impact on [the debtor].'" *Id.* (quoting *Queenie*, 321 F.3d at 288).

This Court agrees. There is insufficient evidence before the Court that establishes the precise relationship between Mr. Roglieri and the various entities and how proceeding in this case would have an immediate adverse economic impact on Mr. Roglieri's personal estate. *See Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13-CV-4650, 2014 WL 4783008, *4 (S.D.N.Y. Sept. 25, 2014) (declining to extend the stay "because there is no reorganization to threaten"); *Tailored Fund Cap LLC v. RWDY, Inc.*, No. 5:20-CV-762, 2020 WL 6343307, *6 (N.D.N.Y. Oct. 29, 2020) ("[The] defendants have failed to identify a legitimate bankruptcy function that any of Tailored Fund's claims would directly affect"); *Xue Hui Zhang v. Ichiban Grp., LLC*, No. 1:17-CV-148, 2018 WL 3597632, *4 (N.D.N.Y. July 26, 2018) (quotation omitted) ("[The p]laintiff argues that the bankruptcy filing by Chen & Ju, Inc., automatically stays this case as to all [the d]efendants. . . . Such an unusual circumstance occurs only 'when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.' Based on the limited information available to the Court, the Court cannot conclude that such a circumstance exists"). Prime Capital and the Third-Party Defendant entities are limited liability corporations, so the Court is not certain that Roglieri would be personally responsible for

the entities' debts and obligations.  In any event, Prime Capital and the Third-Party Defendants have not presented any evidence establishing that proceeding in this action will have an immediate adverse economic impact on Mr. Roglieri's estate.  Thus, the Court declines to extend the stay at this time.[2]

**C.     Appointment of the Receiver**

Defendants seek to stay or vacate the Court's appointment of a permanent receiver.  *See* Dkt. Nos. 70, 148.

### 1.  *Prime Capital*

Prime Capital appealed the Court's decision appointing the permanent receiver to the Second Circuit.  *See* Dkt. No. 60.[3]  Three days after filing its appeal, Prime Capital moved to stay the Court's appointment of the receiver under Rule 62(c) of the Federal Rules of Civil Procedure. *See* Dkt. No. 70-1 at 4.  Plaintiff responded in opposition, *see* Dkt. No. 106, and Prime Capital replied.  *See* Dkt. No. 119.

The morning that Prime Capital filed its motion, the Court issued a Text Order declining to stay appointment of the Receiver pending Prime Capital's appeal.  Dkt. No. 70-1; *see also* Text Order 01/29/2024.  The Court declined to issue such a stay because of the text of Rule 62, which states, in pertinent part as follows: "[u]nless the court orders otherwise, the following are not stayed after being entered, even if an appeal is taken: (1) an interlocutory or final judgment in an action for an injunction or *receivership* . . . ."  FED. R. CIV. P. 62(c)(1).

---

[2] Should the Bankruptcy Court conclude otherwise, this Court would follow such a formal extension of the stay.

[3] The appeal is currently pending in the Second Circuit and Prime Capital's appellant brief is due March 25, 2024.  *See Compass-Charlotte 1031, LLC v. Prime Capital Ventures, LLC, et al.*, No. 24-264 (2d Cir.), Dkt. No. 17.

Plaintiff argues that because the Court issued the Text Order declining to stay the receivership prior to Prime Capital filing its motion, that the motion should be construed as a motion for reconsideration—standards for which Prime Capital did not address in its motion. *See* Dkt. No. 106 at 7 n.5. In its reply, Prime Capital argues that "[t]he Court did not deny a stay pending appeal *sua sponte*. The Court instead noted that the orders listed in Rule 62(c) are not automatically stayed for 30 days and that a party must apply for a stay." Dkt. No. 119 at 4.

The Court issued its Text Order in direct response to Prime Capital filing its notice of appeal. *See* Dkt. No. 60. The Court's Text Order reads in full:

> TEXT ORDER in response to Defendant Prime Capital Ventures, LLCs filing of an Interlocutory Appeal (Dkt. No. 60). Discovery is stayed pending the Second Circuits resolution of the appeal. See Coinbase, Inc. v. Bielski, 599 U.S. 736, 744 (2023) (explaining that an automatic stay of district court proceedings that relate to any aspect of the case involved in the appeal is required). However, the appointment of the receiver is not stayed. See Fed. R. Civ. P. 62 (Unless the court orders otherwise, the following are not stayed after being entered, even if an appeal is taken: (1) an interlocutory or final judgment in an action for an injunction or receivership). The Court also retains jurisdiction to decide Plaintiff Compass-Charlotte 1031, LLCs motion to disqualify (Dkt. No. 67) as it does not relate to the interlocutory appeal.

Text Order 01/29/2024. The Court expressly declined to grant the relief that Prime Capital seeks. Thus, the Court would normally construe Prime Capital's motion as a motion for reconsideration.

However, neither of the Federal Rules of Civil Procedure that are related to reconsideration are applicable. Rule 59 applies only to trials and judgments. *See* FED. R. CIV. P. 59; *see also Douglas v. N.Y.S. Adirondack Park Agency*, No. 8:10-CV-0299, 2012 WL 5364344, *4 (N.D.N.Y. Oct. 30, 2012) ("As the rule indicates, a judgment must be entered for this rule to be invoked"). Although Rule 60 permits reconsideration of orders, it "does not apply where the order or judgment in question is not a final one . . . ." *Douglas*, 2012 WL 5364344, at *4; *see also*

FED. R. CIV. P. 60.  The amendments to Rule 60 specifically note that "interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires."  FED. R. CIV. P. 60 (Advisory Committee Notes 1946).

Rather, "[i]n order to determine whether a preliminary injunction or a receivership order should be terminated, this Court first reviews the circumstances in which such an order would be justified in the first instance – and then considers whether that justification no longer exists." *Baliga v. Link Motion Inc.*, No. 18-CV-11642, 2022 WL 2531535, *16 (S.D.N.Y. Mar. 9, 2022). "More specifically, 'modification or dissolution of an injunction is warranted where the changed circumstances demonstrate that continuance of the injunction is no longer justified and/or will work oppressively against the enjoined parties.'"  *Lead Creation Inc. v. Hangzhou Yueji E-Com. Co.*, No. 22-CV-10377, 2023 WL 2403678, *1 (S.D.N.Y. Mar. 8, 2023) (quoting *Baliga*, 2022 WL 2531535, at *15).  "While the decision on whether to discharge 'a receivership turns on the facts and circumstances of each case[,] . . . [i]t is generally held that a receivership should be dismissed when the reason for the receivership ceases to exist.'"  *Baliga*, 2022 WL 2531535, at *16  (quoting *S.E.C. v. Kirkland*, No. 6:06-CV-183, 2012 WL 3871922, *1-2 (M.D. Fla. Aug. 6, 2012) (additional quotation and quotation marks omitted).

First and foremost, the text of Rule 62 explicitly exempts the appointment of a receiver from the ordinary rule requiring a stay of district court proceedings pending an appeal.  *See* FED. R. CIV. P. 62(a)(1).  Prime Capital does not argue to vacate appointment of the Receiver, but to stay the Receiver pending its appeal.  *See* Dkt. No. 70-1.  Second, Prime Capital has not presented any evidence that causes the Court to second guess its decision to appoint a permanent receiver and to deny a stay pending appeal.

In its motion, Prime Capital first argues that the Court inappropriately appointed a permanent receiver because there is a binding arbitration agreement that dictates authority concerning the underlying dispute between Plaintiff and Prime Capital to an arbitrator. *See* Dkt. No. 70-1 at 5-6. The Court fully considered this argument in its January decision and acknowledged that the binding arbitration agreement at issue permitted the parties to seek Court intervention for "provisional remedies." Dkt. No. 56 at 7 (quoting Dkt. No. 1-29 at 29). Prime Capital argues that the Court erred because the "provisional remedies" clause is limited to those remedies that are "in aid of arbitration" and the Receiver does not aid arbitration. Dkt. No. 70-1 at 7-8. There are changed circumstances that have occurred between the Court's January decision and the time of this decision: Plaintiff and Prime Capital have entered into arbitration. *See* Dkt. No. 106 at 13; Dkt. No. 147 at 7. Therefore, the new evidence that exists in this case does not "demonstrate that continuance of the injunction is no longer justified," *Lead Creation*, 2023 WL 2403678, at *1, but supports the Court's January conclusion that "appointment of a receiver would not hinder arbitration. Rather, the purpose of the Receiver is to maintain the status quo of the parties and locate missing funds, which could allow an arbiter to fashion an appropriate remedy." Dkt. No. 56 at 11. Therefore, the Court rejects this argument as reason to stay the appointment of a permanent receiver over Prime Capital because appointment of a receiver is a provisional remedy and there is no evidence that it will not aid arbitration. *See* Black's Law Dictionary (11th ed. 2019) (emphasis added) ("Provisional Remedy" is "[a] temporary remedy awarded before judgment and pending the action's disposition, such as a temporary restraining order, a preliminary injunction, *a prejudgment receivership*, or an attachment").

Prime Capital next argues that the Court inappropriately distinguished certain cases in its decision. *See* Dkt. No. 70-1 at 9-11 (citing *Owens v. Gaffken & Barriger Fund LLC*, Nos. 08-CV-

8414/08-CV-9357, 2009 WL 773517, *2 (S.D.N.Y. March 24, 2009); *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 310, 312 (1999)); *see also* Dkt. No. 56 at 17.  As Prime Capital explains, the cited cases stand for the proposition that a preliminary injunction is not an appropriate remedy where the purpose of the remedy is to prevent the dissipation of assets.  *See* Dkt. No. 70-1 at 10.  The Court distinguished those cases because, here, the Receiver was appointed to look for Prime Capital's assets to determine if they exist.  *See* Dkt. No. 56 at 17-18.

Prime Capital argues that the Receiver has identified his authority as to "trace funds [a]nd identify avenues of recovery," which is the same function prohibited by *Grupo* and *Owens*.  Dkt. No. 70-1 at 11 (citing Dkt. No. 37 at ¶ 71).  As Plaintiff argues in response, *Grupo* and *Owens* did not concern allegations of ongoing fraud.  *See* Dkt. No. 106 at 14.  Further, there is a difference between (1) preserving assets known to exist to be later used for a specific purpose or to pay a specific party; and (2) attempting to locate assets which may not exist.  Here, the critical inquiry is whether any funds exist, which the Receiver has been tasked with locating.  The Receiver recently retained a forensic CPA who is reviewing bank records "to allow a thorough tracing of monies in and out of the accounts of Prime and the Berone defendants."  Dkt. No. 153 at 10.  As of the date of this decision, Plaintiff's ICA deposit has not been located.  Thus, Prime Capital's argument does not cause the Court to alter its previous discussion of the aforementioned cases.

Prime Capital also argues that the Court erred in its decision by stating that "it is possible that a judgment in Plaintiff's favor would be inadequate."  Dkt. No. 70-1 at 11 (quoting Dkt. No. 56 at 16) (emphasis added by Defendant).  Prime Capital argues that the Court's statement is inaccurate because "[t]he cases cited by the Court . . . have held that the exception to the general

24

rule only applies if the movant has made a showing that insolvency is 'likely and imminent.'" *Id.* (quoting *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 Fed. Appx. 779, 781 (2d Cir. 2010)).

The Court agrees that the appropriate standard to determine whether irreparable harm will occur from the unenforceability of a money judgment is whether insolvency is likely and imminent. *See Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 340 (S.D.N.Y. 2020). That is precisely the standard that the Court applied one sentence before the statement that Prime Capital so heavily relies upon. *See* Dkt. No. 56 at 16. The Court stated that "Plaintiff has provided evidence that 'the risk of insolvency is likely and imminent' because $52 million is not being held in RBC by Berone for the benefit of Prime Capital or in a Citibank account." *Id.* (quoting *Alpha Cap.*, 432 F. Supp. 3d at 340). Prime Capital has presented no new evidence to the Court which causes it to question that conclusion. For the sake of clarity moving forward in this case and so that no parties are uncertain as to the Court's opinion on the matter: on January 24, 2024, when the Court issued its decision and on the date of this decision, it is the Court's opinion that Prime Capital's insolvency is likely and imminent such that a judgment could not be enforced against it and Plaintiff would, in turn, be irreparably harmed.

Specifically, as of the date of the January decision, the Court had evidence that Plaintiff sent approximately $16 million to Prime Capital and that Prime Capital no longer had those funds. As of the filing of the Receiver's first report on January 19, 2024, Mr. Roglieri told the Receiver that Prime Capital had three banks accounts which held roughly $7,028,500. *See* Dkt. No. 37 at ¶ 24. That would not be enough to satisfy a judgment in Plaintiff's favor. Prime Capital emphasizes that the Court should not consider whether Prime Capital maintains the more than $52 million that is allegedly missing from various creditors and should instead focus solely on Plaintiff's $16 million. *See* Dkt. No. 70-1 at 12.

25

As Plaintiff alleged in its complaint, there are numerous cases against Prime Capital across the country. *See* Dkt. No. 1 at ¶¶ 138-39. There is no evidence concerning which cases, judgments, or creditors would be entitled to Prime Capital's $7,028,500. Thus, should, for example, Camshaft, the creditor in the Florida action who filed a motion for final judgment against Prime Capital for $12,400,000, be first entitled to Prime Capital's funds, there would be no money left to enforce a judgment in Plaintiff's favor.[4] *See* Dkt. No. 1-32. Because the evidence clearly and convincingly established that Prime Capital was on the brink of insolvency, the Court correctly concluded that the appointment of a Receiver was necessary. *See Millennium Pipeline Co., L.L.C. v. Seggos*, 288 F. Supp. 3d 530, 542 (N.D.N.Y. 2017) (quoting *Stagliano v. Herkimer Central Sch. Dist.*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015)) ("'In order for harm to [be] irreparable, money damages must be unavailable or at least inadequate'").

It is true that Prime Capital submitted bank statements to the Court which purport to be held for the benefit of Prime Capital by the Berone Defendants reflecting approximately $20 million. *See* Dkt. No. 43-3–43-15. However, those bank statements are from September and November 2022 and January, February, and March 2023. *See* Dkt. Nos. 43-3–43-15. Plaintiff did not wire its ICA deposit to Prime Capital until April 27, 2023. *See* Dkt. No. 1 at ¶ 130. Prime Capital has not presented any bank records from April 2023 or later. *See* Dkt. Nos. 43, 129. As Plaintiff explained in a bankruptcy filing on February 28, 2024, "Prime's bank records show that Prime never sent any funds to Berone in calendar year 2023, when Prime received the vast majority of the ICA deposits given to Prime." *In re Prime Capital Ventures LLC*, No. 23-11302-1, Dkt. No. 140 at 8. Plaintiff noted that "the <u>only</u> money that Prime ever sent to Berone was $20

---

[4] As will be discussed, if Hogan Lovells still represented Camshaft in Florida, it would undoubtedly be seeking the appointment of a receiver or other similar remedies against Prime Capital, which he so vigorously opposes in this case.

million in the fall of 2022." *Id.* at 9.  Thus, there is no new evidence before the Court that causes it to second guess its decision to appoint a permanent Receiver over Prime Capital because Prime Capital did not, and has yet to, explain the location of Plaintiff's $16 million ICA deposit beginning in April 2023.

Perhaps the most bewildering argument made by Prime Capital is that it argues that there was no showing of fraudulent conduct.  *See* Dkt. No. 70-1 at 14-17.  As already set forth, the evidence before the Court was and is that Prime Capital absconded with Plaintiff's ICA deposit.  This is evidenced by the fake RBC bank statement and the fact that once Plaintiff deposited its $16 million deposit, there are no bank records provided to the Court concerning those funds.  Prime Capital lists the bank statements it provided to the Court "for the period [of] January through March 2023." Dkt. No. 70-1 at 15.  Prime Capital contends that "[t]herefore, as of April 2023, when Compass made its ICA deposit of approximately $16 million, Prime Capital believed in good faith that it had more than such an amount in the RBC Capital Markets account ending in 0011." *Id.* at 16.  It does not follow that bank records concerning months preceding the time Plaintiff deposited its ICA deposit reflect the amount of money Prime Capital had following the deposit.  Prime Capital fails to account for Plaintiff's money.  Noticeably absent from Prime Capital's evidence is any affidavit or declaration attesting to the truth of any of its contentions.[5]

---

[5] Prime Capital did submit a declaration from Roglieri that was previously submitted to the Bankruptcy Court.  *See* Dkt. No. 43-13.  The declaration says nothing about the Berone Defendants and only speaks about two line of credit agreements which do "not require that the ICA funds be held in segregated bank accounts."  *Id.* at ¶ 8.  The declaration states that as a result of the involuntary bankruptcy proceeding brought against Prime Capital, Prime Capital has lost approximately $35 million in [line of credit] fees."  *Id.* at ¶ 13.  Prime Capital and the Third-Party Defendants have not otherwise provided sworn statements to the Court besides those from their attorney.

Insofar as Prime Capital argues that Plaintiff did not establish a likelihood of success on the merits of its claims, Prime Capital contends that "Compass has not shown that it has a security interest in Prime Capital's assets, let alone that such a security interest will be dissipated." Dkt. No. 70-1 at 17.  Plaintiff has an arguable interest in the return of its ICA deposit, *see Serio v. Black, Davis & Shue Agency, Inc.*, 2005 WL 3642217, *8 (S.D.N.Y. Dec. 30, 2005), and it has been made more than clear that such an interest might never be returned.

In its January decision, the Court noted that as to Plaintiff's breach of contract claim, neither party disputed the formation of a contract and that Plaintiff performed under the contract. *See* Dkt. No. 56 at 16.  The Court based that conclusion on Prime Capital's statement made in its brief that it disputed the success of Plaintiff's contract claim insofar as "(a) there is a dispute as to whether Prime Capital breached the contract . . .; and (b) Compass is seeking contract damages that are far in excess of the ICA deposit . . . ." Dkt. No. 12 at 22.

Prime Capital now argues that it also contests whether Plaintiff performed under the contract; therefore, success on the merits has not been shown. *See* Dkt. No. 70-1 at 17.[6]  To the extent there are disputes, those disputes create "sufficiently serious questions going to the merits to make them a fair ground for litigation" which can still support relief such as a preliminary injunction. *Baliga*, 2022 WL 2531535, at *16 (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010)).  Therefore, Prime Capital's argument does not negate appointment of the receiver on the likelihood of success issue.

---

[6] Prime Capital argues that Plaintiff failed to meet the closing conditions required to permit return of its ICA deposit.  *See* Dkt. No. 70-1 at 18.  It states that it "discovered this defense to Compass' claim after the Bankruptcy Court dismissed the involuntary petition . . . ." *Id.* at n.11.  The Bankruptcy Court dismissed the involuntary petitioner two weeks before Prime Capital filed its opposition in this Court.  Prime Capital does not explain why it failed to earlier raise this defense in objecting to Plaintiff's likelihood of success on the merits.

Finally, the balance of hardships weighed in Plaintiff's favor and Prime Capital has not presented any materially changed circumstances in fact or law which alter that conclusion. The Court is cognizant that, as Prime Capital purports, appointment of the Receiver prevents Prime Capital from running business as usual. *See* Dkt. No. 70-1 at 20. However, courts in the Second Circuit have made "clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity." *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032, 2023 WL 6958855, *10 (E.D.N.Y. Oct. 20, 2023) (collecting cases).[7] As Plaintiff's have demonstrated irreparable harm in the form of an unenforceable judgment should they succeed on the merits of their claims, and any harm to Prime Capital has been brought on by its own alleged fraudulent scheme, the Court will not alter its prior finding that the balance of harms weighs in Plaintiff's favor. Thus, the Court will not stay appointment of the Receiver over Prime Capital at this time.

## 2. *The Berone Defendants*

The Berone Defendants seek to vacate the Court's appointment of the Receiver utilizing the same standards by which the Court initially appointed the Receiver. *See* Dkt. No. 148-11 at 3 (citing *Baliga*, 2022 WL 2531535, at *16–17). At the time of its January decision, the Court had evidence that Prime Capital and the Berone Defendants were in a joint venture agreement. *See* Dkt. No. 1 at ¶¶ 92-95; *see also* Dkt. No. 1-25. Under that agreement, Prime Capital would find third parties who needed a line of credit, and the Berone Defendants would obtain money for the proposed credit lines. *See id.* at ¶¶ 96-97. It was discovered through the bankruptcy trustee that the purported $52 million that Prime Capital had sent to Berone and which Berone held in an

---

[7] Although the FBI executed search warrants on Mr. Roglieri and Ms. Humphrey, to date, no arrests have been made.

RBC account did not exist.  *See id.* at ¶ 160.  RBC confirmed with the trustee that although RBC held an account for Berone, it was not for the benefit of Prime Capital and held nowhere near $52 million.  *See id.*  Because Mr. Beguesse was out of the country at the time the trustee was appointed, he stated that he was unable to respond to the bankruptcy trustee's inquiries without access to secure client accounts.  *See* Dkt. No. 148-3 at 2.  Despite responding to the bankruptcy trustee and being served with summons, the Berone Defendants did not appear in this action until after the Court's January decision.  *See* Dkt. No. 96.

It was after that decision that the Berone Defendants submitted sworn declarations to address their relationship to this case.  *See* Dkt. No. 149.  Through these declarations, the Berone Defendants challenge the evidence connecting them to Prime Capital by attesting that there is no joint venture agreement and the Berone Defendants never received Plaintiff's $16 million.  *See* Dkt. No. 148-1 at ¶¶ 7-8.

However, Prime Capital asserts that the Berone Defendants are the one who has committed fraud because from November 2022 to March 2023, Prime Capital was provided with bank statements showing that Berone held approximately $20 million for Prime Capital.  *See* Dkt. No. 129.  Prime Capital instituted its own cause of action in this Court in February 2023 against Reign.  *See Reign*, No. 1:23-CV-207, Dkt. No. 1.  According to the complaint, Reign was supposed to use a $20 million deposit from Prime Capital as investment funds located with Berone Capital Fund LP for "Reign [to] participate in a transaction platform involving arbitrage of international commercial private placement programs."  *Id.*, Dkt. No. 4 at ¶ 12.  Prime Capital alleged that "Reign took out a line of credit against Prime's account at Berone Capital and absconded with more than $12,000,000 dollars in loan proceeds."  *Id.* at ¶ 14.

In this case, Plaintiff contends that "the $20 million that Prime sued for in the Reign Lawsuit was the same $20 million wired to it as described in the Onward Complaint."  Dkt. No. 1 at ¶ 111.  In the *Reign* action, Prime Capital is pointing the finger at Reign.  *See Reign*, No. 1:23-CV-207, Dkt. No. 4.  In this action, Prime Capital is pointing the finger at the Berone Defendants. *See* Dkt. No. 129.

There is some evidence that would support vacatur of the receivership over Berone for a lack of evidence of fraudulent conduct by Berone as it relates to Plaintiff: the Berone Defendants' declarations sworn under the penalty of perjury contend that they never entered into a joint venture agreement with Prime Capital and never received any of Plaintiff's funds, *see* Dkt. No. 148-1, 148-2, and the bank records do not reflect a $16 million transfer from Prime Capital to the Berone Defendants in April 2023.  *See* Dkt. No. 156-4.

Nevertheless, the Berone Defendants' self-serving declarations are largely uncorroborated by any evidence.  *See District of Columbia v. Murphy*, 314 U.S. 441, 456 (1941) ("One's testimony with regard to his intention is of course to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts"); *Syncx LLC v. Kimedics, Inc.*, No. 23-CV-5070, 2023 WL 5127834, *18 (S.D.N.Y. Aug. 10, 2023) (noting in relation to the irreparable harm factor of a preliminary injunction analysis that "other than self-serving declarations that Syncx's relationship with those clients is fragile, Syncx also has not compellingly expressed fear that either of its clients would leave its side for Kimedics.  Syncx's second theory of irreparable harm fails"); *CG3 Media, LLC v. Belleau Techs., LLC*, No. 1:21-CV-04607, 2023 WL 2456640, *8 (S.D.N.Y. Mar. 1, 2023) (concluding that "[t]he Court finds

Belleau's other irreparable harm arguments similarly unpersuasive" because there was minimal evidence presented "beyond its own self-serving declaration").

As to irreparable harm, Messrs. Stone and Beguesse attest that they have been unable to work with clients, have gone into arrears on a Bloomberg market data account, lost a relationship with RBC and TD bank, have been forced to liquidate assets, and have gone into personal debt.[8] *See* Dkt. No. 148-1 at ¶¶ 21-26; Dkt. No. 148-2 at ¶ 3.  They do submit a bill from Bloomberg and letters from RBC and TD bank terminating their relationships.  *See* Dkt. Nos. 148-6–148-7. However, they do not provide any detail as to what clients, funds, or assets they have lost or will lose from appointment of the Receiver.  *See generally* Dkt. No. 148.  The Berone Defendants also provide no explanation as for why they would not be able to seek relief from the Receiver by asking the Receiver to approve legitimate business transactions or otherwise take actions that the business would normally take.  The Berone Defendants assert that because the Receiver is not a registered investment advisor, he "is not well-positioned to discharge these fiduciary duties owed to the clients."  Dkt. No. 148-1 at ¶ 21.  Mr. Beguesse is a Registered Investment Advisor, *see* Dkt. No. 148-2 at ¶ 1, but Mr. Stone is not.  *See* Dkt. No. 1 at ¶¶ 49-53; *see also* Dkt. No. 97 at ¶ 8.  There is no evidence that the Berone Defendants approached the Receiver and attempted to engage in any sort of business and the Receiver was unable to comprehend the business or failed to respond to any inquiries.

The Receiver states in his response to the Berone Defendants' motion that no clients have contacted the Receiver and "[i]f proof of such clients were provided, the Receiver would commit

---

[8] This argument rings hollow.  Messrs. Stone and Beguesse were out of the country for over a month and unable to access client accounts.  They fail to explain how they could be absent for such a period without causing harm to legitimate business activities, since they have no other employees.

to considering seeking Court permission to allow him to return any funds of such clients he has seized." Dkt. No. 153 at 11.  Additionally, as the Receiver notes, the Berone Defendants have admitted that Prime Capital "was one of its clients." Dkt. No. 148-1 at ¶ 5.  The Berone Defendants do not explain the intricacies of this "client" relationship.  The Receiver attaches to his response to the Berone Defendants motion, filings that were previously submitted to the Court by Prime Capital.  *See* Dkt. No. 153-3.  Part of those filings is a "Limited Partnership Agreement" signed by Mr. Roglieri for Prime Capital Ventures and Mr. Beguesse for Berone Capital Partners, LLC and Berone Capital Fund, LP.  *See id.* at 13; *see also* Dkt. No. 129-2 at 46-97.  The Receiver states that "Prime has raised serious and substantial allegations of fraudulent conduct on the part of Berone.  Berone sidesteps most of the allegations.  Significant monies are unaccounted for relating to the monies transferred to Martin Karo and to the Signature Bank Account.  Luxury purchases and expenditures should be explored to determine if they were made with any of Prime's monies." Dkt. No. 153 at 13.

The Court is mindful that there is no cause of action currently before the Court by Prime Capital and against the Berone Defendants, or vice versa, despite the various allegations being advanced by each party, toward the other.  However, a key inquiry in this case is whether Plaintiff was defrauded and where Plaintiff's money is located.  The Receiver's appointment aides answering those questions by following Prime Capital's bank accounts.  Some of those bank accounts have led to the Berone Defendants.  And much like Mr. Roglieri, the money that made it into the Berone Defendants' accounts seems to have been used for luxury purchases and to pay Martin Karo, Esq. millions of dollars.

Martin Karo is a defendant in Prime Capital's action against Reign.  In that case, Prime Capital alleges that Mr. Karo is Reign's "Escrow Attorney."  *Reign*, No. 1:23-CV-207, Dkt. No. 4

at ¶ 29.  Prime Capital alleges that Mr. Karo is liable to Prime Capital for aiding and abetting

Reign in a fraudulent scheme to obtain $20 million from Prime Capital.  *See id.* at ¶ 67.  Prime

Capital also contends that on or about November 7, 2022, Reign wired $12 million to Mr. Karo.

*See id.* at ¶ 41.

On the case presently before the Court, records reflect a transfer of $5.9 million to Mr.

Karo from Berone on November 8, 2022, and $11.8 million to Mr. Karo from Berone on

November 9, 2022.  *See* Dkt. No. 129-2 at 12.  The Berone Defendants do not acknowledge Reign

or Mr. Karo in their motion to vacate the receivership.  *See* Dkt. No. 148.

However, in their reply, Mr. Beguesse states that "[t]hose wires were initiated by Berone

at the verbal authorization and direction of Kris Roglieri."  Dkt. No. 157 at ¶ 12.  If the situation is

as Prime Capital contends, that Prime Capital was to send money to Reign, through Berone, then

it makes sense that Berone wired millions of dollars to Mr. Karo, who works for Reign.

Curiously, Prime Capital did not name the Berone Defendants as a defendant in the *Reign* action.

Further, although the amount of money that was transferred to Mr. Karo seems extreme, there is

absolutely no indication that any of that money belonged to Plaintiff.

On February 14, 2024, the Receiver e-mailed counsel for the Berone Defendants

identifying questionable purchases reflected in their bank statements.  *See* Dkt. No. 153-4 at 2.

The Receiver asked counsel to gather more information from his clients regarding the purchase of

two luxury vehicles with what appeared to be Prime Capital's money.  *See id.*  The Receiver asked

for the Berone Defendants to identify the year, make, model, and VIN number of the vehicles as

well as collect the titles, registrations, etc.  *See id.*  The Receiver has not received that

information.  *See* Dkt. No. 153 at 9.  The Receiver also asked the Berone Defendants to explain

the monetary transfers to Mr. Karo's IOLTA account that totaled $17,800,000 in less than two

weeks. *See* Dkt. No. 153-4 at 2.

   In response to the Receiver's e-mail inquiry, the Berone Defendants wrote as follows:

> We are not privy to the conversations between Reign and Prime re:
> Martin Karo's role and obligations. He is referenced in Prime v.
> Reign having extensive discussions between Giorgio (Reign) and
> Kris (Prime). Please refer [the Receiver] to Prime v. Reign (First
> amended complaint) for more information on Martin Karo['s]
> IOLTA accounts and for the purpose Prime and Reign had for the
> monies sent.

Dkt. No. 153-4 at 6. Another document states that

> [a]fter returning $1.8 million to Prime and $11.9 million sent to
> [the] Martin Karo IOLTA account. We worked for and are entitled
> to the fees we deducted in 2022 and 2023 that are non-refundable.
> Also, the partnership is responsible for all expenses occurred during
> operations. As demonstrated by our statements the remaining funds
> were invested in illiquid alternative investments and equities trades.
> We are still awaiting K-1 documents from these alternative
> investment companies that will show what valuation these
> investments are at this time.

*Id.* at 7. In a third typed document, a "breakdown" is provided as to various investments. *Id.* at

32. This is information that Mr. Beguesse "compiled." Dkt. No. 157 at ¶ 13. Mr. Beguesse

writes that certain million-dollar "initial contributions" to other entities such as MapleBear Inc.

and Tevva Motors LTD have lost their value by 50 to 100 percent. Dkt. No. 153-4 at 32. Mr.

Beguesse stated that there are non-refundable fees and expenses in the amount of $620,000. *See*

*id.* There are no documents provided to the Court to corroborate these assertions. The Berone

Defendants do provide bank records from TD bank, but the records list only debit card purchases,

"INTL TXN FEE," wire transfers, and "ACH Settlement." *Id.* at 34-50. It is not obvious to the

Court and the Berone Defendants do not explain how these bank records substantiate their

purported losses in business, assets, and clients. An additional issue that has arisen in the

Receiver's efforts to track monies in this case is that one bank used by the Berone Defendants, Signature Bank, is under a receivership with the Federal Deposit Insurance Corporation ("FDIC"). *See* Dkt. No. 153 at 8.

Plaintiff also responded in opposition to vacating the appointment of the receiver over the Berone Defendants. *See* Dkt. No. 156. In large part, Plaintiff's reasons mirror the Receiver's reasons. However, Plaintiff's response highlights additional questionable activity that creates concern about the legitimacy of the Berone Defendant's claims. Specifically, Plaintiff notes that as alleged in their complaint, Berone Capital Partners, LLC, which was the General Partner of Berone Capital Fund LP, voluntarily dissolved on November 29, 2023. *See id.* at 7-8. Plaintiffs aver that this dissolution caused the dissolution of Berone Capital Fund, LP. *See id.* at 8. Plaintiff contends that these actions mean that there is no business of the Berone Capital Fund, LP to continue and assets need to be liquidated. *See id.* Plaintiffs also note that 405 Motorsports LLC voluntarily dissolved on November 29, 2023. *See id.* As of the filing of Plaintiff's response, the Berone Defendants had not yet acknowledged these dissolutions or how they relate to the running of their businesses. *See id.*

This is moderately concerning to the Court because of Mr. Beguesse's representation in his declaration that "[t]he equity assets of Berone Capital Partners LLC have been force liquidated due to this Receivership, causing financial damage." Dkt. No. 148-1 at ¶ 25. Plaintiff attached to its complaint copies of search records from the State of Florida Division of Corporations related to the Berone entities. *See* Dkt. No. 1-1–1-3. The records indicate that Berone Capital Equity Partners, LLC was dissolved on September 8, 2023, and 405 Motorsports LLC and Berone Capital Partners LLC were dissolved on November 29, 2023. *See* Dkt. No. 1-1–1-3. The Receiver was first appointed in this action on January 12, 2024. *See* Dkt. No. 8. Therefore, Mr.

Beguesse's statement that the Receiver has forced the liquidation of his business appears unsubstantiated.

Further, as Plaintiff states, the Berone Defendants did not appear in this action until February 6, 2024. *See* Dkt. No. 96. That is despite the Court's January 2024 Order to Show Cause being sent to the exact e-mail address that Mr. Beguesse used to respond to the bankruptcy trustee on December 27, 2023. *See* Dkt. No. 8; *see also* Dkt. No. 148-3 at 3. In response to the bankruptcy trustee's inquiries, Mr. Beguesse stated that because he was "overseas," he did "not have secure access to client accounts." Dkt. No. 148-3 at 2. Mr. Beguesse confirms the same in his declaration. *See* Dkt. No. 148-1 at ¶ 18. He does not, however, state that during his time overseas, he did not have access to e-mail, telephone communications, or was otherwise unable to engage with the Bankruptcy Court or this Court. *See* Dkt. No. 148-1; Dkt. No. 148-3 at 2. Similarly, Mr. Stone, who is the Chief Operating Officer of Berone Capital, LLC, provides zero justification for his lack of appearance with the Court, despite responding to the Receiver via e-mail on January 18, 2024. *See* Dkt. No. 148-5 at 4. Mr. Stone responded via the same e-mail that the Court's and the parties' filings have been sent. *See* Dkt. No. 8. During the Court's second show cause hearing, counsel for the Berone Defendants stated that Mr. Beguesse and Mr. Stone were on vacation together in the Dominican Republic, and then Mr. Beguesse visited his family in Trinidad and Tobago. *See* Dkt. No. 155 at 12. Neither Mr. Beguesse nor Mr. Stone provide any reason as to why they were unable to communicate with this Court either individually or through counsel until a month after the Court appointed the Receiver over the Berone Defendants. *See* Dkt. No. 156 at 10.

The Berone Defendants attempt to clarify many of these issues in their reply. First, Mr. Beguesse explains that the two luxury vehicles owned by the Berone Defendants are company

cars that are not used for personal use.  *See* Dkt. No. 157 at ¶ 14.  Mr. Beguesse states that the cars are kept in storage and only used for business and marketing endeavors when they are working to obtain wealthy clients.  *See id.*  He also states that if the Receiver stays in place, he will have to notify his clients that they must find another platform for their investments and that it would be difficult to win those clients back.  *See id.* at ¶ 19.  Finally, he explains that although Berone Capital Partners, LLC was dissolved in Florida on November 29, 2023, the Berone Defendants formed Berone Capital Partners, LLC, in Montana the day before to take advantage of lower corporate fees.  *See id.* at ¶ 20.  Thus, Mr. Beguesse states that the intention was never to dissolve the hedge fund and that receivership has interfered with the Florida business because it prevents the Berone Defendants from winding up their affairs.  *See id.*; *see also* Dkt. No. 157-2 at 9.

Some courts have questioned the practice of entertaining a request to vacate an injunction where the party failed to respond or object to the Court's initial granting of it.  *See Huk-A-Poo Sportswear, Inc. v. Little Lisa, Ltd.*, 74 F.R.D. 621, 624 (S.D.N.Y. 1977) ("Strong policy reasons favor the denial of the defendant's motion at this time.  To permit a party to withhold its objections to a preliminary injunction until such time as it can present the strongest possible case and allow it to then obtain a dissolution of the injunction would be judicially unwise.  This is precisely the sort of situation accommodated by the distinction between emergency or temporary and permanent relief"); *see also Cablevision Sys. Corp. v. Degiremci*, No. 92-CV-5460, 1995 WL 362546, *2 (E.D.N.Y. June 2, 1995) ("The Court agrees with the court in *Huk-A-Poo Sportswear* that, as a policy matter, defendants should not now be heard to challenge the preliminary injunction to which they consented initially").  Neither Plaintiff nor the Receiver provides similar case law as it relates to the appointment of a Receiver.  *See* Dkt. No. 156.

However, "[c]ourts have 'wide discretion' to vacate injunctions." *NML Cap., Ltd. v. Republic of Argentina*, No. 08-CV-6978, 2016 WL 836773, *6 (S.D.N.Y. Mar. 2, 2016), *aff'd sub nom. Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 644 Fed. Appx. 98 (2d Cir. 2016) (quoting *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 648 (1961)). "Generally, a court may vacate only when 'there has been such a change in the circumstances as to make modification of the decree equitable.'" *Id.* (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984)). "The ultimate question, then, is 'whether an ongoing exercise of the court's equitable authority is supported by the prior showing of illegality, judged against the claim that changed circumstances have rendered prospective relief inappropriate.'" *Id.* (quoting *Salazar v. Buono*, 559 U.S. 700, 718 (2010)). "A court should also consider 'whether the requested modification effectuates or thwarts the purpose behind the injunction.'" *Id.* (quoting *Sierra Club*, 732 F.2d at 256).

In order for Plaintiff to be successful on the merits of its fraud, conversion, and unfair trade practices claims, there must be some evidence tying the Berone Defendants to Plaintiff's money. The evidence that the Court had concerning a joint venture agreement and a $52 million bank statement have been called into question by sworn declarations made under the penalty of perjury. No bank records showing otherwise—that the Berone Defendants do in fact have some of Plaintiff's money—have been produced. There is evidence that the Berone Defendants have spent Prime Capital's money on luxury expenses and sent millions of dollars to an attorney. However, there is no evidence that the money spent by the Berone Defendants was Plaintiff's money. This would support vacatur of the receivership. As to the balancing of harms, insofar as the Berone Defendants claim irreparable harm, no evidence other than their own declarations have been provided establishing the business, investments, assets, or clients that they are unable to

attend to or will lose.  These conclusory declarations, however, provide only marginal and something unbelievable support to their claims.

To be sure, the purpose of the Receiver has not yet been achieved.  The purpose of the Receiver was to locate Plaintiff's ICA deposit which Plaintiff alleges was secured by fraud from Prime Capital and the Berone Defendants.  *See* Dkt. No. 56 at 11, 18.  That has not been accomplished, in part, perhaps because the Berone Defendants have been largely unresponsive to the Receiver's inquiries.  Rather, the Receiver has recently retained a forensic accountant who is reviewing substantial banking records from Prime Capital and the Berone Defendants.  *See* Dkt. No. 153 at 7.  However, if the records reveal what the Berone Defendants' assert—that they never had Plaintiff's funds—then they should likely be released from the receivership when that information becomes accurate and reliable.

During the Court's third show cause hearing, Counsel for the Berone Defendants reiterated the statements made in the Berone Defendants' declarations: that their business is being harmed by the Receiver, the Receiver is not a Registered Investment Advisor, and Plaintiff's money was never sent to Berone.  Counsel also explained that the Berone Defendants did not have money to retain legal assistance or pay "office bills," but that they work out of the basement of one of the principal's parents' homes.  Counsel did not provide the Court with any documents corroborating the allegations of business or personal harm.

Perhaps most alarming to the Court was the Berone Defendants' representation that Prime Capital provided verbal authorization, over the telephone, to Berone, to wire $11.9 million to Mr. Karo.  The Court was provided with an exhibit during the hearing which contains an e-mail between Mr. Roglieri and Reign dated October 2022.  *See* Court Ex. 1.  The e-mail indicates that Mr. Roglieri declined an investment opportunity, in part, because "Martin Karo is still listed on

these agreements." *Id.* This creates concern as to the veracity of the Berone Defendants'

contention that Mr. Roglieri verbally authorized an \$11.9 million transfer to Mr. Karo.

Additionally, the Receiver confirmed that he is working to obtain the Berone Defendants'

Signature Bank records from the FDIC and that his forensic CPA was actively reviewing the bank

records that he does have. The Receiver also confirmed his willingness to work with the Berone

Defendants should they present legitimate business they wish to engage in while under the

Receivership.

Based on the foregoing, the Court will not vacate the Receivership over the Berone

Defendants at this time. The Court will give the Receiver thirty days to review documents and

present the same to the Court which will either corroborate or negate the Berone Defendants'

involvement in this case as it relates to Plaintiff. Based on the information the Court receives, the

Court may permit the Berone Defendants to file supplemental briefing concerning the

receivership.[9] Failure to comply with requests from the Receiver will weigh heavily against any

subsequent request to vacate.

**D.      Pre-Judgment Attachment**

The Receiver seeks an order of pre-judgment attachment over the Third-Party Defendants'

assets pursuant to Rule 64 of the Federal Rules of Civil Procedure. *See* Dkt. No. 72.

Rule 64 provides, in relevant part as follows: "At the commencement of and throughout an

action, every remedy is available that, under the law of the state where the court is located,

---

[9] The Berone Defendants argue in a single paragraph on the final page of their memorandum of
law in support of their motion to vacate the receiver, that the Court lacks personal jurisdiction
over them because the joint venture agreement is a fraud. *See* Dkt. No. 148-11 at 6. In their
reply, they note that Plaintiff failed to address this issue in its response. *See* Dkt. No. 157-2 at 7.
It is true that Plaintiff did not address the issue. *See* Dkt. No. 156. However, the Court will not
address jurisdictional issues without more thorough briefing from both sides. The Court refers the
parties to its Individual Rules of Practice concerning the filing of dispositive motions.

provides for seizing a person or property to secure satisfaction of the potential judgment.  But a

federal statute governs to the extent it applies." FED. R. CIV. P. 64(a).

New York Civil Practice Law and Rules ("C.P.L.R.") § 6201 states:

> An order of attachment may be granted in any action, except a
> matrimonial action, where the plaintiff has demanded and would be
> entitled, in whole or in part, or in the alternative, to a money
> judgment against one or more defendants, when: [] the defendant,
> with intent to defraud his creditors or frustrate the enforcement of a
> judgment that might be rendered in plaintiff's favor, has assigned,
> disposed of, encumbered or secreted property, or removed it from
> the state or is about to do any of these acts.

N.Y. C.P.L.R. § 6201(3).  Further,

> On a motion for an order of attachment, or for an order to confirm
> an order of attachment, the plaintiff shall show, by affidavit and
> such other written evidence as may be submitted, that there is a
> cause of action, that it is probable that the plaintiff will succeed on
> the merits, that one or more grounds for attachment provided in
> section 6201 exist, and that the amount demanded from the
> defendant exceeds all counterclaims known to the plaintiff.

N.Y. C.P.L.R. § 6212(a).

"[A] motion court presented with an application for an order of attachment must determine

whether a statutory ground for attachment exists, whether the applicant has established a

likelihood of success on the merits, and whether the remedy is needed to secure payment or obtain

jurisdiction." *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006)

Attachment is "a drastic remedy," and is "strictly construed in favor of those against whom

it may be employed." *Ne. United Corp. v. Lewis*, 137 A.D.3d 1387, 1388 (3d Dept. 2016)

(quotation omitted); *see also Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*,

862 F. Supp. 1070, 1073 (S.D.N.Y. 1994) ("Attachment is a harsh remedy, and should not be

lightly granted by the court").  "Because 'fraudulent intent is rarely susceptible to direct proof,'

courts in the Second Circuit have examined whether allegedly suspicious transactions exhibit 'badges of fraud' that give rise to a sufficient inference of intent." *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 320 (E.D.N.Y. 2009) (quoting *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983)) (additional citations omitted).  "The existence of several badges of fraud can constitute clear and convincing evidence of actual intent" to defraud creditors.  *In re MarketXT Holdings Corp.*, 376 B.R. 390, 405 (Bankr. S.D.N.Y. 2007) (citing *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005)).  Among the "badges" that courts consider are:

> (1) [T]he lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*CF 135 Flat LLC v. Triadou SPV N.A.*, No. 15-CV-5345, 2016 WL 5945912, *10 (S.D.N.Y. June 24, 2016) (quoting *In re Kaiser*, 722 F.2d at 1582-83).  "While the presence or absence of any particular badges of fraud is not determinative in finding fraudulent intent, 'the presence of multiple indicia will increase the strength of the inference.'"  *Allstate Ins. Co. v. Mirvis*, No. 08-CV-4405, 2018 WL 4921631, *5 (E.D.N.Y. Sept. 4, 2018) (quoting *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995)).

   "'To show a probability of success on the merits, the moving party must demonstrate by affidavit that it is more likely than not that it will succeed on its claims.'"  *Serenity Alpha, LLC v. Northway Mining, LLC*, 531 F. Supp. 3d 512, 519 (N.D.N.Y. 2021) (quoting *DLJ Mortg.*, 594 F. Supp. 2d at 319)).  "'While all legitimate inferences should be drawn in favor of the party seeking attachment, the moving party must nevertheless make an evidentiary showing of proof stronger

than that required to establish a prima facie case in order to satisfy this requirement.'" *Id.* (quotation omitted).

"The Second Circuit has held that courts presented with an application for an order of attachment must determine not only 'whether a statutory ground for attachment exists' and 'whether the applicant has established a likelihood of success on the merits,' *but also* 'whether the remedy is needed to secure payment or obtain jurisdiction.'" *In re Maidan*, No. 8-19-77027, 2024 WL 386826, *6 (Bankr. E.D.N.Y. Feb. 1, 2024) (citing *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006) ("The legislative history further supports the view that a motion court's 'discretion' to grant an application depends on its determination that a plaintiff both satisfies the statutory requirements and establishes the need for an attachment. . . . Similarly, although treatises on New York practice describe attachment as a 'discretionary' remedy to which a party has no statutory right, *they appear to mean that motion courts may deny attachment for lack of need even though the plaintiff has established a ground under Section 6201 and satisfied the requirements of Section 6212*")). "Where, however, a statutory ground for attachment exists and both need and likelihood of success are established, [a court's] discretion does not permit denial of the remedy for some other reason, at least absent extraordinary circumstances and perhaps even then." *Cap. Ventures Int'l*, 443 F.3d at 222.

Here, pre-judgment attachment is not warranted. First, most of the evidence that the Receiver presents relates to Third-Party Defendant Kris Roglieri. The Receiver does not present evidence sufficient to explain why pre-judgment attachment is warranted against Third-Party Defendants Tina Roglieri, Kimberly Humphrey, Prime Commercial, CCTG, FMG, NACLB, or FUPME, except for the fact that they are associated with Kris Roglieri. That is not enough to

warrant pre-judgment attachment.  Second, the Receiver has sought dismissal of Mr. Roglieri

such that the request to attach over his property is now moot.

The Receiver argues that all of the "badges of fraud" are present.  The Receiver contends

that financial records reflect a lack of consideration to Prime Capital where ICA deposits were

used for Roglieri's benefit.  *See* Dkt. No. 72 at 9.  He also emphasizes the close relationship

between Roglieri and the other named Third-Party Defendants and that there is no restriction on

Kris Roglieri's ownership and use of the property.  *See id.* at 9-10.  The Receiver asserts that as to

the financial condition of the party sought to be charged before and after the transaction, because

of Kris Roglieri's conduct, Prime Capital is unable to pay its creditors and that "[w]hether [his

spending] was undertaken to remove assets from the reach of creditors or simply because the

Roglieris [sic] appetite for ostentatious spending knows no bounds . . . is immaterial."  *Id.* at 11.

The Receiver argues that "the systematic looting of Prime and the ICA Deposits for no

apparent legitimate purpose, leaving Prime in default of its obligations and without access to the

assets to pay back Plaintiff and the other Prime creditors, manifestly satisfies th[e] badge of

fraud" concerning "the existence or cumulative effect of a pattern or series of transactions or

course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat

of suits by creditors."  *Id.*  As to chronology, the Receiver argues that Kris Roglieri's use of "ICA

funds continued unabated" after "Prime's creditors began to notice the default in Prime's ability to

fund the LOC loans or pay back the ICA deposits."  *Id.* at 15.  The Receiver contends that the

amount demanded exceeds all known counterclaims, as there are no counterclaims at the present

time.  *See id.* at 16.  Finally, he argues that attachment is necessary because the Court already

concluded that Prime Capital's insolvency is "likely and imminent" and there is a risk that any award will be meaningless because the ICA deposits have been lost or dissipated. *Id.* at 16-17.[10]

Tina Roglieri responded in opposition to Receiver's attachment request, explaining that she and Mr. Roglieri entered into a post-nuptial agreement in 2016 under which Mrs. Roglieri agreed to discontinue divorce litigation and Mr. Roglieri agreed to pay certain moneys for support and maintenance of Mrs. Roglieri and their two children. *See* Dkt. No. 101 at ¶ 5. They have not lived together since 2019. *See id.* Mrs. Roglieri argues that she shares two joint checking accounts with Mr. Roglieri, but that she did not "have actual or constructive knowledge that Kris Roglieri may have incurred debts beyond his ability to pay or that he and/or Prime may be insolvent." *Id.* at ¶ 9. She contends that it would not be "appropriate to encumber, restrain or otherwise inhibit her use or transfer of most, if not all, of the assets that are exclusively hers. Several of these assets were legitimately purchased by Tina Roglieri or on her behalf well before any of the alleged wrongdoing underlying this action occurred." *Id.* at ¶ 10. Mrs. Roglieri re-commenced a divorce action against Kris in January 2024. *See id.* at ¶ 11. She argues that a domestic support order will enjoy preference over unsecured creditors' claims. *See id.*

On February 7, 2024, Mr. Van Tol filed a formal response in opposition to the Receiver's emergency motion, on behalf of the Third-Party Defendants. *See* Dkt. No. 103.[11] The Third-

---

[10] In a letter filed one day after the Receiver's motion, Prime Capital argued that the motion is deficient because of the arbitration agreement between Plaintiff and Prime Capital, Prime Capital's pending appeal divests the Court "of jurisdiction over such matters relating to the receivership," the Receiver lacks the authority to bring the motion on Prime's behalf, the motion evades the Court's order staying discovery, and the Receiver is not doing his job appropriately. Dkt. No. 74 at 1-2. The Receiver responded in a letter the same day, contending that Prime Capital does not have standing to raise issues on behalf of the Third-party Defendants and that because the Court did not stay the Receivership, he is acting within his authority. *See* Dkt. No. 77 at 1-2.

[11] The Third-Party Defendants initially argue that the Court lacks subject matter jurisdiction over the Third-Party claims. *See* Dkt. No. 103 at 2. The Third-Party Defendants contend that "(1) the

Party Defendants argue that the Receiver has not shown a likelihood of success on the merits of the claims outlined in the Third-Party complaint. *See id.* at 10. They also contend that "[t]he Receiver presents <u>no</u> evidence that the Third-Party Defendants have hidden or transferred any assets. All the 'evidence' cited by the Receiver relates to previous transfers made from <u>Prime Capital</u> to the Third-Party Defendants, <u>not</u> to any transfers from the Third-Party Defendants to others." *Id.* at 12.

The Third-Party Defendants argue that the Receiver's arguments concerning the badges of fraud are unavailing because there is no evidence that the transactions were not given consideration or for corporate purposes and that there is no evidence warranting piercing the corporate veil for the named entities. *See id.* at 13. They note that "the Receiver conflates Prime Capital and the Third-Party Defendants. The Receiver has not presented <u>any</u> evidence regarding

---

Third-Party Complaint fails to include a jurisdictional statement, in violation of Fed. R. Civ. P. 8(a)(1); (2) the Third-Party Complaint effectively seeks an adjudication of the same claims that are subject to valid and binding arbitration clauses; (3) Prime Capital's appeal divested the Court of jurisdiction to determine the issues that the Receiver has raised in the Third-Party Complaint, which are bound up with Prime Capital's appeal; and (4) the Receiver lacks standing to bring the Third-Party Complaint because the Court intentionally excluded the power to assert legal claims on Prime Capital's behalf from the Receiver's duties in the January 24, 2024 order . . . appointing him." *Id.* The Third-Party Defendants attempted to fully brief these arguments in a motion to dismiss filed on February 7, 2024. *See* Dkt. No. 109. However, the Court struck the motion to dismiss for failure to comply with the Court's Individual Rules of Practice which require parties to file a pre-motion letter prior to filing a dispositive motion. *See* Dkt. No. 110. The Third-Party Defendants subsequently submitted such a pre-motion letter. *See* Dkt. No. 115. At this time, because the Court declines the Receiver's request for pre-judgment attachment, the Court will not delve into whether the Receiver has authority to obtain such relief. The Court emphasizes that Prime Capital has appealed the Court's appointment of the Receiver and notes that it likely will not decide any further motions concerning the Receiver and his authority until the Second Circuit issues a decision. *See* Dkt. No. 60.

the solvency of the Third-Party Defendants or the risk of dissipation of funds or assets that they received from Prime Capital." *Id.* at 15.[12]

Although the Receiver presents ample evidence that Kris Roglieri, in Prime Capital's name and with Prime Capital accounts, purchased luxury vehicles, travel, and homes, he does not present similar evidence related to any other Third-Party Defendant.  The Receiver provides no evidence about what the Third-Party Defendants' financial conditions were before and after the various transactions.  He also does not present evidence that the transactions occurred as a response to creditor's actions, to indebtedness, or in an attempt to hide funds.  Additionally, as the Third-Party Defendants argue, the Receiver does not allege, or present evidence of whether Mr. Roglieri, or any other Third-Party Defendant, are likely approaching insolvency.  *See* Dkt. No. 103 at 15.

As to the remaining section 6212 factors, the Receiver has not shown a probability of success on the merits concerning the Third-Party Defendants besides Mr. Roglieri.  The Receiver alleges claims for fraudulent conveyance, breach of fiduciary duty, corporate waste, and conversion.  *See* Dkt. No. 71 at ¶¶ 85-108.

As to the fraudulent conveyance claims, "[t]he New York Debtor and Creditor Law ("DCL") distinguishes between conveyances that are actually fraudulent, . . . and those that are constructively fraudulent." *Long Oil Heat, Inc. v. Spencer*, 375 F. Supp. 3d 175, 195 (N.D.N.Y. 2019) (citing N.Y. Debt. & Cred. Law §§ 273-276).  "Whereas actual fraud under DCL § 276 focuses on the transferor's actual intent, constructive fraud under DCL §§ 273–275 is premised on a lack of fair consideration." *Id.* (citing *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir.

---

[12] The Court now has ample evidence that Mr. Roglieri is approaching insolvency as he filed a voluntary Chapter 11 bankruptcy petition.  This does not support a finding that all of the other Third-Party Defendants are approaching insolvency.

1994)).  "When a conveyance is determined to be fraudulent as to a creditor, the creditor may, 'as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase,' have the conveyance 'set aside . . . to the extent necessary to satisfy [the creditor's] claim.'"  *Id.* (quoting N.Y. Debt. & Cred. Law § 278(1)(a)).  "DCL § 276 defines as actually fraudulent '[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors.'  The party seeking to set aside the conveyance must prove actual intent by clear and convincing evidence."  *Id.* (quoting *McCombs*, 30 F.3d at 328).  Under DCL § 273, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."  N.Y. Debt. & Cred. Law § 273.  "Because direct proof of actual intent is rare, a plaintiff may 'rely on so-called "badges of fraud" to prove his case,' which 'are circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.'"  *Long Oil Heat*, 375 F. Supp. 3d at 195 (quoting *Ray v. Ray*, 108 A.D.3d 449, 451 (1st Dept. 2013)).

Next, "'[t]he corporate opportunity doctrine provides that corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation.'"  *Kleeberg v. Eber*, 665 F. Supp. 3d 543, 573 (S.D.N.Y. 2023) (quoting *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13-CV-4650, 2015 WL 7078641, *4 (S.D.N.Y. Nov. 12, 2015)).  "In this context, '[a] corporate opportunity is defined as any property, information, or prospective business dealing in which the corporation has an interest or tangible expectancy or which is essential to its existence or logically and naturally adaptable to its business.'"  *Id.* (quoting *Moser v. Devine Real Estate, Inc. (Fla.)*, 42

49

A.D.3d 731 (3d Dept. 2007)).  "Such an 'interest' or 'tangible expectancy' constitutes 'something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope.'"  *Id.* (quoting *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 206 (S.D.N.Y. 2008)).  "The Second Circuit has held that the existence of a 'tangible expectancy' depends on 'degree of likelihood' that the corporation would 'realiz[e]' that opportunity.  The purpose of this doctrine is to prevent employees from acquiring 'property which the corporation needs or is seeking, or which they are otherwise under a duty to the corporation to acquire for it.'"  *Id.* (quoting *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85, 89 (2d Cir. 1973); *Burg v. Horn*, 380 F.2d 897, 899 (2d Cir. 1967)).

As to a breach of fiduciary duty claim, the relevant elements "are (1) the existence of a fiduciary relationship between the parties and (2) breach of the fiduciary duty."  *United Republic Ins. Co. v. Chase Manhattan Bank*, 168 F. Supp. 2d 8, 15 (N.D.N.Y. 2001), *aff'd*, 40 Fed. Appx. 630 (2d Cir. 2002) (citing *Cramer v. Devon Group, Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991)). "Under New York law, the relationship of a debtor and creditor alone does not create a fiduciary duty.  However, unusual circumstances such as a situation where one party assumes control and responsibility for another can create a fiduciary duty."  *Id.* (citations omitted).

Finally, a "claim of waste constitutes a cause of action separate from his breach of fiduciary duty claim."  *Patrick v. Allen*, 355 F. Supp. 2d 704, 714-15 (S.D.N.Y. 2005) (citing *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 279 (2d Cir. 1986)) ("[A] prima facie showing of lack of due care is distinct from a prima facie showing of corporate waste, which may constitute a cause of action against directors separate and distinct from breach of the duty of loyalty or due care")).  "'[T]he essence of waste is the diversion of corporate assets for improper or unnecessary purposes.'"  *Id.* (alterations in original) (quotation omitted).  "Corporate waste

occurs when assets are used in a manner 'so far opposed to the true interests [of the corporation so] as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests.'" *Id.* (alterations in original) (quoting *Meredith v. Camp Hill Estates, Inc.*, 77 A.D.2d 649, 430 (2d Dept. 1980)).

The Receiver asserts that "[t]he allegations in the [Complaint and Third-Party Complaint], together with the exhibits presented, make out a strong prima facie case of fraud, conversion and breaches of fiduciary duty . . . ." Dkt. No. 72 at 7. The Third-Party Complaint discusses numerous million-dollar bank transfers and luxury purchases. *See* Dkt. No. 71 at ¶¶ 74-81. The Receiver's request for pre-judgment attachment over certain bank accounts is listed in their proposed show cause order. *See* Dkt. No. 72-2 at 3. The Court asked the Receiver to clarify the owner of those bank accounts, *see* Dkt. No. 139, all of which the Receiver identified to be controlled by Prime Capital. *See* Dkt. No. 140. The Receiver does not explain why pre-judgment attachment over Prime Capital bank accounts is necessary when he retains exclusive control over the business at this time.

In the Third-Party Complaint, the Receiver alleges that approximately $6 million was transferred to a joint account owned by Mr. and Mrs. Roglieri, that nearly $5 million was transferred to an account owned by CCTG, roughly $5.6 million was sent to Prime Commercial, and $20,000 was wired to NACLB. *See* Dkt. No. 71 at ¶ 75. During the Court's third show cause hearing, the Court inquired of the Receiver whether these transactions could have been for any legitimate business purpose. The Receiver could only assume that some of the money may have been for marketing purposes but could not otherwise think of a legitimate business purpose for the expenditures, and certainly not for such large amounts. The close relationship between Prime Capital and the entities is clear: they are all solely owned by the same person. The Third-Party

Defendants have not presented any legitimate reason for the transfers.  The Receiver has not specifically established the financial status of each of the individual entities before and after any of the transactions.  However, Mr. Roglieri, the sole owner of each entity, has filed for bankruptcy subsequent to the complaints against him and his companies and the requests for attachment.  The transactions as detailed by the Receiver indicate transfers from Prime Capital to the Third-Party Defendant entities in amounts ranging from $3,000 to $5,000,000.  *See* Dkt. No. 71-1 at 35-42.  Prime Capital also received funds from the Third-Party Defendant entities in amounts from $6,000 to $130,000.  *See id.*  Neither Prime nor the Third-Party Defendants provide justifications for these transactions.  The majority of the transactions began after the initiation of Prime Capital's dealings with companies such as ALUX, Reign, and Onward.

Counsel for the Third-Party Defendants focuses on the fact that these transactions are from Prime Capital.  *See* Dkt. No. 103 at 8-9.  It is true that the majority of the identified transfers were made by Prime Capital.  However, those transactions were made to the Third-Party Defendant entities and the Court is tasked with determining if that property, *i.e.*, the money, was fraudulently transferred and should be subject to attachment.  Counsel argues that "the Receiver has admitted that the Virginia Beach, Virginia property was an investment for Prime Capital, and it stands to reason that Prime Capital purchased other items for the same purpose.  The Receiver has similarly failed to show that other transfers had no corporate purpose, such as compensation for Mr. Roglieri or payment for business-related travel."  *Id.* at 8.  This response says nothing of the near $17 million that was transferred from one company wholly owned by Mr. Roglieri, to the Third-Party Defendant entities wholly owned by Mr. Roglieri.  All of this supports the conclusion that the Receiver has a likelihood of success on his fraudulent conveyance claims because there is no evidence of consideration for any of the transactions and Mr. Roglieri, the sole owner of all of the

entities, has entered into bankruptcy.  *See Long Oil Heat*, 375 F. Supp. 3d at 195 (relying on the "badges of fraud" to support a fraudulent conveyance claim).  Thus, pre-judgment attachment is warranted over the monies related to Prime Capital that can be verifiably traced as being sent from Prime Capital to the Third-Party Defendant entities.

The Court comes to a different conclusion as to monies transferred to Mrs. Roglieri.  The Receiver contends that roughly $6.5 million was transferred from Prime Capital to a joint account owned by Kris and Tina Roglieri.  *See* Dkt. No. 71 at ¶ 75.  The Receiver details these transfers as being made from March 2022 to December 2023 and ranging in amounts from $1,000 to $1,300,000.  *See* Dkt. No. 71-1 at 43-47.  Mrs. Roglieri explains, through independent counsel, that she entered into a separation agreement with Mr. Roglieri in 2016 in which he agreed to provide for the support for Mrs. Roglieri and their two children in consideration for her terminating a divorce litigation.  *See* Dkt. No. 101 at ¶¶ 5-6.  Although it is questionable whether all of the transfers were made for legitimate reasons, the Court concludes that there are insufficient "badges of fraud" connected to the transfers made to the Roglieri's joint bank account at this time such that pre-judgment attachment is not warranted.

As to Ms. Humphrey, aside from the home in Virginia, Beach, the Receiver does not set forth property or monetary transfers related to her.  *See* Dkt. No. 72.  In his third status report, the Receiver informed the Court that he paid the insurance on the house and was working to encumber the title of the house.  *See* Dkt. No. 107 at ¶¶ 3-4.  Therefore, at this time, the Court does not have a sufficiently detailed request or related evidence that establishes the need for attachment over Ms. Humphrey's property.

Finally, the Receiver seeks to attach assets held by Shark Ventures LLC.  *See* Dkt. No. 118-1 at 11.  The Receiver contends that Shark Ventures was organized under Montana law by

Mr. Roglieri "in order to save very substantial sales tax had the automobiles been purchased and owned by a New York entity." *Id.* He states that Shark Ventures purchased five automobiles and that "for the reasons already established in support of the Receiver's Order to Show Cause . . . receiver submits that the automobiles and assets paid for by Prime and held by Shark Ventures LLC, be likewise subjected to the same restraint . . . ." *Id.*

Shark Ventures is not a named Third-Party Defendant in the Receiver's Third-Party complaint. *See* Dkt. No. 71. As such, Shark Ventures is not a party to this action. Additionally, the Receiver has not set forth with sufficient particularity the financial status of Shark Ventures before and after the purchases, whether there was any consideration for the purchases, or whether the purchases were made for illegitimate purposes. *See* Dkt. No. 72 at 8 (setting forth the requisite "badges of fraud"). Accordingly, the Court denies the Receiver's request for pre-judgment attachment over non-party Shark Venture LLC's automobiles and assets.

E.      **Anti-Litigation Injunction**

The Receiver asks the Court to enter an order staying and enjoining any actions against Prime Capital, the Berone Defendants, or the Third-Party Defendants during the pendency of the receivership. *See* Dkt. No. 118-1. The Receiver asserts that he "is actively engaged in identifying the whereabouts of the ICA Deposits of all of Prime's borrowers, recovering both money and tangible assets . . . , safeguarding the disputed assets, administering Prime's property as suitable, and assisting the Court in achieving a final, equitable distribution." *Id.* at 11 (footnotes omitted). The Receiver argues that a stay of litigation is necessary to allow him to "determine the full universe of those who have been harmed by the alleged Ponzi scheme at issue here." *Id.* at 13. He lists actions—four in state court, one in federal court, and one which has yet to be filed—that are already pending against Prime Capital. *See id.* at 8.

Prime Capital stated that it "takes no position on the part of the [Receiver's] Motion that seeks a stay of litigation." Dkt. No. 129 at 5 n.1.  The Berone Defendants opposed the Receiver's request insofar as the Receiver's proposed injunction would have prevented them from filing motions or amended pleadings in this case.  *See* Dkt. No. 128-5 at 4.  The Receiver clarified during the second show cause hearing that his request for an anti-litigation injunction was not intended to limit the Berone Defendants' ability to litigate in this case.  *See* Dkt. No. 155 at 13.

The Anti-Injunction Act provides as follows: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in the aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.[13]  "The Act is 'an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions.'" *MLE Realty Assocs. v. Handler*, 192 F.3d 259, 261 (2d Cir. 1999) (quoting *Atl. Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970)).

"[I]njunctions may issue where necessary 'to protect or effectuate [a federal court's] judgments.'" *Id.* (quoting 28 U.S.C. § 2283).  "This exception is also known as the relitigation exception.  As the Supreme Court has explained, '[t]he relitigation exception was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court.  It is founded in the well-recognized concepts of res judicata and collateral estoppel.'" *Id.* (quoting *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988)).  "The Court went on to note that 'an essential prerequisite for applying the relitigation exception is

---

[13] The vast majority of case law dealing with appointment of a receiver and an anti-litigation injunction concern lawsuits that have been brought by the Securities and Exchange Commission. "The Anti-Injunction Act is not applicable where a federal agency requests a stay of state court proceedings." *Cutler v. 65 Sec. Plan*, 831 F. Supp. 1008, 1014 (E.D.N.Y. 1993).  That exception is, of course, not applicable in this case.

that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court.  Moreover, . . . this prerequisite is strict and narrow.'"  *Id.* (quotation omitted).

"Indeed, since the Anti-Injunction Act's prohibitory provision 'rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction.'"  *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 99 F. Supp. 3d 288, 300 (E.D.N.Y. 2015) (quoting *Atl. Coast Line R.R. Co.*, 398 U.S. at 287).  "'Proceedings in state courts[, thus,] should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately [the Supreme] Court.'"  *Id.* (quotation omitted).  "'Many—though not all—of the cases permitting injunctions in complex litigation cases involve injunctions issued as the parties approached settlement.'"  *Id.* (quoting *In re Diet Drugs*, 282 F.3d 220, 236 (3d Cir. 2002); citing *In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334-35 (5th Cir. 1981)).

"The Anti-Injunction Act does not prevent a federal court from restraining a party from instituting future state proceedings."  *Pathways, Inc. v. Dunne*, 329 F.3d 108, 114 (2d Cir. 2003) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2 (1965)).  Additionally, "'[t]he Second Circuit has recognized that an anti-litigation injunction or litigation stay in a receiver order is a valid exercise of a district court's equitable powers.'"  *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 21-CV-583, 2023 WL 8468467, *15 (E.D.N.Y. Dec. 7, 2023) (quoting *SEC. v. Callahan*, 2 F. Supp. 3d 427, 436 (E.D.N.Y. 2014)); *see also SEC v. Byers*, 609 F.3d 87, 92-93 (2d Cir. 2010) (affirming district court's anti-litigation injunction where "the receivership must manage hundreds of Wextrust entities that sprawl across the Middle East, Africa and the United

States, many of which may have co-mingled assets.  This is precisely the situation in which an anti-litigation injunction may assist the district court and receiver who will want to maintain maximum control over the assets").  "While such injunctions are to be used sparingly, there are situations in which they are entirely appropriate." *Byers*, 609 F.3d at 92.  "One such situation is where a receiver must 'maintain maximum control over the assets' of a large complex entity to 'prevent[ ] small groups of creditors from placing some entities into bankruptcy, thereby removing assets from the receivership estate to the potential detriment of all.'" *GPB Cap. Holdings*, 2023 WL 8468467, at *15  (quoting *Byers*, 609 F.3d at 93).

In *GPB Cap. Holdings*,[14] the court entered an anti-litigation injunction where "[t]he Amended Proposed Order contains a list of twenty-two litigations involving the receivership entities or their assets, . . . and the Monitor notes that these 'pending litigation proceedings, including class action litigation . . . will require potential reserves, and there are limited funds available for these purposes.'"  *Id.* at *16 (citation omitted); *see also KeyBank Nat'l Ass'n v. Monolith Solar Assocs. LLC*, No. 1:19-CV-1562, 2020 WL 4340518, *1 (N.D.N.Y. July 28, 2020) (denying request to lift litigation stay which was put in place at the same time as appointment of the receiver because "[t]he result of such destruction of the receivership's present and future assets would be a charge en masse of creditors seeking a lift in their stays before the receivership's resource pool dries up without so much as a trickle of future income left behind for those too slow in acting to redress their own rights").

Here, the Receiver states that "there are at least 7 actions pending against Prime Capital . . . seeking return of approximately $63 million in lost ICA deposits . . . ."  Dkt. No. 118-2 at ¶ 3.

---

[14] An appeal was filed in December 2023 from the court's order granting the SEC's motion to convert the monitorship into a receivership and impose a litigation injunction.

The Receiver's third status report also notes that fourteen other entities have contacted the Receiver and claimed to be harmed by Prime Capital's alleged fraud.  *See* Dkt. No. 107 at ¶ 24.

There has not been a final judgment from this Court which would warrant application of the relitigation exception to the Anti-Injunction Act.  We are also not nearing settlement which negates application of the "in aid of jurisdiction" exception.  Additionally, the Receiver has control over roughly two entities (Berone and Prime Capital), and the ones over which he has control are not complex entities; they are owned by three men.  Thus, an anti-litigation injunction is not warranted at this time.

## F.    Disqualification

At the time Plaintiff's disqualification motion was filed, Hogan Lovells represented Prime Capital and Camshaft CRE 1, LLC, plaintiff in a lawsuit against Prime.[15]  *See Camshaft CRE 1, LLC v. Prime Capital Ventures, LLC*, 2023-023173-CA-01 (Cir. Ct., Miami-Dade Cnty., Fla.), https://www2.miamidadeclerk.gov/ocs/Search.aspx (last visited Mar. 13, 2024).  Plaintiff argued that Hogan Lovells has an unwaivable conflict of interest.  Mr. Van Tol argued that disqualification is not warranted because he obtained consent from Camshaft and Prime Capital. *See* Dkt. No. 33 at 1.

"In deciding whether to disqualify an attorney, a district court must balance 'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.'"  *GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010) (quoting *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005)).

---

[15] The motions concerning disqualification primarily concern the concurrent representation of Prime Capital and Camshaft.  Subsequent to the filing of Plaintiff's motion, the same attorneys also appeared on behalf of the Third-Party Defendants, except for Mrs. Roglieri who obtained independent counsel.  Plaintiff and the Receiver made note of this in their replies.  *See* Dkt. No. 105 at 1, n.1; Dk. No. 111 at ¶ 2.

"Courts in this circuit strongly disfavor disqualification 'because it 'impinges on parties' rights to employ the counsel of their choice.'" *Brown v. City of Syracuse*, No. 5:11-CV-668, 2013 WL 2445050, *2 (N.D.N.Y. June 4, 2013) (quoting *My First Shade v. Baby Blanket Suncare*, No. 08-CV-4599, 2012 WL 517539 (E.D.N.Y.  Feb.16, 2012)).  "Disqualification motions, according to the Second Circuit, are often interposed for tactical reasons, and that even when made in the best faith, such motions inevitably cause delay[;] therefore, a party seeking disqualification must meet a high standard of proof in order to succeed." *Id.* (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791-92 (2d Cir. 1983)) (additional quotation marks omitted).

The burden is high "[b]ecause disqualification motions can often be strategically motivated, create delay and additional expense, and interrupt attorney-client relationships . . . ." *Streichert v. Town of Chester*, No. 19-CV-7133, 2021 WL 735475, *5 (S.D.N.Y. Feb. 25, 2021).  "Accordingly, courts should take a 'restrained approach' to motions to disqualify and grant them only in limited circumstances.'" *Smith v. Jaynes*, No. 9:18-CV-1107, 2019 WL 11727238, *3 (N.D.N.Y. May 21, 2019) (quoting *Bottaro v. Hatton Assoc.*, 680 F.2d 895, 896 (2d Cir. 1982)).

On the eve of the Court's second show cause hearing and weeks after Plaintiff filed its motion to disqualify, counsel for Hogan Lovells filed a stipulation for substitution of counsel in the Florida Camshaft case.  *See* Dkt. No. 134-1.  Because Hogan Lovells no longer represents Camshaft, it might be assumed that the conflict is successive.  However, "[t]o determine the nature of an attorney's conflict of interest, a court should look to '[t]he status of the [attorney's] relationship' with his client 'at the time that the conflict arises.'" *Bricklayers Ins. & Welfare Fund v. Mastercraft Masonry I, Inc.*, No. 12-CV-3031, 2020 WL 13929945, *4 (E.D.N.Y. Feb. 21, 2020) (quoting *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 209 (S.D.N.Y. 2009)).  "'And, indeed, where counsel have simultaneously represented clients with differing interests, the

59

standard for concurrent representation applies even if the representation ceases prior to the filing of a disqualification motion.'" *Id.* (quotation omitted). "This approach 'prevent[s] attorneys from manipulating their commitments merely by firing the disfavored client, dropping the client like a hot potato, and transforming a continuing relationship to a former relationship by way of client abandonment[.]'" *Id.* (quoting *CQS ABS Master Fund Ltd. v. MBIA Inc.*, No. 12-CV-6840, 2013 WL 3270322, *9 n.5 (S.D.N.Y. June 24, 2013) (additional quotation marks omitted); *see also Troika Media Grp., Inc. v. Stephenson*, No. 19-CV-145, 2019 WL 5587009, *5 (S.D.N.Y. Oct. 30, 2019) (quoting *Ehrich v. Binghamton City Sch. Dist.*, 210 F.R.D. 17, 25 (N.D.N.Y. 2002)) ("In the absence of this 'hot potato' rule, 'an attorney could always convert a present client into a "former client" by choosing when to cease to represent the disfavored client'"); *Eaton v. Coca-Cola Co.*, 640 F. Supp. 2d 203, 207 (D. Conn. 2009) ("The 'hot potato'/'lucrative client' analysis seems to be more aptly applied in situations where firms drop older clients in favor newer, more profitable clients, not where firms are attempting to salvage their relationships with long-standing clients").

Hogan Lovells agrees that there is a conflict of interest but argues that the conflict is waivable, and that the parties did waive it. *See* Dkt. No. 93. The representations that were made to the Court during the second show cause hearing was that Camshaft and Prime Capital "are aligned in their interest that Camshaft believes they have a better chance of getting repaid rightly or wrongly if Prime Capital is not in Receivership." Dkt. No. 155 at 24. On January 18, 2024, Mr. Van Tol provided the Court with what he purported to be Camshaft's and Prime's written consent to the concurrent representation. *See* Dkt. No. 33. The e-mail to Camshaft reads:

Will,

> As you know, with your consent, HL has been retained as
> counsel by Prime in connection with the involuntary bankruptcy
> petitioner in the N.D.N.Y.  You have already confirmed orally that
> you waive any conflicts with respect to HL's representation of
> Prime in this proceeding.  Further, you have confirmed orally that
> you agree that HL cannot represent you as a potential creditor in a
> Prime bankruptcy proceed.  Please confirm the same in response to
> this email for documentation purposes.

Dkt. No. 33-1 at 2.  William Morton responded, "I confirm." *Id.*  The e-mail to Prime Capital,

reads:

> Kris,
>
> As you know, pursuant to your consent and direction, Prime
> retained HL as counsel for Prime in connection with the involuntary
> bankruptcy petition filed in the N.D.N.Y., and the receivership
> petition and related complaint filed in the N.D.N.Y.  You have
> already confirmed that you waive any conflicts with respect to HL's
> representation of Prime in these proceedings, including HL's
> representation of Camshaft in Florida state court.  Please confirm
> the same in response to this email for documentation purposes.

Dkt. No. 33-2 at 2.  The response email sates, "Confirmed." *Id.*

Following the Court's first show cause hearing, it sought renewed consent from Prime

Capital and Camshaft.  *See* Dkt. No. 93 at 10.  Hogan Lovells explains that

> [i]n each conversation the Hogan Lovells lawyers explained the
> nature of the conflict of interest, the potential risks to each client
> and the available alternatives.  Both Prime Capital and Camshaft
> acknowledged that they understood these risks and that they
> consented to Hogan Lovells' concurrent representation of both
> clients.  Both clients also confirmed this understanding in writing.

*Id.*  The e-mail to Camshaft states as follows:

> Will,
>
> As you know, with your prior consent, Prime retained HL as
> counsel for Prime in connection with the involuntary bankruptcy
> petition filed in the N.D.N.Y., and the receivership petition and
> related complaint filed in the N.D.N.Y, styled Compass-Charlotte
> 1031, LLC v. Prime Capital Ventures, LLC et al., 24-cv-55

61

> (MAD/CJH).  You have already confirmed that you waive any
> conflicts with respect to HL's representation of Prime in these
> proceedings, having taken into consideration HL's representation of
> Camshaft in Florida state court.  Please confirm the same in
> response to this email for documentation purposes.

Dkt. No. 92-6 at 2.  Camshaft responded, "Hi David, I confirm this in my capacity as a member of

Camshaft CRE 1 LLC.  William Morton."  *Id.*  The e-mail to Prime Capital reads:

> Kris,
>           As you know, pursuant to your consent and direction, Prime
> retained HL as counsel for Prime in connection with the involuntary
> bankruptcy petition filed in the N.D.N.Y., and the receivership
> petition and related complaint filed in the N.D.N.Y.  You have
> already confirmed that you waive any conflicts with respect to HL's
> representation of Prime in these proceedings, including HL's
> representation of Camshaft in Florida state court.  Please confirm
> the same in response to this email for documentation purposes.
> Best,
> Dave

Dkt. No. 92-3 at 2.  Kris Roglieri responded from the e-mail, kris@primecommerciallending.com,

and stated, "Confirmed."  *Id.*  Hogan Lovells also provides the retainer agreements, which

included a conflicts clause signed by William Morton on June 8, 2023, and by Kris Roglieri on

January 15, 2024.  *See* Dkt. Nos. 92-1, 92-2.  The agreements state:

> You agree that we are free to represent other clients (including
> future clients) in matters that involve you or are adverse to you as
> long as those matters are not the same as or substantially related to
> matters in which we represent you, or have represented you.
> "Matter" refers to transactions, negotiations, proceedings, or other
> represetnations involving specific parties.  Such unrelated matters
> may include, but are not limited to: . . . Litigation matters brought
> by or against you.

Dkt. No. 92-1 at 5-6; *see also* Dkt. No. 92-2 at 6.  Hogan Lovells presents the Court with

declarations from William Morton and Kris Roglieri, executed on February 3, 2024, which state

that they understood the risk of the concurrent representation and waive the conflict.  *See* Dkt. No.

92-8; Dkt. No. 92-9.

In its motion to disqualify, Plaintiff states that

> the non-moving party must establish that "(1) it is obvious that
> [they] can adequately represent the interest of each [adverse party]
> and (2) [they] obtained the consent of each to the representation
> after full disclosure of the import of his representation." *Fisons
> Corp. v. Atochem N. Am., Inc.*, 1990 WL 180551, *4 (S.D.N.Y. Nov.
> 14, 1990).

Dkt. No. 67-1 at 13-14.

*Fisons* quoted Disciplinary Rule 5–105 of the Model Code of Professional Responsibility.

However, that Code was repealed effective April 1, 2009.  *See* N.Y. C.P.R. D.R. 5-105.  Rather,

the appropriate standard is set for in Rule 1.7 concerning conflict of interest with current clients:

> (a) Except as provided in paragraph (b), a lawyer shall not represent
> a client if a reasonably lawyer would conclude that either:
>
>> (1) the representation will involve the lawyer in representing
>> differing interests;
>>
>> (2) there is a significant risk that the lawyer's professional
>> judgment on behalf of a client will be adversely affected by
>> the lawyer's own financial, business, property or other
>> personal interests.
>
> (b) Notwithstanding the existence of a concurrent conflict of
> interest under paragraph (a), a lawyer may represent a client if:
>
>> (1) the lawyer reasonably believes that the lawyer will be
>> able to provide competent and diligent representation to
>> each affected client;
>>
>> (2) the representation is not prohibited by law;
>>
>> (3) the representation does not involve the assertion of a
>> claim by one client against another client represented by the
>> lawyer in the same litigation or other proceeding before a
>> tribunal; and

63

(4) each affected client gives informed consent, confirmed
in writing.

N.Y. R.P.C. 1.7.  "Confirmed in writing" means

(i) a writing from the person to the lawyer confirming that the
person has given consent, (ii) a writing that the lawyer promptly
transmits to the person confirming the person's oral consent, or (iii)
a statement by the person made on the record of any proceeding
before a tribunal.  If it is not feasible to obtain or transmit the
writing at the time the person gives oral consent, then the lawyer
must obtain or transmit it within a reasonable time thereafter.

N.Y. R.P.C. 1.0(e).  "Informed consent"

denotes the agreement by a person to a proposed course of conduct
after the lawyer has communicated information adequate for the
person to make an informed decision, and after the lawyer has
adequately explained to the person the material risks of the
proposed course of conduct and reasonably available alternatives.

N.Y. R.P.C. 1.0(j).

"Although the American Bar Association ("ABA") and state disciplinary codes provide

valuable guidance, a violation of those rules may not warrant disqualification.  Instead,

disqualification is warranted only if 'an attorney's conduct tends to taint the underlying trial.'"

*GSI Com. Sols.*, 618 F.3d at 209 (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.

1979)).  "One established ground for disqualification is concurrent representation, an attorney's

simultaneous representation of one existing client in a matter adverse to another existing client."

*Id.* (citing *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976)).  "Because

concurrent representation is 'prima facie improper,' it is incumbent upon the attorney to 'show, at

the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the

vigor of his representation.'"  *Id.* (quotation omitted).  The Second Circuit has "noted that this is 'a

burden so heavy that it will rarely be met.'"  *Id.* (quotation omitted).

64

Hogan Lovells also contends that the allegations in the two cases "are significantly different."  Dkt. No. 93 at 19.  It states that

> [a]lthough both Camshaft and Compass have alleged that they are owed money by Prime Capital, that allegation alone is not sufficient to make the cases "identical."  Unlike the allegations in this action, Camshaft has not accused Prime Capital of engaging in a scheme to defraud and has not sought the appointment of a receiver to recover allegedly squandered assets.  In addition, the claims in the Florida Action involve different agreements, different business dealings, and different counterparties.

*Id.*  It also states that the interests of Camshaft and Prime Capital are aligned because "Camshaft has far less to gain if a receiver is permitted to remain in place for the primary purpose of marshaling assets to repay Compass.  Camshaft believes that it is more likely to recover the sums owed to it if Prime Capital is able to continue operating, and therefore supports Prime Capital's robust defense of this action."  *Id.* at 19-20.

First, as to Prime Capital's argument that Plaintiff cannot bring the motion because it is not a former client, Prime Capital has not presented any case law to support its argument.  The Court may consider a motion to disqualify brought by opposing counsel.  However, the Court is particularly mindful that "it is well-established that '[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are "often interposed for tactical reasons" and result in unnecessary delay.'"  *Gabayzadeh v. Taylor*, 639 F. Supp. 2d 298, 300 (E.D.N.Y. 2009) (citing *Muniz v. Re Spec Corp.*, 230 F. Supp. 3d 147, 152 (S.D.N.Y. 2017)).

Second, Hogan Lovells contends that the engagement letter conflict waivers "cover the situation at issue here."  Dkt. No. 93 at 16.  The Court disagrees.  Hogan Lovells asserts that the Camshaft and Prime Capital cases are distinct because "Camshaft has not accused Prime Capital of engaging in a scheme to defraud and has not sought the appointment of a receiver to recover

allegedly squandered assets." Dkt. No. 93 at 19. It is true that Camshaft did not seek the

appointment of a receiver in the Florida action. However, as Plaintiff states, the facts of this case

and the Camshaft case are nearly identical. As demonstrated in the filings from the Camshaft

case that Plaintiff provides to the Court, Camshaft and Prime Capital entered into a Development

Line of Credit Agreement whereby Prime Capital would provide Camshaft with funds to use for

real estate development. *See* Dkt. No. 105-2 at ¶ 7. Camshaft paid Prime $13,000,000 as an ICA

payment. *See* Dkt. No. 105-2 at ¶¶ 7-9.

      Camshaft alleged "that Prime's failure or refusal to timely communicate with Camshaft

was often intentional and apparently intended to hinder Camshaft's ability to exercise its rights

under the DLOC Agreement." *Id.* at ¶ 12. It also noted that

> it came to learn that personnel formerly affiliated with Prime, and
> former clients of prime, harbor significant concerns about Prime,
> including (i) the quality and qualifications of its leadership and
> management, (ii) its operational capabilities, (iii) misrepresentation
> of its capability to successfully close transactions, (iv)
> misrepresentation of its ability to fulfill its contractual duties,
> including certain breaches of its fiduciary duties, and (v) its
> fundamental operational, financial, and legal soundness.

*Id.* at ¶ 14. Thus, Camshaft brought breach of contract claims for failure to return the ICA

deposit. *See id.* at ¶¶ 26-36. In a motion for a preliminary injunction, Camshaft stated that "[a]t

one point, Prime erroneously advised Camshaft that part of the funds had been sent, including

providing Camshaft with a fake Federal ID Reference number that Camshaft's bank, JPMorgan

Chase & Co., was not able to validate." Dkt. No. 105-4 at ¶ 23.

      Here, Plaintiff entered into a Development Line of Credit with Prime whereby it deposited

more than $15 million to Prime as an ICA payment to secure a loan to develop real estate. *See*

Dkt. No. 1 at ¶¶ 117-131.  Prime did not advance the funds or return the ICA deposit.  *See id.* at ¶¶ 135-37.

It is truly bewildering that independent counsel representing Hogan Lovells argues that these situations are "significantly different."  Dkt. No. 93 at 19.  The waiver in the engagement letters states that Hogan Lovells can represent others who may have adverse interests "as long as those matters are not the same as or substantially related to matters in which we represent you."  Dkt. No. 92-1 at 5-6; *see also* Dkt. No. 92-2 at 6.  The Camshaft and Compass-Charlotte matters are substantially related, if not the nearly identical.  Thus, the waivers in the engagement letters do not save the conflict.

No attorney has explained why Camshaft believes the Receiver would inhibit its ability to recover what is due from Prime Capital.  The Receiver is in place to locate any funds owned by Prime Capital, with the hope of understanding and communicating to the Court and the parties the circumstances underlying all of Prime Capital's business, credits, and debts.  There is no logical explanation for why Camshaft would be left off that list.  The Court is not aware of what Camshaft was being told with respect to the Receiver's duties and how the existence of a Receiver might actually benefit Camshaft in having a better understanding of whether Prime Capital maintains any funds whatsoever, which could be used to pay Camshaft's judgment.  It is extremely suspect that Prime Capital believes its interests are "aligned" with the one creditor who is not engaged in seeking a Receivership against it.  The Court is not convinced that the attorneys "communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives."  N.Y. R.P.C. 1.0(j).

Additionally, "consent must have been obtained prior to [] undertaking representation of adverse interests, not in response to a motion to disqualify." *Canfield v. SS&C Techs. Holdings, Inc.*, No. 1:18-CV-08913, 2020 WL 3960929, *5 (S.D.N.Y. July 10, 2020) (citing *Discotrade Ltd. v. Wyeth-Ayerst Intern., Inc.*, 200 F. Supp. 2d 355, 360 (S.D.N.Y. 2002) (disqualifying counsel because, among other reasons, "it is clear from the documentary record that [counsel] knew it had not secured an effective waiver before filing this lawsuit"); *Stratagem Development Corp. v. Heron Int'l, N.V.*, 756 F. Supp. 789, 794 (S.D.N.Y.1991) (holding that consent must be obtained from current client prior to undertaking representation adverse to that of its current client); *Anderson v. Nassau Cnty. Dep't of Corr.*, 376 F. Supp. 2d 294, 299-300 (E.D.N.Y. 2005) (counsel contends his clients have provided informed consent to joint representation, thereby waiving any conflict.  However, this consent needed to be "obtained prior to [Counsel's] undertaking representation of adverse interests, not in response to a motion to disqualify")); *see also Lee v. Charles*, No. 12-CV-7374, 2013 WL 5637658, *2 (S.D.N.Y. Oct. 16, 2013).

Camshaft's informed and written consent was not obtained prior to Mr. Van Tol entering his appearance on Prime Capital's behalf in this case.  Hogan Lovells obtained Camshaft's consent for the bankruptcy representation on December 29, 2023.  *See* Dkt. No. 92-4 at 2.  Mr. Van Tol entered his appearance in this action on January 14, 2024.  *See* Dkt. No. 9.  Plaintiff filed its pre-motion letter seeking to file a motion to disqualify on January 15, 2024.  *See* Dkt. No. 11.  Hogan Lovells obtained written informed consent from Camshaft related to this action on January 23, 2024.  *See* Dkt. No. 92-6 at 2.  It obtained a sworn affidavit on February 3, 2024.  *See* Dkt. No. 92-8 at 3.

Rule 1.7 and the related definitions of informed, written consent do not require consent to be obtained "prior" to the representation.  However, caselaw has interpreted those rules to require

full disclosure of the conflict and informed, written consent to be obtained prior to undergoing the representation that would cause the conflict. That is missing, here, as the consent was obtained after Plaintiff filed its request to seek to disqualify counsel.

Moreover, the e-mail purporting to delineate Prime Capital's consent is from the e-mail kris@primecommerciallending.com. *See* Dkt. No. 33-2 at 2. In a letter filed by Mr. Van Tol, he emphasizes that Prime Commercial Lending "is an entity that is separate from Prime Capital." Dkt. No. 12 at 25. Mr. Van Tol states, "[t]he facts surrounding that transaction will be developed in the appropriate forum (i.e., arbitration), but it will suffice to say here that purported activities of Prime Commercial Lending LLC cannot be used to support a fraud claim by Compass against Prime Capital." *Id.* However, Kris Roglieri is the sole member of Prime Capital and Prime Commercial Lending. This highlights the confusing nature of this case concerning the relationship between all of the named parties and whether full, informed consent has truly been obtained. Despite the Court's sincere and well-founded concerns about Hogan Lovells' representation, courts have often repeated that "'[t]he motion will be granted only if the facts present a real risk that the trial will be tainted.'" *Muniz*, 230 F. Supp. 3d at 152 (quoting *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 388 (S.D.N.Y. 2010)) (additional quotation and quotation marks omitted).

Here, Camshaft is not a party in this case. Plaintiff has not set forth what information Hogan Lovells might have learned through the Florida action that would taint any of the future proceedings in this case. Rather, the Florida docket reveals that Camshaft filed its complaint, emergency motion, motion for default, motion for final judgment, and stipulation of substitution of counsel, all while Prime Capital filed only a motion for extension of time. *See Camshaft*, No. 2023-023173-CA-01, https://www2.miamidadeclerk.gov/ocs/Search.aspx (last visited Mar. 13,

2024).  It does not appear that the parties conducted any discovery in the matter and new counsel for Camshaft has now been substituted by order of the Court to proceed with seeking enforcement of the judgment against Prime Capital.  Although the Court is truly concerned by some of the conduct presented to the Court by Hogan Lovells, through their counsel, "[d]isqualification is viewed 'with disfavor in this Circuit'" *Muniz*, 230 F. Supp. 3d at 152 (quotations and quotation marks omitted), and because the Court cannot confidently conclude that future proceedings will be tainted by the concurrent representation, the Court denies Plaintiff's motion to disqualify.[16]

## G.    Other Pending Motions

There are numerous other pending motions presently before the Court.  Prime Capital filed a motion to stay discovery pending arbitration.  *See* Dkt. No. 58.  The Court denies this request as moot as the parties have entered arbitration.  *See* Dkt. No. 106 at 13; Dkt. No. 147 at 7.  The Court orders that discovery shall proceed according to the binding arbitration agreement in the credit agreement.  *See* Dkt. No. 1-29 at 29.  In addition to seeking to stay appointment of the Receiver, Prime Capital requested an expedited briefing schedule.  *See* Dkt. No. 70.  The motion is denied as moot because the Court previously granted expedited briefing on the issue.  *See* Dkt. No. 73.  Prime Capital also filed a pre-motion letter seeking to file a motion to dismiss the Receiver's third-party complaint.  *See* Dkt. No. 115.  The letter request is denied with leave to renew pending completion of arbitration.  Prime Capital filed another letter asking the Court to disregard a declaration submitted by the Receiver insofar as the declaration extended beyond the allowable page-limit of the Court's Local Rules and it contained legal conclusions.  *See* Dkt. No.

---

[16] In Mr. Roglieri's initial voluntary Chapter 11 bankruptcy petition, he listed Hogan Lovells as his largest creditor.  *See In re Roglieri*, 24-10157, Dkt. No 1 at 8.  The allegation that this litigation and the Florida case are "significantly different" is comically disingenuous.  Going forward, Mr. Van Tol is to remember his ethical obligations to the Court, including those of candor and truthfulness.

70

130.  The Receiver's declaration is violative of the Court's rules.  *See* Dkt. No. 121-1.  However, Prime Capital's counsel has likewise violated the Court's Local Rules on occasion by failing to file a pre-motion letter.  *See* Dkt. Nos. 109, 110.  This case has an inordinate number of filings for having been opened only two months ago.  The Court will not strike Mr. Levine's declaration at this time and Prime Capital's letter motion is denied.  However, all parties are cautioned to comply with the Court's Local Rules and the undersigned's Individual Rules for all future filings. Failure to comply will result in future filings being stricken from the docket.  Finally, there is a motion to intervene pending before the Court.  *See* Dkt. No. 138.  Prime Capital responded in opposition.  *See* Dkt. No. 147.  The Intervenor filed a request to file a reply, *see* Dkt. No. 159, which is granted.  The Court will address the motion to intervene in the normal course of ruling on the Court's motions.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submission and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Receiver's motion to dismiss (Dkt. Nos. 143, 155) Third-Party Defendant Kris Roglieri from this action without prejudice is **GRANTED**; and the Court further

**ORDERS** that Third-Party Defendant Kris Roglieri is **DISMISSED without prejudice** pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure; and the Court further

**ORDERS** that case against the remaining Defendants and Third-Party Defendants shall proceed despite the bankruptcy petition filed by Kris Roglieri; and the Court further

**ORDERS** that the Receiver's motions seeking a pre-judgment attachment over Third-Party Defendants' assets (Dkt. No. 72, 90, 118) are **DENIED in part and GRANTED in part**; and the Court further

**ORDERS** that the Receiver's motion seeking an anti-litigation injunction (Dkt. No. 118) is **DENIED**; and the Court further

**ORDERS** that the Berone Defendants' motion seeking to vacate the appointment of a Receiver (Dkt. No. 148) is **DENIED**; and the Court further

**ORDERS** that Prime Capital's motion to stay the appointment of a Receiver (Dkt. No. 70) is **DENIED**: and the Court further

**ORDERS** that Plaintiff's motion to disqualify Prime Capital's counsel (Dkt. No. 67) is **DENIED**; and the Court further

**ORDERS** that Prime Capital's pre-motion letter (Dkt. No. 115) is **DENIED with leave to renew** pending completion of arbitration; and the Court further

**ORDERS** that Prime Capital's letter motion (Dkt. No. 130) is **DENIED**; and the Court further

**ORDERS** that Prime Capital's motion to stay discovery (Dkt. No. 58) is **DENIED**; and the Court further

**ORDERS** that discovery shall proceed pursuant to the Section 13.8 of the binding arbitration agreement (Dkt. No. 1-29 at 29); and the Court further

**ORDERS** that the Intervenor's request to file a reply (Dkt. No. 159) is **GRANTED**; and the Court further

**ORDERS** that the Intervenor's reply (Dkt. No. 159-1) is **ACCEPTED as filed**; and the Court further

**ORDERS** that the parties shall not file further motions or letter briefs without the Court's express permission, except for status reports to be submitted by the Receiver, pending the Second Circuit's resolution of Prime Capital's interlocutory appeal; and the Court further

**ORDERS** that the Receiver shall provide a status report to the Court within **thirty (30) days** of the filings of this Memorandum-Decision and Order, and thereafter at thirty-day intervals; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules

**IT IS SO ORDERED.**

Dated: March 19, 2024
        Albany, New York

Mae A. D'Agostino
U.S. District Judge